

JS 44 (Rev. 06/17)

## JS 44 CIVIL COVER SHEET

2:18 - 2307

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

Etta Calhoun, et al.

**(b)** County of Residence of First Listed Plaintiff   Harris County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Levan Legal LLC
Two Bala Plaza, Bala Cynwyd PA 19004
610-660-7781, Richard A. Levan and Jon-Jorge Aras

### DEFENDANTS

18    2307

Invention Submission Corporation d/b/a 'InventHelp' and 'innovation Communications', et al.
County of Residence of First Listed Defendant   Allegheny County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
  Plaintiff
- ☒ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government
  Defendant
- ☐ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
American Inventors Protection Act of 1999, 35 § 297

Brief description of cause:
Class action arises out of deceptive and fraudulent scam promoted by Defendants

### VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
June 1, 2018

SIGNATURE OF ATTORNEY OF RECORD

JUN - 1 2018

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____



**JS**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**18   2307**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 23510 Whispering Willow, Spring, Texas 77373. _____

Address of Defendant: _____ 217 Ninth Street, Pittsburgh, Pennsylvania 15222 _____

Place of Accident, Incident or Transaction: _____ Pennsylvania _____

---

**RELATED CASE, IF ANY:**

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _June 1, 2018_   _[signature]_   _314967_
Attorney-at-Law / Pro Se Plaintiff   Attorney I.D. # (if applicable)

---

**CIVIL: (Place a √ in one category only)**

**A.  *Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☑ 11. All other Federal Question Cases
   *(Please specify):* 35 U.S.C. § 297

**B.  *Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
   *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _Jon-Jorge Aras_, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: _June 1, 2018_   _Jon-Jorge Aras_   _314967_
Attorney-at-Law / Pro Se Plaintiff   Attorney I.D. # (if applicable)

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

JUN - 1 2018



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

Etta Calhoun, et al.                     :          CIVIL ACTION
                                                    :
                    v.                              :
Invention Submission Corporation,                   :          **18    2307**
et al.                                              :          NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for
plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of
filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse
side of this form.) In the event that a defendant does not agree with the plaintiff regarding said
designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on
the plaintiff and all other parties, a Case Management Track Designation Form specifying the track
to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                           (✓)

(f) Standard Management – Cases that do not fall into any one of the other tracks.   ( )


June 1, 2018          Richard A. Levan          Plaintiffs
**Date**              **Attorney-at-law**       **Attorney for**

610-660-7781                                    Richard@Levan-Legal
**Telephone**         **FAX Number**            **E-Mail Address**


(Civ. 660) 10/02

JUN -1 2018

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

-------------------------------------------------------------------X

Etta Calhoun, On Behalf of Herself and All Other
Persons Similarly Situated

                    Plaintiff,

    -against-                                       **Complaint — Class Action**

                                                     **Jury Trial Demanded**

Invention Submission Corporation d/b/a InventHelp,
Technosystems Consolidated Corp., Technosystems
Service Corp., Western Invention Submission Corp.,
Universal Payment Corporation, Intromark Incorporated,
Innovation Credit Corp., Robert J. Susa, Thomas Frost, P.A.,
Above Board Drafting, Inc., John Doe Companies 1-10;
John Doe Individuals 1-10,

                    Defendants.

-------------------------------------------------------------------X

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff, on behalf of herself and all others similarly situated, makes the following

allegations on personal knowledge as to her own actions and upon information and belief:

<u>**NATURE OF THE ACTION**</u>

1.     This class action arises out of a deceptive and fraudulent invention promotion

scam that has bilked thousands of aspiring inventors and entrepreneurs into paying millions of

dollars to Defendants for invention promotion services that Defendants do not, and never intend

to, provide.

2.     Defendants herein are part and parcel of a sophisticated and grand scheme that has fraudulently enriched themselves at the expense of innocent and often naive aspiring inventors.

3.     Defendants' ubiquitous television and internet commercials, featuring a cartoon image of a caveman sitting on a rock, banging a wheel with a chisel, promise consumers that InventHelp has contracts with thousands of companies that are looking for new ideas.  The commercials state, "We keep your idea confidential"; "We explain every step of the invention process"; "We create professional materials representing your idea and submit it to companies who are looking for new ideas"; "We have more than 9,000 companies who have agreed to review ideas, in confidence," among other representations.  In truth and in fact, InventHelp is not in the business of helping aspiring inventors develop and monetize their inventions.  Rather, InventHelp is in the business of taking consumers' money with fraudulent promises and oftentimes phony "companies looking for new ideas."

4.     Defendant InventHelp is the conduit through which all Class Plaintiffs are defrauded.  Whilst InventHelp, Universal Payment Corporation, Intromark Inc., and the other named Defendants hold themselves out to be independent companies, they are one and the same, and are parts of an integrated fraudulent enterprise.  The schemes, trickery, and fraud set forth herein are universal and indistinguishable, notwithstanding the titles of the entities with which Class Plaintiffs believe they are dealing.

5.     Defendants craft their polished marketing materials (including television advertisements, internet ads, web pages and telemarketing calls) to create the impression that Defendants have successfully helped other inventors monetize their inventions, and thus that

Defendants are reliable and reputable.  Defendants' offices are decorated with supposed successful inventions, often labeled, "As Seen On TV," in order to further create the impression that they are a legitimate enterprise.  In truth and in fact, Defendants are a fraud and fail to fulfill almost every promise they make to consumers.

6.      Defendants' multi-tiered conspiracy preys upon aspiring inventors' high hopes and dreams.  It is cleverly constructed to avoid liability and monetary judgment by employing an intricate web of seemingly independent entities – invention promotion companies, private money lenders, patent attorneys, licensing and distribution companies, and manufacturing companies – that act in concert to defraud Class Plaintiffs.

7.      Defendants employ sophisticated and crafty mechanisms to escape liability, including the insertion of fraudulent clauses into their various contracts designed to extinguish would-be private litigants' rights.

8.      After luring Class Plaintiffs in with slick television and internet advertising, Defendants assure each and every consumer who inquires of their services that Plaintiffs' ideas are unique, patentable, and/or carry terrific potential for immense profit.

9.      Defendants then offer loans, research, patenting, invention promotion, marketing, manufacturing, licensing and distribution services to individual consumers located throughout Pennsylvania and the United States.

10.     In exchange for fees ranging between $700 and $30,000, Defendants represent that they will obtain patents and produce models, press releases, and infomercials, among other things, to promote Class Plaintiffs' inventions.

11. Then, because Class Plaintiffs often do not have at hand the thousands of dollars 'necessary' to make their dreams come true, they are offered generous loans by "independent private money lender" Universal Payment Corporation.

12. This "independent private money lender" is not independent at all – it operates under the same ownership and control as InventHelp, and is an indispensable arm of the fraudulent scheme described herein.

13. Class Plaintiffs then agree to pay the steep initial fees out of pocket (often selling personal property, remortgaging their homes, or borrowing from family members) or to loan the money from Defendant Universal Payment Corporation. In the meantime, Defendants make off with Class Plaintiffs' money and do little to nothing to fulfill their end of the bargain, stringing Class Plaintiffs along with false promises and boilerplate "analyses" in order to extract more money from them for additional services (which they do not and never intend to provide), and then disappearing and dodging calls as soon as Defendants have all the money in hand.

14. After months or years of silence, Defendants reappear to Class Plaintiffs, sometimes in the guise of distribution, marketing or manufacturing companies, and other times as representatives of InventHelp or Intromark Incorporated, Plaintiffs' "licensing agents," telling Class Plaintiffs that they've discovered Class Plaintiffs' inventions, that they have purchase orders, licensing agreements, and/or retail distributors at the ready, and that they just need an additional $5000-$10,000 in order to make those final arrangements. After scamming more money from Plaintiffs, they disappear without a trace.

15.     Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.  Defendants' enterprise as a whole is fraudulent, and Defendants fraudulently induce Class Plaintiffs to sign various contracts.

16.     Defendants also fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants (*fraud-in-the-factum*).

17.     Before consumers have the opportunity to meaningfully review the lengthy, complicated contracts at issue, Defendants use high-pressure tactics, routinely telling consumers that "today is the very last day" of a "special" or "promotion" that will save consumers hundreds or thousands of dollars, but that in order to get these savings, consumers must sign immediately, before leaving the office.  These statements are false and fraudulent – there are no such "specials" or "promotions" that are about to expire.

18.     Defendants' actions are particularly egregious because many of their customers are of modest means.  Defendants' representatives employ high pressure tactics to push Class Plaintiffs to hand over tens of thousands of dollars and sign fraudulent contracts, falsely representing to Class Plaintiffs the actual content of those contracts, that if Class Plaintiffs sign immediately (without time to properly review the contracts) they will receive substantial discounts pursuant to "specials" that are about to expire,  that Class Plaintiffs' proposed inventions are one-of-a-kind and/or carry terrific potential for profit, and that Class Plaintiffs likely stand to make 'millions' or 'billions' if they engage Defendants' services.

19.     In truth and in fact, Defendants do not (nor ever intend to) fulfill the bulk of the promises they make to Plaintiffs, instead making off with their money and leaving Plaintiffs high and dry.

20.     Defendants also employ deceptive and fraudulent tactics by using threats, intimidation and harassment to collect debts.  In order to induce Class Plaintiffs to sign contracts, Defendants represent that if Class Plaintiffs can no longer make payments, then there is "no risk" – the contracts will simply expire with no further performance on either end.  However, if and when Class Plaintiffs stop paying, Defendants dog Class Plaintiffs, threaten to "destroy" Plaintiffs' credit and threaten to put liens on their homes and other personal property.

21.     As detailed *infra*, Defendants' actions violate Pennsylvania consumer protection statutes and give rise to liability pursuant to a variety of common law claims, including fraud, breach of contract, and breach of implied covenant of good faith and fair dealing, among others.

## THE PARTIES

22.     Plaintiff Etta Calhoun ("Ms. Calhoun" or "Plaintiff") is an individual who is a citizen of the State of Texas, residing at 23510 Whispering Willow, Spring, Texas 77373.

23.     The entities and individuals listed in paragraphs 24-33 have engaged in and have conspired to engage in a pattern of fraudulent activity, have each committed numerous criminal acts as part of their scheme to defraud Class Plaintiffs, have each participated in the operation or management of a fraudulent and criminal enterprise, and have each acted with actual authority and/or apparent authority on behalf of each and every Defendant herein.

24.     Defendant Invention Submission Corporation does business under the names 'InventHelp,' and 'Innovation Communications,' among others, and is located in the same office,

and shares identical employees, with InventHelp, Technosystems Consolidated Corporation,

Western Invention Submission Corporation, Technosystems Service Corporation, and Intromark

Incorporated (collectively, "InventHelp Defendants").   Moreover, as detailed *supra*, consumers

who sign contracts with InventHelp and/or Western InventHelp sign an explicit

acknowledgement that InventHelp, Invention Submission Corp., Western InventHelp, and

Technosystems Service Corporation will all be performing services under the contracts,

regardless of the particular contract's corporate signatory.  All contracts signed by any

InventHelp Defendant are ultimately signed by Angela Beauchamp on behalf of each and every

entity.

      25.     Defendant Invention Submission Corporation d/b/a/ InventHelp and d/b/a/

Innovative Communications, is a Pennsylvania corporation with its principal place of business

located at 217 Ninth Street, Pittsburgh, Pennsylvania 15222, and is registered to do business

under the name InventHelp.  InventHelp has an office located at 1853 William Penn Way, #330,

Lancaster, Pennsylvania 17603.  InventHelp advertises on its nationwide website that it has a

Philadelphia office.  On March 21, 2018, Inventhelp published an approximately 1,000-word

article and advertisement in "Philadelphia Weekly" advertising its services.

      26.     Defendant Technosystems Consolidated Corporation identifies its "web URL" as

"www.inventhelp.com."   It is a Delaware corporation with its primary place of business located

at 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  Upon information and belief, Defendant

Technosystems Consolidated Corporation is a parent company of InventHelp and Invention

Submission Corporation.  Bloomberg identifies the "web URL" of Technosystems Consolidated

Corporation as "www.inventhelp.com."  Upon information and belief, many proposed Class

Plaintiffs who sign contracts with InventHelp, Universal Credit Corp., Intromark, and/or Western InventHelp are actually charged on credit card statements by Technosystems Consolidated Corporation.

27.     Defendant Technosystems Service Corporation is a Delaware Corporation with a primary place of business located at 217 9th Street, Pittsburgh, PA 15222.   Individuals who contract with InventHelp and/or Western InventHelp sign an explicit acknowledgement that Technosystems Service Corporation will:  "engage in performing invention development services under this Contract."  Upon information and belief, Technosystems Service Corporation is affiliated with InventHelp, Invention Submission Corporation and other Defendants herein and is used in Defendants' perpetration of the scheme described herein.

28.     Defendant Western Invention Submission Corporation ("WISC") is a North Carolina Corporation with a principal place of business located at 217 9th Street, Pittsburgh, PA 15222.  Individuals who contract with WISC sign the following acknowledgement:  "[WISC] is the name of the corporation contracting to perform the Invention development services.  WISC is operating under its registered name, Western InventHelp.  Western Inventhelp's principal business address is: 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  There are no parent, subsidiary or affiliated companies that will engage in performing invention development services under this Contract other than INVENTION SUBMISSION CORPORATION, 217 Ninth Street, Pittsburgh, Pennsylvania, 15222, an affiliate, and TECHNOSYSTEMS SERVICE CORP., 217 Ninth Street, Pittsburgh, Pennsylvania, an affiliate."

29.     Defendant Universal Payment Corporation is a Pennsylvania Corporation with a principal place of business listed at 903 Liberty Avenue, 3rd Floor, Pittsburgh, PA 15222.  Upon

information and belief, all individuals who finance their contracts with InventHelp and/or

Western InventHelp do so through this entity, which is not independent and is affiliated with

InventHelp.  Additionally, upon information and belief, many individuals who sign contracts

with InventHelp and/or WISC are charged by Universal Payment Corporation, even though

many of these individuals did not sign contracts with Universal Payment Corporation.

30.     Defendant Robert J. Susa is President of Defendants Invention Submission

Corporation, Technosystems Consolidated Corporation, Technosystems Service Corporation,

Western Invention Submission Corporation, Innovation Communications, Intromark, Inc., and

InventHelp.  Upon information and belief, Mr. Susa is an individual who is a citizen of

Pennsylvania, residing at 86 Waterfront Drive, Pittsburgh, Pennsylvania 15222.

31.     Defendant Abrams Gentile Entertainment LLC is listed on documents obtained by

Plaintiff's counsel as having a principal place of business at 244 West 54th Street, 9th Floor, New

York, New York.  The existence of that actual entity is questionable.  However, Abrams Gentile

Entertainment, Inc. is a New York corporation with a principal place of business at 11

Middleneck Road, Suite 200, Great Neck, New York, 10021.

32.     Defendant Thomas Frost is a patent attorney licensed to practice in the State of

Florida, with a primary place of business at 6600 Fourth Street North, Suite 102, Saint

Petersburg, Florida 33702.

33.     Defendant Above Board Drafting, Inc., is a Florida corporation with a principal

place of business at 933 Oleander Way South, Suite 4, South Pasadena, Florida 33707.

34.     Defendants 'John Doe' Individuals and 'John Doe' Companies exercise complete domination over all the entities named herein and use the entities and such domination to commit the fraud described herein.

## JURISDICTION

35.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. Sections 1331, 1332(d)(2)(A). This Court has original jurisdiction over this civil action as it arises under the Constitution, laws, or treaties of the United States, specifically the American Inventors Protection Act of 1999, 35 U.S.C. § 297.  Alternatively, this Court has original jurisdiction because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which a member of the class of plaintiffs is a citizen of a state different from the defendants.

36.     Venue is proper pursuant to 28 U.S.C. Section 1391.

37.     Exercise of jurisdiction over Defendants is proper.  Defendants are subject to general jurisdiction in the Commonwealth of Pennsylvania because all Defendants list their principal places of business as located in Pennsylvania, regularly transact extensive business activities in Pennsylvania, and are licensed and/or authorized to do business in Pennsylvania. Moreover, Defendants are subject to specific jurisdiction in Pennsylvania because they have transacted and continue to transact business in Pennsylvania, have engaged in tortious conduct in Pennsylvania, and there is a substantial nexus between Defendants' purposeful availment of the Pennsylvania forum and Plaintiff(s)' claims.

38.     Defendants have significant contact with Pennsylvania such that they are subject to the personal jurisdiction of this Court.  This Court's assertion of jurisdiction over Defendants

is consistent with the notions of fair play and substantial justice.  One or more Defendants purposefully availed themselves of the benefits of Pennsylvania such that they could reasonably anticipate being hauled into Court here, or otherwise directed their conduct toward this Pennsylvania such that the effects of their damages were occasioned upon Plaintiff(s) within Pennsylvania.

## FACTUAL BASIS FOR CLAIMS

39.     During 2012, Plaintiff Etta Calhoun believed that she had created a new invention, bed linens printed with words of Christian scripture.  She named her invention, "The Word of God Bedding."

40.     Plaintiff saw various television spots advertising the services of the company InventHelp.  Plaintiff was struck by the advertisement's cartoon image of a caveman sitting on a rock, banging a wheel with a chisel.

41.     On or about January 2012, Plaintiff contacted InventHelp by telephone to inquire about their services.

42.     An InventHelp representative answered the telephone, took Ms. Calhoun's name, telephone number, and address, and promised that someone from the InventHelp team would return her call shortly.  Upon information and belief, these same representations were made to all Class Plaintiffs who called InventHelp.

43.     On or about February 18, 2012, Plaintiff met with InventHelp at their offices located at 11200 Broadway, Suite 2743, Pearland, Texas 77584 to inquire about whether her idea was appropriate for their services.  Upon entering InventHelp's office, Plaintiff was given the impression that InventHelp had successfully helped other inventors, and thus that they are a

reliable and reputable company.  Defendants' offices were decorated with supposed successful inventions, often labeled, "As Seen On TV," in order to further create the impression that the entity is a legitimate enterprise. Upon information and belief, contrary to its purposeful impression, the Pearland, Texas office, and most InventHelp offices throughout the country, are merely rented space and not permanent InventHelp locations.

44.     At that meeting, Ms. Calhoun was assured by an InventHelp representative, Renee Hopes, that her idea was not only viable, but that it was original and presented an excellent opportunity for profit.  Upon information and belief, these statements were knowingly false when made and/or were made with reckless disregard for their truth or falsity.

45.     Upon information and belief, Plaintiff's idea was not novel, non-obvious, or otherwise unavailable to the public, and several companies already manufactured and sold products similar to Plaintiff's idea.

46.     Upon information and belief, all Class Plaintiffs were told that their proposed inventions were novel, marketable, and/or presented excellent opportunities for profit during their initial meetings with Defendants.

47.     At that meeting, the InventHelp representative told Ms. Calhoun that she had a great "add on" idea for Ms. Calhoun's invention.  In addition to linens with words of Christian scripture, the pillowcases could have a "listening device" that would play audio recordings of words of scripture.  Ms. Calhoun agreed that this "add on" was a great idea.

48.     Upon information and belief, InventHelp did not suggest the listening device because it would add to the marketability and/or profitability of Ms. Calhoun's invention. Rather, unbeknownst to Ms. Calhoun, InventHelp suggested the listening device because the

addition of that device to Ms. Calhoun's idea would render it potentially patentable, and would thereby increase the amount of money that Ms. Calhoun would pay.

49.     Upon information and belief, this strategy is employed by all InventHelp representatives when they are presented an idea that they believe may not be patentable.

50.     Indeed, by letter dated June 18, 1999 to the U.S. Patent & Trademark Office from a patent attorney who was employed by an InventHelp-affiliated patent law firm, the attorney stated that he was taught "how to make a 'non-patentable' invention 'patentable'" by virtue of alterations to the nature and structure of consumers' proposed inventions without consumers' consent.

51.     Ms. Calhoun was overjoyed that a seemingly experienced, reputable and successful company, InventHelp, was impressed with her idea.  She signed the "Basic Information Package Agreement" and agreed to pay $780 for a "Basic Information Package Report."

52.     As part of that contract, Ms. Calhoun signed "Disclosures." required by InventHelp.  One of those disclosures states, "The total number of customers who have contracted with InventHelp in the past 5 years is 8,095. . . The total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 38."

53.     However, another "Affirmative Disclosure Statement" signed and dated by Ms. Calhoun on that very same day, February 12, 2018, states, "THE TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1985 IS 53,037.  THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION

DEVELOPER TO HAVE RECEIVED, BY VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE, AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS 0."

54.     At that meeting, InventHelp did not inform Plaintiff of, *inter alia*, the accurate number of customers it had in the last five years, the number of positive and negative evaluations, the accurate number of customers who received a net profit from inventions, the accurate number of customers who received license agreements, or the names and addresses of invention promotion companies with whom InventHelp or its officers were affiliated in the last ten (10) years.

55.     At that meeting, Renee told Ms. Calhoun that InventHelp would partner with her for $9,950.00 for their "Submission Services" to help her market her invention.

56.     That amount was shocking and costly to Ms. Calhoun and she declined.  She agreed only to the $780 Basic Information Package Report.

57.     At that time, Ms. Calhoun could not afford the $780 payment.

58.     The InventHelp representative told her that InventHelp had a 'relationship' with a "private money lender" and conveniently had a "Retail Installment Contract" from Defendant Universal Payment Corporation on hand. That contract identifies the "Seller" as InventHelp, the "Buyer" as Ms. Porter, and the "Assignee" as Universal Payment Corporation.

59.     However, Ms. Calhoun's first payment pursuant to that contract was charged to "Techno InventHelp."

60.     After February 18, 2012, InventHelp repeatedly called Ms. Calhoun to urge her to move forward with submission services.  Ms. Calhoun again met with Renee Hopes

approximately one month later, on or about March 15, 2012, and was presented with a

"Submission Agreement" for $9,950.00 at the meeting.  However, the price was so

overwhelmingly high to Ms. Calhoun that she left the meeting without committing to the

contract.

61.     Thereafter, Ms. Calhoun was again repeatedly called by InventHelp.

62.     Upon information and belief, these calls came from InventHelp's Pennsylvania

office.

63.     Ms. Calhoun did not want to speak with anonymous sales agents.  Instead, she

tried calling Renee Hope, with whom she had met.  However, she was told that Renee was no

longer with the company.  Throughout the process, Ms. Calhoun was repeatedly told that certain

representatives with whom she spoke or met had left, and was juggled from person to person.

Upon information and belief, this is common practice of Defendants.

64.     Ms. Calhoun eventually connected with a sales representative named Heather.

Heather spoke with Ms. Calhoun frequently and told her that "The Word of God Bedding" idea

was brilliant, that she had never seen anything like it, that she would buy it, and that if Ms.

Calhoun moved forward with InventHelp she would have a great chance of profiting from her

invention.  Ms. Calhoun was extremely apprehensive about spending close to $10,000, a

tremendous amount of money, and repeatedly asked Heather's opinion.  Heather at all times

unequivocally told her to go forward.  Upon information and belief, Heather's representations on

behalf of InventHelp were false or made with reckless disregard for the truth.

65.     On or about April 2012, Ms. Calhoun received the "Basic Information Package"

and "Preliminary Patentability Search and Opinion" for which she contracted from InventHelp.

66.     The Preliminary Patentability Search and Opinion is signed by Defendant Thomas Frost, a patent attorney, and is presented on his letterhead.

67.     Ms. Calhoun was led to believe that the Patentability Opinion was drafted by an objective and independent registered patent attorney.   Upon information and belief, Defendant Frost receives all or a substantial percentage of his business from Defendants, and is not independent nor objective.

68.     Upon information and belief, the Patentability Opinion provided to Ms. Calhoun is nothing but boilerplate drivel, meant to appear professional, and is purposefully confusing so that unsuspecting inventors will proceed with expensive "Submission Services" with InventHelp.

69.     Upon information and belief, many Patentability Opinions provided to InventHelp customers are not even researched or drafted by Mr. Frost or any other patent attorney.  Instead, upon information and belief, InventHelp sends the searches to an entity called "Above Board Drafting, Inc., a Florida corporation.  Upon information and belief Above Board Drafting performs the patent searches, drafts the 'Patentability Opinions' on attorney letterhead, and then sends hundreds of the Patentability Opinions to patent attorneys engaged by InventHelp for the purpose of fraudulently representing that those attorneys prepared the opinions and searches.

70.     Upon information and belief, Mr. Frost had first-hand knowledge of hundreds of customers referred by InventHelp that did not receive utility patents and complained that InventHelp is a fraud.  Mr. Frost, an attorney with a fiduciary duty to Ms. Calhoun, informed her of none of these facts.

71.     Independently, the "Basic Information Package" received by Ms. Calhoun is also constructed to appear professional and well thought out, when, in truth and in fact, it is nothing

more than loosely-related cut and pasted information, placed into a hard-bound book with Ms. Calhoun's name on the first page.

72.     Although purporting to be an end in itself, in truth and in fact the Basic Information Package is part of Defendants' ploy to convince consumers that their inventions are marketable, and con them into signing contracts for the more expensive Submission Services.

73.     Upon information and belief, the 'Basic Information Package' is merely the first step in InventHelp's scheme to draw aspiring inventors into spending tens of thousands of dollars on additional services.  InventHelp did not disclose this, nor did InventHelp disclose that the purpose of their next meeting would not be to review the book, but rather to "upsell" Ms. Calhoun on to another, more costly and involved, package.

74.     Following receipt of the "Basic Information Package," Ms. Calhoun was again contacted by InventHelp.  The professed reason for those calls was to set up a meeting to go over the Basic Information Package.  In truth and in fact, the real reason for those calls and subsequent meeting was to "upsell" Ms. Calhoun on the costly Submission Services Agreement.

75.     On or about August 2, 2013, Ms. Calhoun met with InventHelp representative Joy Hinson at 2002 Timberloch Place, Suite 200. The Woodlands, Texas 77380.  Ms. Hinson told Ms. Calhoun that InventHelp was wrapping up a special offer, and that it was on or about the last day to receive a $1000 discount for "Submission Services."

76.     At this meeting, Ms. Porter expressed concern about the high cost of these services.

77.     Ms. Hinson pressured Ms. Calhoun.  She also explained that Ms. Calhoun could use her contract with Universal Payment Corporation to finance the submission services.

78.     Ms. Porter signed a "Submission Agreement" with Western InventHelp for $8990. Upon information and belief, all "Submission Agreements" with InventHelp and/or Western InventHelp are identical.

79.     That Submission Agreement states, "WESTERN INVENTION SUBMISSION CORPORATION (WISC) is the name of the corporation contracting to perform the invention development services. WISC is operating under its registered name, Western InventHelp. There are no parent, subsidiary or affiliated companies that will engage in performing invention development services under this Contract except for INVENTION SUBMISSION CORPORATION, an affiliate, and TECHNOSYSTEMS SERVICE CORPORATION, an affiliate. Company is also affiliated with INTROMARK INCORPORATED, which attempts to market inventions where substantial interest has been expressed in accordance with paragraph 1.N above."

80.     The Submission Agreement states, among other things, that "InventHelp will prepare a New Product Submission Brochure, which shall include a description of the invention, benefits and features, a 3D graphic or other illustration in color, Standard Industrial Classification (SIC) codes and suggested distribution channels."

81.     The Submission Agreement states, "InventHelp maintains a Data Bank of companies that have registered to receive our clients' submission materials on an ongoing basis. . . . InventHelp will submit Client's invention, product or idea to Data Bank companies in an attempt to obtain a good faith review as set forth in more detail below."

82.     The Submission Agreement states, "Companies registered in our Data Bank have agreed to review submission materials submitted to them by InventHelp in confidence and have signed confidentiality and non-use agreements."

83.     The Submission Agreement states, "DataBank companies that we have attempted to match with your invention will be sent a copy of Client's New Product Submission Brochure. This is how Data Bank companies may encounter, receive or see your invention and are then in a position to decide whether to conduct a good faith review."

84.     The Submission Agreement states, "Client agrees that InventHelp shall have the exclusive right to submit the idea, invention or product which is the subject of this Agreement, for the sole purpose of attempting to obtain a good faith review and reviewing any interest expressed including the right to use designs, models, patents issued and pending . . . ."

85.     The August 8, 2013 Submission Agreement discloses:  "THE TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1985 IS 56,345.  THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BY VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE, AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS 0."

86.     That statement directly contradicts the disclosure signed by Ms. Calhoun approximately one year earlier, on February 18, 2012, which stated that over the past 5 years, "the total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 38."

87.     A Submission Agreement signed in 2016 obtained from a potential Class Member states, "From 2013-2015, we signed Submission Agreements with 6,076 clients.  As a result of our services 153 clients have received license agreements for their products, and 27 clients have received more money than they paid us for these services."

88.     Submission Agreements signed in 2018 obtained from potential Class Members state, "from 2015-2017, we signed Submission Agreements with 6,564 clients."  Those agreements state, "We charge $975 for a Basic Information Package.  We charge from $11,900 to $16,900 for our marketing, licensing or promotional services."

89.     Submission Agreements signed in 2018 obtained from potential Class Members state, "The total number of customers who have contracted with InventHelp in the past 5 years is 10,272."

90.     Submission Agreements signed in 2018 obtained from potential Class Members state, "The total number of customers to have received a net financial profit as a direct result of invention promotion services provided by InventHelp is unknown.  However, the total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 61."

91.     By letter dated April 23, 2014, Ms. Calhoun received a letter from InventHelp stating that "Your New Product Submission Brochure was mailed to the companies on the enclosed report listed as "Data Bank."  Attached to that letter is a list of 20 "Data Bank" companies.

92.     Upon information and belief, this list of Data Bank companies, and Data Bank company lists sent to all InventHelp customers, are shams.  Some of the companies do not exist

and are purposefully misspelled to resemble actual existing companies that have no relationship with InventHelp (for example, listing the company as 'Inc.' instead of 'LLC').  Other "Data Bank" companies claim to have no relationship with InventHelp, and have not signed any confidentiality agreements, or any agreements whatsoever, with InventHelp.  Upon information and belief, some of the companies are sham companies and/or are affiliated with InventHelp.

93.     Perhaps most disturbingly, some of the entities listed as Data Bank companies by Invent Help have in fact agreed to review invention ideas.  However, upon information and belief, in the rare instances that these companies express interest in an invention and attempt to contact InventHelp to proceed further, InventHelp does not return the calls.  These companies are provided no contact with InventHelp other than the 1-800 customer numbers advertised to the public on InventHelp's television commercials, and calls to these numbers on behalf of companies that actually want to proceed are often not returned.

94.     Upon information and belief, InventHelp has no infrastructure to deal with companies that actually want to proceed with ideas.   Rather, InventHelp's business model is to take consumers' money with absolutely no intention to follow up with any outside company that may be interested in a prospective inventor's idea.

95.     On August 2, 2013 Ms. Calhoun also signed an "Intromark Proposal" with Intromark Incorporated.  All agreements described herein were signed in Pittsburgh by "Angela Beauchamp" on behalf of the various entities.

96.     Upon information and belief, all individuals who sign Submission Agreements with InventHelp also sign "Intromark Proposals" with Intromark at the very same time, signed by the same InventHelp representatives.  During the meetings at which these documents are

signed, the InventHelp representative makes no distinction between the companies, and purposefully gives the impression that all contracts form a single, integrated whole.  All such contracts are ultimately signed by Angela Beauchamp on behalf of all entities, with no distinctions made between the entities.

97.     The Intromark contract states, "Intromark has agreed to attempt to market inventions, ideas or products only where substantial interest has been expressed, or where in Intromark's sole discretion it wishes to undertake said marketing effort."

98.     The Intromark contract states, "Client further agrees that Intromark during the term of this Proposal shall have the <u>exclusive right to negotiate, and to execute contracts on Client's behalf for the sale and licensing of the idea, invention or product</u>."

99.     Thus, the Intromark contract creates a fiduciary relationship between the client, here, Ms. Calhoun, and Intromark.

100.     By letter dated August 26, 2014, InventHelp sent Ms. Calhoun a "copy of your completed Virtual Invention Presentation (VIP) which is a DVD containing 3-D renderings" of Ms. Calhoun's Invention.  InventHelp represented that "We will send your VIP to any InventHelp Data Bank that may specifically request it."

101.     Ms. Calhoun was extremely distressed when she viewed the DVD. It was shoddily-done, and, to her dismay, did not present her "Word of God Bedding" in an attractive light.

102.     Ms. Calhoun immediately called InventHelp to express her disappointment and concern.  An InventHelp representative assured Ms. Calhoun that the "Word of God Bedding"

was purposefully presented in this way because, otherwise, "someone could steal your idea." Upon information and belief, this was a lie.

103.     Throughout this entire process, up to and including the present, Ms. Calhoun has been dutifully making monthly payments to Universal Payment Corporation.  While there were certain times where she felt financially constrained and was unable to make payments, even then, she would send $10 or $15 to Universal Payment Corporation monthly because she wanted to be "honest" and "keep [her] end of the bargain."

104.     At various points between 2013 to date, Universal Payment Corporation contacted Ms. Calhoun by telephone and mail, telling her to pay amounts owing on the contracts and threatening that if she fails to do so, she will be reported to Credit Agencies and her credit will be otherwise damaged and/or destroyed.

105.     In sum, all "efforts" made on Ms. Calhoun's behalf by Defendants in order to help her "commercialize her invention" are lies and scams.  Defendants, contrary to their written and verbal representations, have no meaningful interest or investment in fulfilling their contractual promises; rather, their business model is based upon receipt of Submission Service fees, and nothing more.

106.     Upon information and belief, Defendants' acts have the same or similar purposes and results (*i.e.* carry out a scheme to defraud Plaintiff and Class Members of money), participants (*i.e.* Defendants), victims (*i.e.* the Plaintiff and Class Members), methods of commission (*i.e.* using television, telephone, in-person meetings, and internet networks to falsely represent to Plaintiff and Class Members that the inventions were patentable and profitable), and are not isolated events.

107.    Upon information and belief, the acts described herein amount to continued fraudulent activity and were committed by Defendants in furtherance of their continuing scheme to defraud Plaintiff and Class Members.

108.    Moreover, the scheme described herein is a continuing operation and poses the threat of continued criminal activity, preying upon unsuspecting victims. Defendants' websites and television commercials continue to tout their invention promotion services to lure potential inventors to enter into contracts with Defendants for fraudulent invention promotion services.

109.    Upon information and belief, Defendants defrauded other victims before, during and after they defrauded Plaintiffs. The foregoing demonstrates that there is no obvious terminating goal or date for the fraudulent activity; the foregoing acts are part of the Defendants' ongoing, regular way of doing business; and Defendants operate a long-term association that exists for criminal purposes *(e.g.,* fraudulently inducing potential inventors to enter into contracts that obligate the inventors to pay money to Defendants).

110.    Defendants' conduct employs the use of the public telephone, television, U.S. mail, and internet networks.

111.    The injuries to Plaintiffs and the members of the Class were caused by Defendants' scheme of fraudulently inducing Plaintiffs and Class Members, through false promises, misrepresentations, and omissions, to enter into contractual agreements.

112.    Furthermore, most of the misrepresentations and omissions alleged herein are contained on Defendant's websites.

## CLASS ACTION ALLEGATIONS

113.    Plaintiff brings this suit individually and as a class pursuant to Federal Rule of

Civil Procedure 23, the requirements of such are met with respect to the class as defined below.

114.    The Class consists of: All persons and entities in the United States who purchased

goods and/or services from Defendants who were contacted by Defendants from 2010 to present.

115.    Subject to additional information obtained through further investigation and

discovery, the foregoing definition may be expanded or narrowed by amendment.

116.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of

Defendants; any entity in which any Defendant has or had a controlling interest or which

Defendants otherwise control or controlled; any officer, director, legal representative,

predecessor, successor, or assignee of a Defendant.

117.    This action is properly maintainable as a class action.

118.    The Class is so numerous that joinder of all individual members in one action

would be impracticable.  Submission Agreements signed in 2018 obtained from potential Class

Members state, "the total number of customers who have contracted with InventHelp in the past

10 years is 10,272."  Submission Agreements signed in 2018 from potential Class Members

state, "from 2015-2017, we signed submission agreements with 6,564 clients." The exact number

of class members can be determined by appropriate discovery.

119.    Plaintiffs' claims are typical of the claims of the Class Members in that they all

paid for services from Defendants and were injured by the same wrongful conduct.  The

violations of the statutory and common laws and the relief sought herein are common to Plaintiff

and the members of the class.

120.    By decision dated February 21, 2018, the Supreme Court of Pennsylvania in *Danganan v. Guardian Protection Services* unequivocally held that a non-Pennsylvania resident may bring suit under the Pennsylvania Unfair Trade Practices and Consumer Protection Law against a Pennsylvania Commonwealth-headquartered business based on transactions that occurred outside of Pennsylvania.  Thus, a nationwide class is appropriate here.

121.    There are questions of fact and law common to all Class Members that predominate over questions which may affect individual members. These include the following:

a.  Whether Defendants' advertisements and business practices violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. Section 201-1, et seq.;

b.  Whether Defendants' acts described herein, and developed upon further discovery, constitute a mode and practice that pervades the entire company and/or enterprise, including promulgating policies and/or instruction to use common fraudulent practices;

c.  Whether Defendants are responsible for the conduct alleged herein, which was and is uniformly directed at all consumers who purchased Defendants' products and services;

d.  Whether Defendants' misconduct set forth herein demonstrates that Defendants engaged in unfair, fraudulent, and/or unlawful business practices with respect to the advertising, marketing and sale of their products and services;

e.  Whether Defendants made false and/or misleading statements to the Class and the public concerning the legitimacy of their goods and services;

f.   Whether Defendants' false and misleading statements were likely to deceive the public;

g.   Whether Defendants had a pattern or practice of making fraudulent and false representations to consumers in order to induce them to sign contracts;

h.   Whether Defendants had a pattern or practice of making fraudulent and false representations to consumers regardless of whether consumers' ideas were likely to receive a utility patent;

i.   Whether Defendants created an enterprise by working in concert to defraud Plaintiff and Class members;

j.   Whether Defendants engaged in a conspiracy to work in concert to defraud Plaintiff and Class members;

k.   Whether Defendants made fraudulent misrepresentations and misleading statements with the intent to mislead consumers;

l.   Whether Defendants breached the covenant of good faith and fair dealing by committing the acts described herein;

m.   Whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

n.   Whether Defendants should be enjoined from the actions described herein.

122.   Plaintiff is an adequate Class representative because her interests do not conflict with the interest of the Class Members she seeks to represent; her claims are common to all members of the Class and are based upon the same facts (practice or course of conduct) undertaken by Defendants' with respect to all Class Members and are based upon the same legal

theories; plaintiff has a strong interest in vindicating her rights.  The Class Members' interests will be fairly and adequately protected by Plaintiffs and counsel.  Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members.

123.    Plaintiff has retained counsel experienced and competent in the prosecution of complex class action litigation and intends to vigorously prosecute this action.  Plaintiff and her attorneys are familiar with the subject matter of this action and have already expended substantial hours ascertaining and investigating the allegations herein.

124.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class members. Common issues of law and fact predominate, as the primary focus is Defendants' deceptive and misleading practices.

125.    The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class; (ii) to keep the courts from being inundated by thousands of repetitive cases; and (iii) to reduce transaction costs so that the injured class members can obtain the most compensation possible.  Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation.

126.    Importantly, individual Class Members here lack resources to undertake the burden and expense of individual prosecution of these claims.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. It also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management

difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

127.    Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action which will result in further damages to Plaintiff and Class Members.

### CLAIMS FOR RELIEF

### COUNT I
**Against All Defendants**
**(Violation of the American Inventors Protection Act of 1999, 35 U.S.C. § 297)**

128.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

129.    Defendants are "invention promoters" as defined by the American Inventors Protection Act of 1999, 35 U.S.C. § 297 ("AIPA").

130.    The "Basic Information Package Agreements" and "Submission Agreements" are contracts for invention promotion services as defined by the AIPA.

131.    Plaintiff and Class Members are customers as defined by the AIPA.

132.    Defendants contracted with Plaintiff and Class Members to provide them with invention promotion services as defined by the AIPA.

133.    Defendants violated the AIPA by not providing the proper disclosures to Plaintiff and Class Members prior to entering into contracts for invention promotion services.  As detailed *supra*, Defendants' purported disclosures are inaccurate, internally inconsistent, and fraudulent.

134.    Defendants violated the AIPA by making materially false and fraudulent statements to Plaintiff and Class Members, and are therefore liable for all damages proscribed by the AIPA.

135.    By reason of the foregoing, Defendants are liable to Plaintiff and the Class for actual damages and statutory trebling of those damages, together with punitive damages, attorneys' fees, costs, and interest

## COUNT II
**Against All Defendants**
**(Violations of Pennsylvania Unfair Trade Practices And Consumer Protection Act,**
**73 P.S. Section 201-1, et seq.)**

136.    Plaintiffs reallege and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

137.    Section 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Act ("UTPCPA") defines "trade" and "commerce" to mean the "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, person or mixed, and any other article, commodity, or thing of value wherever situate, and includes trade or commerce directly or indirectly affecting the people of this Commonwealth."

138.    Defendants have engaged in trade and commerce in the Commonwealth of Pennsylvania and nationally by marketing, offering for sale, and selling invention promotion services directly to consumers of the Commonwealth and nationwide.

139.    In the course of advertising, marketing, promotion, offering for sale and selling invention promotion services Defendants have represented that they have helped other inventors monetize their inventions, that they are affiliated with and have confidentiality agreements with

DataBank companies, and that their list of DataBank companies is a legitimate and useful mechanism for Plaintiffs seeking to market their inventions, when, in truth and in fact, many DataBank companies do not exist, do not have relationships with Defendants, and/or are not appropriate companies to manufacture, license and/or market Plaintiff consumers' proposed inventions.

140.    Defendants' acts and practices are likely to confuse or mislead consumers acting reasonably under the circumstances into believing that the Defendants are a legitimate enterprise, and that Defendants' services are tailored to help inventors monetize their inventions.  In truth and in fact, Defendants' services are tailored to extract as much money from Plaintiffs as possible, have little to no utility for Plaintiffs, and are in fact a fraud.

141.    InventHelp fraudulently targets minorities and women through the use of misleading websites, including www.black-inventor.com and www.women-inventor.com.  These websites, although purporting to be educational pages, are in fact InventHelp advertisements.

142.    Defendants often offer to give Class Plaintiffs "discounts" that are "about to expire."  If Class Plaintiffs request time to think about signing the contracts and/or making the substantial monetary commitment, Defendants inform them that the discount will be revoked if they do so.  Upon information and belief, these discounts and specials are shams.

143.    If and when Class Plaintiffs express questions or concerns about forfeiting any legal rights that they may have, Defendants' deceptively point out provisions in the purported contracts that appear to retain Class Plaintiffs' rights, while hiding those provisions that seek to vanquish those same rights; Defendants also falsely state that the contracts are "no risk" when in fact they are not.

144.    Defendants have therefore engaged in unfair and deceptive acts and practices in violation of 73 Pa. Cons. Stat. Section 201-2(4).

145.    The acts and practices described *supra* and below constitute violations of UTPCPL:

(a)  Passing off goods or services as those of another;

(b) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(c) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

(d) Using deceptive representations or designations of geographic origin in connection with goods and services;

(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has sponsorship, approval, status, affiliation or connection that he does not have;

(f)  Representing that goods are original when they are in fact not;

(g) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, when they are of another;

(h) Advertising goods or services with intent not to sell them as advertised;

(i)  Advertising goods or services with intent not to supply reasonably expectable public demand;

(j)   Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(k)   Failing to comply with the terms of written guarantees, warranties, and contracts;

(l)   Knowingly misrepresenting that services are needed when they are not needed;

(m)   Making solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating the seller, purpose of the call, and nature of the goods and services;

(n)   Using a contract, form or other document related to consumer transactions that seeks to waive consumer's right to assert a legal defense to an action; and

(o)   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

146.   Defendants have repeatedly and persistently engaged in material deceptive or misleading consumer-related business practices, i.e., advertising, publishing and selling invention promotion, patent, manufacturing, licensing and consultation services that they do not (nor intend to) provide, misrepresenting the viability and potential profitability of Plaintiffs' proposed inventions, and lying and/or coercing Plaintiffs into signing fraudulent contracts.

147.   The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services has been, and continues to be, materially misleading and deceptive to members of the Class and to Plaintiffs in material respects.

148.    The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services are directed toward consumers and has a broad negative impact on the general public, including Plaintiffs and members of the Class.

149.    Plaintiffs and Class Members have been injured by reason of being deceived by Defendants into paying Defendants for purported services that Defendants did not (and did not intend to) provide.

150.    Defendants' deceptive practices were and are consumer-oriented.  Defendants advertise via television commercials and internet web pages, among other things, thereby deceiving and attracting large numbers of consumers.

151.    Defendants' material misrepresentations were and are substantially uniform in content, presentation and impact upon consumers at large.

152.    Plaintiff and other members of the Class entered into agreements with Defendants herein and suffered ascertainable loss as a direct and proximate result of Defendants' actions.

153.    Defendants' misconduct described herein was intentional, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, Plaintiffs and the other members of the Class.  Defendants are therefore additionally liable for treble and punitive damages, in an amount to be determined at trial, as well as attorneys' fees and costs.

<u>COUNT III</u>

**Against All Defendants**

**(Violation of Pennsylvania Telemarketer Registration Act, 73 Pa. Cons. Stat. Ann. 2241, et seq.)**

154.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

155.    Pennsylvania' Telemarketer Registration Act (Pa TRA) prohibits "sellers" or "telemarketers" engaged in telemarketing from engaging in any deceptive or abuse telemarketing acts or practices in violation of the Telemarketing Sales Rule, 16 C.F.R. Part 310.  73 Pa. Cons. Stat. Ann. 2245(a)(9).

156.    Defendants' acts and practices are deceptive telemarketing acts or practices that violation Section 310.3(a)(4) of the Telemarketing Sales Rule; therefore, Defendants are engaged in deceptive and abusive telemarketing acts in violation of the Pa TRA, thereby violating sub-clause (xxi) of the UTPCPL.  73 Pa. Cons. Stat. Ann. 201-2(4)(xxi).

157.    Plaintiff and Class Members reasonably and justifiably relied on Defendants' deceptive, misleading or false advertising in purchasing Defendants' purported goods and services.

158.    Defendants' violations have caused Plaintiff and Class Members to suffer injury including paying Defendants for purported goods and services that Defendants did not (and did not intend to) provide.

159.    Defendants willfully and knowingly engaged in the conduct described above.

160.    Plaintiffs are entitled to damages, including treble and punitive damages, injunctive relief, and attorneys' fees

## COUNT IV
### Against All Defendants
### (Fraud)

161.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

162.    Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.

163.    The agreements and contracts signed by Class Plaintiffs are part and parcel of a grand fraudulent scheme perpetrated by Defendants.

164.    Defendants made and continue to make false and fraudulent statements, false promises, misleading representations, and omitting material facts to Plaintiff and Class members pertaining to the uniqueness, patentability, and profitability, among other things, of their inventions, as set forth above.  These representations are part of Defendants' overall business practices and are substantially similar and uniform.

165.    As set forth *infra*, throughout the course of dealings between Plaintiffs and Defendants, Defendants make many blatant misrepresentations and omissions of present fact, including that certain external companies are interested in Plaintiffs' inventions, when those companies do not exist or have not in fact expressed interest; that Defendants have strong relationships with "Data Bank" companies; that Defendants have never seen items similar to Plaintiffs' inventions; that Defendants believe that consumers' proposed inventions are likely to make a profit; among other things.

166.     Defendants fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants.

167.     Defendants also falsely represent verbally that their services will likely result in financial gain for consumers in order to induce Plaintiffs to sign the various contracts at issue, when, in truth and in fact, Defendants do not believe this to be the case, and, upon information and belief, Defendants have often seen these very same inventions before.

168.     Defendants falsely represent that they will undertake certain services on consumers' behalf, including but not limited to marketing and promotion of Plaintiffs' proposed inventions.  In truth and in fact, Defendants do none of these things.

169.     Defendants falsely represent themselves to be independent companies, but they are part and parcel of a single, grand scheme.

170.     Defendants made many other material misrepresentations to and concealed or suppressed material facts from Class Plaintiffs.

171.     Defendants knew or believed these material misrepresentations and omissions to be false, or made them with reckless regard for the truth.

172.     Defendants misrepresented, concealed or suppressed these facts with the intent to defraud Class Plaintiffs inducing them to purchase Defendants' services and goods.

173.     Class Plaintiffs were reasonable in relying on Defendants' misrepresentations and omissions of material facts because Defendants advertised and held themselves out to be credible, legitimate and experienced sellers of invention promotion, manufacturing, distribution,

and other such services, and as having extensive knowledge and expertise in bringing new inventions to fruition.

174.    At the time Class Plaintiffs acted, they were unaware of the false, concealed and/ or suppressed facts and would not have purchased Defendants' goods and services had they known the true facts.

175.    All Defendants are liable for the tortious conduct of the other Defendants, as they (a) performed the tortious acts in concert with the others and pursuant to a common design with them, (b) knew that the other Defendants' conduct constituted tortious conduct and gave substantial assistance or encouragement to the other Defendants, and (c) gave substantial assistance to the other Defendants in accomplishing the tortious result and their own conduct, separately considered, constituted tortious conduct towards Plaintiff and Class members.

176.    As a direct and proximate result of Defendants' misrepresentations and concealment of material facts, Class Plaintiffs have suffered damages, the precise amount to be determined at trial.

### COUNT V
**Against All Defendants**
**(Negligent Misrepresentation)**

177.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

178.    Defendants made misrepresentations and other statements in connection with their deceptive invention promotion, patent, manufacturing, licensing and consultation services.

179.    Defendants made these representations while in privity of contract with Plaintiffs.

180.    The misrepresentations were and are false, deceptive and misleading at the time they were made.

181.    Upon information and belief, at the time they were made, Defendants knew that the statements were false, deceptive and misleading.

182.    Upon information and belief, Defendants stated, disseminated, published and advertised the misrepresentations with the intent to deceive and defraud the general public, including Class Plaintiffs.

183.    Class Plaintiffs were unaware of the falsity of the misrepresentations and relied upon the misrepresentations and as a result have been defrauded out of large sums of money.

**COUNT VI**
**Against All Defendants**
**(Breach of Contract)**

184.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

185.    Defendants and Plaintiffs and members of the Class entered into various contracts, as described above.

186.    Defendants failed to fulfill the obligations set forth in the above-referenced contracts, thereby breaching their respective contracts with Plaintiffs, and Plaintiffs have been damaged thereby.

187.    Upon information and belief, Defendants executed substantially identical contracts with all Class Plaintiffs and failed to fulfill their obligations set forth in those contracts, damaging Class Plaintiffs.

188.     By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT VII
### Against All Defendants
### (Breach of Duty of Good Faith & Fair Dealing)

189.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

190.     Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

191.     Under the contracts described herein, Plaintiffs and Class Members reasonably expected Defendants' to carry out the covenants set forth in those contracts.

192.     Defendants arbitrarily and unreasonably did not fulfill the various covenants set forth in the contracts, even though they in fact represented to Plaintiffs and Class Members that they would make best efforts to do so.

193.     Defendants acted in bad faith.

194.     As a result, Defendants' are liable to Plaintiffs and Class Members for damages in an amount to be determined at trial and attorneys' fees.

## COUNT VIII
### Against All Defendants
### (Unjust Enrichment)

195.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

196.    Defendants' conduct as described herein allowed Defendants to knowingly realize substantial revenues from selling their goods and services at the expense of, and to the detriment or impoverishment of, Class Plaintiffs, and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity and good conscience.

197.    Class Plaintiffs conferred significant financial benefits and paid substantial compensation to Defendants.

198.    It is inequitable for Defendants to retain the benefits conferred by Class Plaintiffs.

199.    By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they suffered as a result of Defendants' actions, the amount of which shall be determined at trial, plus attorneys' fees.

## COUNT IX
**Against Attorney Frost, John Doe Defendants and Intromark, Inc.**
**(Breach of Fiduciary Duty)**

200.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

201.    Defendant Frost and Intromark owe Class Plaintiffs fiduciary duties, including advising and acting in Class Plaintiffs' best interests.

202.    Upon information and belief, along with Defendant Frost, there are several attorneys and/or law firms located throughout the United States (John Doe Defendants) with whom Defendants contract to provide services to Class Plaintiffs, under the guise that these defendants are independent and impartial.  (Collectively, the "Attorney Defendants").

203.    The Attorney Defendants breached their fiduciary duties of care by, among other things, advising Class Plaintiffs to apply for utility patents even though Defendants were aware

41

that Class Plaintiffs' idea were not suitable for utility patents for various reasons.  Defendants also had first-hand knowledge of hundreds of customers, referred by InventHelp who did not receive utility patents and complained that InventHelp is a fraud.  Yet, Defendants informed Class Plaintiffs of none of these facts and instead advised them to apply for utility patents.

204.    Pursuant to contracts between the parties, Defendant Intromark Inc. agreed to act in Plaintiffs' best interests and was given the exclusive right "to negotiate, and to execute contracts on [Class Members'] behalf . . . ."  Upon information and belief, Intromark defrauded Class Plaintiffs by falsely representing that companies were interested in Class Plaintiffs' proposed inventions, when, in truth and in fact, no such companies expressed any interest and/or even existed.

205.    Class Plaintiffs have been damaged by Defendants' breach of their fiduciary duties.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs, on behalf themselves and the Class, pray that the Court:

(a) Issue an Order certifying the Class as defined above, appointing the Plaintiffs as Class Representatives, and designating their Attorneys as Class Counsel;

(b) Find that Defendants have committed the violations of statutory and common law alleged herein;

(c) Enter an Order granting monetary relief, including treble and punitive damages on behalf of the Class in an amount at least $36,000,000.00, the precise amount of which is to be determined at trial;

(d)  Enter an Order granting monetary relief, including compensatory damages on behalf of the Class in an amount of at least $72,000,000.00, the precise amount of which is to be determined at trial;

(e)  Enter an Order rescinding the various contracts described herein;

(f)  Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate Order awarding restitution and monetary damages;

(g)  Enter an Order granting all appropriate relief on behalf of the Class under the applicable state statutory and common laws;

(h)  Enter judgment including interest, costs, reasonable attorneys' fees, and expenses;

(i)  Entering preliminary and permanent injunctive relief against Defendants, directing Defendants to correct their practices and to comply with New York consumer protection laws; and

(j)  Granting such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

Dated: June 1, 2018

LEVAN LEGAL LLC

By: */s/ Richard A. Levan*
Richard A. Levan Esq. Bar ID. 50019
Jon-Jorge Aras, Esq.  Bar ID. 314967
Two Bala Plaza
Suite 300
Bala Cynwyd, PA 19004
610-688-7781

OF COUNSEL:

Julie Pechersky Plitt, Esq.
Marc S. Oxman, Esq.

Oxman Law Group, PLLC
120 Bloomingdale Road
White Plains, NY 10605
(914) 422-3900