## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------------X

Etta Calhoun, On Behalf of Herself and All Other
Persons Similarly Situated

                             Plaintiff,

     -against-

Invention Submission Corporation d/b/a InventHelp,
Technosystems Consolidated Corp., Technosystems
Service Corp., Western Invention Submission Corp.,
Universal Payment Corporation, Intromark Incorporated,
Innovation Credit Corp., Robert J. Susa, Thomas Frost, P.A.,
Thomas Frost, Law Office of Kyle Fletcher, P.C.,
Kyle A. Fletcher, Crossley & Stevenson, Crossley Patent Law,
Kaufhold & Dix, Above Board Drafting, Inc.,
John Doe Companies 1-10; John Doe Individuals 1-10,

                             Defendants.

-------------------------------------------------------------------X

**Docket No. 2:18-cv-01022**

**Amended Complaint**
**Class Action**

**Jury Trial Demanded**

## CLASS ACTION COMPLAINT

Plaintiff, on behalf of herself and all others similarly situated, makes the following

allegations on personal knowledge as to her own actions and upon information and belief:

### NATURE OF THE ACTION

1.    This class action arises out of a deceptive and fraudulent invention promotion

scam that has bilked thousands of aspiring inventors and entrepreneurs into paying millions of

dollars to Defendants for invention promotion services that Defendants do not, and never intend

to, provide.

2.      Defendants herein are part and parcel of a sophisticated and grand scheme that has fraudulently enriched themselves at the expense of innocent and often naive aspiring inventors.

3.      Defendants' ubiquitous television and internet commercials, featuring a cartoon image of a caveman sitting on a rock, banging a wheel with a chisel, promise consumers that InventHelp has contracts with thousands of companies that are looking for new ideas.  The commercials state, "We keep your idea confidential"; "We explain every step of the invention process"; "We create professional materials representing your idea and submit it to companies who are looking for new ideas"; "We have more than 9,000 companies who have agreed to review ideas, in confidence," among other representations.  In truth and in fact, InventHelp is not in the business of helping aspiring inventors develop and monetize their inventions.  Rather, InventHelp is in the business of taking consumers' money with fraudulent promises and oftentimes phony "companies looking for new ideas."

4.      Defendants' entire business model and enterprise is fraudulent, from start to finish.  After being lured in by Defendants' slick advertising and sales tactics, Class Plaintiffs are then induced to sign expensive contracts based upon Defendants' purposefully incomplete 'patent searches,' practically each and every one of which informs Class Plaintiffs, in identical boilerplate language, that although there are already patented products on the market similar to those proposed by Class Plaintiffs, "protection in the form of a utility patent may be available directed to the specific novel structural or functional features of your invention."

5.      After receipt of fees ranging from $10,000 to $30,000 per consumer, Defendants then purportedly begin the process of "marketing" Class Plaintiffs' inventions.  This too is a

scam – contrary to Defendants' representations, they do not have "relationships" with "more than 9,000 companies who have agreed to review ideas, in confidence."

6.      Defendants' "marketing" does not and cannot lead to licensing agreements for Class Plaintiffs – Defendants are purportedly "marketing" non-patented, undeveloped ideas, which, by virtue of that status, have little to no salability.

7.      Defendant InventHelp is the conduit through which all Class Plaintiffs are defrauded.  Whilst InventHelp, Universal Payment Corporation, Intromark Inc., and the other named Defendants hold themselves out to be independent companies, they are one and the same, and are parts of an integrated fraudulent enterprise.  The schemes, trickery, and fraud set forth herein are universal and indistinguishable, notwithstanding the titles of the entities with which Class Plaintiffs believe they are dealing.

8.      Defendants craft their polished marketing materials (including television advertisements, internet ads, web pages and telemarketing calls) to create the impression that Defendants have successfully helped other consumers monetize their inventions, and thus that Defendants are reliable and reputable.  Defendants' offices are decorated with supposed successful inventions, often labeled, "As Seen On TV," in order to further create the impression that they are a legitimate enterprise.  In truth and in fact, Defendants are a fraud and fail to fulfill almost every promise they make to consumers.

9.      Defendants' multi-tiered conspiracy preys upon consumers' high hopes and dreams.  It is cleverly constructed to avoid liability and monetary judgment by employing an intricate web of seemingly independent entities – invention promotion companies, private money lenders, patent attorneys, licensing and distribution companies, and manufacturing companies – that act in concert to defraud Class Plaintiffs.

10.     Defendants employ sophisticated and crafty mechanisms to escape liability, including the insertion of fraudulent clauses into their various contracts designed to extinguish would-be private litigants' rights.

11.     After luring Class Plaintiffs in with slick television and internet advertising, Defendants assure each and every consumer who inquires of their services that Plaintiffs' ideas are unique, patentable, and/or carry terrific potential for immense profit.

12.     Defendants then offer loans, research, patenting, invention promotion, marketing, manufacturing, licensing and distribution services to individual consumers located throughout Pennsylvania and the United States.

13.     In exchange for fees ranging between $700 and $30,000, Defendants represent that they will obtain patents and produce models, press releases, and infomercials, among other things, to promote Class Plaintiffs' inventions.

14.     Then, because Class Plaintiffs often do not have at hand the thousands of dollars 'necessary' to make their dreams come true, they are offered generous loans by "independent private money lender" Universal Payment Corporation.

15.     This "independent private money lender" is not independent at all – it operates under the same ownership and control as InventHelp, has no actual business address other than a P.O. Box, and is an indispensable arm of the fraudulent scheme described herein.

16.     Class Plaintiffs then agree to pay the steep initial fees out of pocket (often selling personal property, remortgaging their homes, or borrowing from family members) or to loan the money from Defendant Universal Payment Corporation.  In the meantime, Defendants make off with Class Plaintiffs' money and do little to nothing to fulfill their end of the bargain, stringing Class Plaintiffs along with false promises and boilerplate "analyses" in order to extract more

money from them for additional services (which they do not and never intend to provide), and then disappearing and dodging calls as soon as Defendants have all the money in hand.

17.     Once consumers sign the expensive agreements, they receive a flurry of paperwork for years on end, thereby giving consumers the impression that Defendants are working on their behalf.  In truth and in fact, Defendants are generating this paperwork in order to create this impression, with no expectation that the proposed inventions will be licensed.

18.     After months or years of silence, Defendants reappear to Class Plaintiffs, sometimes in the guise of distribution, marketing or manufacturing companies, and other times as representatives of InventHelp or Intromark Incorporated, Plaintiffs' "licensing agents," telling Class Plaintiffs that they've discovered Class Plaintiffs' inventions, that they have purchase orders, licensing agreements, and/or retail distributors at the ready, and that they just need an additional $5000-$10,000 in order to make those final arrangements.  After scamming more money from Plaintiffs, they disappear without a trace.

19.     Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.  Defendants' enterprise as a whole is fraudulent, and Defendants fraudulently induce Class Plaintiffs to sign various contracts.

20.     Defendants also fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants (*fraud-in-the-factum*).

21.     Before consumers have the opportunity to meaningfully review the lengthy, complicated contracts at issue, Defendants use high-pressure tactics, routinely telling consumers that "today is the very last day" of a "special" or "promotion" that will save consumers hundreds

or thousands of dollars, but that in order to get these savings, consumers must sign immediately, before leaving the office.  These statements are false and fraudulent – there are no such "specials" or "promotions" that are about to expire.

22.     Defendants' actions are particularly egregious because many of their customers are of modest means.  Defendants' representatives employ high pressure tactics to push Class Plaintiffs to hand over tens of thousands of dollars and sign fraudulent contracts, falsely representing to Class Plaintiffs the actual content of those contracts, that if Class Plaintiffs sign immediately (without time to properly review the contracts) they will receive substantial discounts pursuant to "specials" that are about to expire,  that Class Plaintiffs' proposed inventions are one-of-a-kind and/or carry terrific potential for profit, and that Class Plaintiffs likely stand to make 'millions' or 'billions' if they engage Defendants' services.

23.     In truth and in fact, Defendants do not (nor ever intend to) fulfill the bulk of the promises they make to Plaintiffs, instead making off with their money and leaving Plaintiffs high and dry.

24.     Importantly, upon information and belief, the disclosures mandated by the American Inventors Protection Act of 1999 ("AIPA") and various state laws that are set forth in Defendants' contracts and published materials are false, misleading and not in compliance with the laws.

25.     Upon information and belief, Defendants use nefarious means to censor, block and/or mask negative reviews of InventHelp, thereby preventing consumers from seeing what really happens to those who sign up for their services.  To wit, upon information and belief, in order to obstruct consumers' view of the likely hundreds of negative reviews of InventHelp on the consumer-targeted internet websites www.pissedconsumer.com, and www.ripoffreport.com,

Defendants employ sophisticated mechanisms (including purchasing domain names) to redirect those consumers to InventHelp's own website, or otherwise redirect consumers (without consumers' knowledge and/or consent) to false and fraudulent glowing reviews.

26.     Defendants also employ deceptive and fraudulent tactics by using threats, intimidation and harassment to collect debts.  In order to induce Class Plaintiffs to sign contracts, Defendants represent that if Class Plaintiffs can no longer make payments, then there is "no risk" – the contracts will simply expire with no further performance on either end.  However, if and when Class Plaintiffs stop paying, Defendants dog Class Plaintiffs, threaten to "destroy" Plaintiffs' credit and threaten to put liens on their homes and other personal property.

27.     Defendants call Class Plaintiffs multiple times per day, often on Plaintiffs' cell phones, and verbally threaten and harass, oftentimes using foul language.

28.     As detailed *infra*, Defendants' actions violate the AIPA, the Telephone Consumer Protection Act, Pennsylvania consumer protection statutes and give rise to liability pursuant to a variety of common law claims, including fraud, breach of contract, and breach of implied covenant of good faith and fair dealing, among others.

## THE PARTIES

29.     Plaintiff Etta Calhoun ("Ms. Calhoun" or "Plaintiff") is an individual who is a citizen of the State of Texas, residing at 23510 Whispering Willow, Spring, Texas 77373.

30.     The entities and individuals listed in paragraphs 31-43 have engaged in and have conspired to engage in a pattern of fraudulent activity, have each committed numerous acts as part of their scheme to defraud Class Plaintiffs, have each participated in the operation or management of a fraudulent enterprise, and have each acted with actual authority and/or apparent authority on behalf of each and every Defendant herein.

31.     Defendant Invention Submission Corporation does business under the names 'InventHelp,' and 'Innovation Communications,' among others, and is located in the same office, and shares identical employees, with InventHelp, Technosystems Consolidated Corporation, Western Invention Submission Corporation, Technosystems Service Corporation, and Intromark Incorporated (collectively, "InventHelp Defendants").  Moreover, as detailed *supra*, consumers who sign contracts with InventHelp and/or Western InventHelp sign an explicit acknowledgement that InventHelp, Invention Submission Corp., Western InventHelp, and Technosystems Service Corporation will all be performing services under the contracts, regardless of the particular contract's corporate signatory.  All contracts signed by any InventHelp Defendant are ultimately signed by Angela Beauchamp, in Pittsburgh PA, on behalf of each and every entity.

32.     Defendant Invention Submission Corporation d/b/a/ InventHelp and d/b/a/ Innovative Communications, is a Pennsylvania corporation with its principal place of business located at 217 Ninth Street, Pittsburgh, Pennsylvania 15222, and is registered to do business under the name InventHelp.

33.     Defendant Technosystems Consolidated Corporation identifies its "web URL" as "www.inventhelp.com."  It is a Delaware corporation with its primary place of business located at 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  Upon information and belief, Defendant Technosystems Consolidated Corporation is a parent company of InventHelp and Invention Submission Corporation.  Bloomberg identifies the "web URL" of Technosystems Consolidated Corporation as "www.inventhelp.com."  Upon information and belief, many proposed Class Plaintiffs who sign contracts with InventHelp, Universal Credit Corp., and/or Western

InventHelp are actually charged on credit card statements by Technosystems Consolidated Corporation.

34.    Defendant Technosystems Service Corporation is a Delaware Corporation with a primary place of business located at 217 9th Street, Pittsburgh, PA 15222.  Individuals who contract with InventHelp and/or Western InventHelp sign an explicit acknowledgement that Technosystems Service Corporation will:  "engage in performing invention development services under this Contract."  Upon information and belief, Technosystems Service Corporation is affiliated with InventHelp, Invention Submission Corporation and other Defendants herein and is used in Defendants' perpetration of the scheme described herein.

35.    Defendant Western Invention Submission Corporation ("WISC") is a North Carolina Corporation with a principal place of business located at 217 9th Street, Pittsburgh, PA 15222.  Individuals who contract with WISC sign the following acknowledgement:  "[WISC] is the name of the corporation contracting to perform the Invention development services.  WISC is operating under its registered name, Western InventHelp.  Western Inventhelp's principal business address is: 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  There are no parent, subsidiary or affiliated companies that will engage in performing invention development services under this Contract other than INVENTION SUBMISSION CORPORATION, 217 Ninth Street, Pittsburgh, Pennsylvania, 15222, an affiliate, and TECHNOSYSTEMS SERVICE CORP., 217 Ninth Street, Pittsburgh, Pennsylvania, an affiliate."

36.    Defendant Universal Payment Corporation is a Pennsylvania Corporation with a principal place of business listed at 903 Liberty Avenue, 3rd Floor, Pittsburgh, PA 15222.  Upon information and belief, all individuals who finance their contracts with InventHelp and/or Western InventHelp do so through this entity, which is not independent and is affiliated with

InventHelp.  Additionally, upon information and belief, many individuals who sign contracts with InventHelp and/or WISC are charged by Universal Payment Corporation, even though many of these individuals did not sign contracts with Universal Payment Corporation.

37.     Defendant Robert J. Susa is President of Defendants Invention Submission Corporation, Technosystems Consolidated Corporation, Technosystems Service Corporation, Western Invention Submission Corporation, Universal Payment Corporation, Innovation Communications, Intromark, Inc., and InventHelp.  Upon information and belief, Mr. Susa is an individual who is a citizen of Pennsylvania, residing at 4190 and 4240 Muirfield Circle, Presto, Pennsylvania 15142-1069.

38.     Defendant Kyle A. Fletcher is a citizen and resident of the State of North Carolina, is the principal of Defendant Law Office of Kyle Fletcher, and is a patent attorney licensed to practice in the State of North Carolina, with a primary place of business at 1515 Mockingbird Lane, Suite 50, Charlotte North Carolina 28209.

39.     Defendant Thomas Frost is a patent attorney licensed to practice in the State of Florida, and is the principal of Defendant Thomas Frost, P.A., with a primary place of business at 6600 Fourth Street North, Suite 102, Saint Petersburg, Florida 33702.

40.     Defendant Above Board Drafting, Inc., is a Florida corporation with a principal place of business at 933 Oleander Way South, Suite 4, South Pasadena, Florida 33707.  Upon information and belief, the preliminary patent searches and/or patent design drawings are performed by this entity, which is not a patent firm and is not licensed to engage in these activities.

41.     Defendant Crossley & Stevenson and Crossley Patent Law are patent law firms, with principal places of business located at 236 South Third Street, #287, Montrose Colorado, 81404 and 63 Mercill Avenue, #12, Jackson Wyoming 83001.

42.     Defendant Kaufhold & Dix is a patent law firm with principal places of business located at 744 Metro Blvd., Suite 420, Edina Minnesota 55439 and 6330 South Western Avenue, Suite 100, Sioux Falls, South Dakota 57108.

43.     Defendants 'John Doe' Individuals and 'John Doe' Companies are unidentified persons and entities that participate in the fraud described herein.

## JURISDICTION

44.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. Sections 1331, 1332(d)(2)(A). This Court has original jurisdiction over this civil action as it arises under the Constitution, laws, or treaties of the United States, specifically the American Inventors Protection Act of 1999, 35 U.S.C. § 297.  Alternatively, this Court has original jurisdiction because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which a member of the class of plaintiffs is a citizen of a state different from the defendants.

45.     Venue is proper pursuant to 28 U.S.C. Section 1391.

46.     Exercise of jurisdiction over Defendants is proper.  Defendants are subject to general jurisdiction in the Commonwealth of Pennsylvania because all Defendants list their principal places of business as located in Pennsylvania, regularly transact extensive business activities in Pennsylvania, and are licensed and/or authorized to do business in Pennsylvania. Moreover, Defendants are subject to specific jurisdiction in Pennsylvania because they have transacted and continue to transact business in Pennsylvania, have engaged in tortious conduct in

Pennsylvania, and there is a substantial nexus between Defendants' purposeful availment of the Pennsylvania forum and Plaintiff(s)' claims.

47.     Defendants have significant contact with Pennsylvania such that they are subject to the personal jurisdiction of this Court. This Court's assertion of jurisdiction over Defendants is consistent with the notions of fair play and substantial justice. One or more Defendants purposefully availed themselves of the benefits of Pennsylvania such that they could reasonably anticipate being hauled into Court here, or otherwise directed their conduct toward this Pennsylvania such that the effects of their damages were occasioned upon Plaintiff(s) within Pennsylvania.

## FACTUAL BASIS FOR CLAIMS

48.     During 2012, Plaintiff Etta Calhoun believed that she had created a new invention, bed linens printed with words of Christian scripture. She named her invention, "The Word of God Bedding."

49.     Plaintiff saw various television spots advertising the services of the company InventHelp. Plaintiff was struck by the advertisement's cartoon image of a caveman sitting on a rock, banging a wheel with a chisel.

50.     On or about January 2012, Plaintiff contacted InventHelp by telephone to inquire about their services.

51.     An InventHelp representative answered the telephone, took Ms. Calhoun's name, telephone number, and address, and promised that someone from the InventHelp team would return her call shortly. Upon information and belief, these same representations were made to all Class Plaintiffs who called InventHelp.

52.     On or about February 18, 2012, Plaintiff met with InventHelp at their offices located at 11200 Broadway, Suite 2743, Pearland, Texas 77584 to inquire about whether her idea was appropriate for their services.  Upon entering InventHelp's office, Plaintiff was given the impression that InventHelp had successfully helped other inventors, and thus that they are a reliable and reputable company.  Defendants' offices were decorated with supposed successful inventions in order to further create the impression that the entity is a legitimate enterprise.  Upon information and belief, contrary to its purposeful impression, the Pearland, Texas office, and most InventHelp offices throughout the country, are merely rented space and not permanent InventHelp locations.

53.     At that meeting, Ms. Calhoun was assured by an InventHelp representative, Renee Hopes, that her idea was not only viable, but that it was original and presented an excellent opportunity for profit.  Upon information and belief, these statements were knowingly false when made and/or were made with reckless disregard for their truth or falsity.

54.     Upon information and belief, Plaintiff's idea was not novel, non-obvious, or otherwise unavailable to the public, and several companies already manufactured and sold products similar to Plaintiff's idea.

55.     Upon information and belief, all Class Plaintiffs are given the impression by Defendants that their proposed inventions are novel, marketable, and/or present excellent opportunities for profit during their initial meetings with Defendants.

56.     At that meeting, the InventHelp representative told Ms. Calhoun that she had a great "add on" idea for Ms. Calhoun's invention.  In addition to linens with words of Christian scripture, the pillowcases could have a "listening device" that would play audio recordings of words of scripture.  Ms. Calhoun agreed that this "add on" was a great idea.

57.    Upon information and belief, InventHelp did not suggest the listening device because it would add to the marketability and/or profitability of Ms. Calhoun's invention. Rather, unbeknownst to Ms. Calhoun, InventHelp suggested the listening device because the addition of that device to Ms. Calhoun's idea would render it potentially patentable, and would thereby increase the amount of money that Ms. Calhoun would pay to Defendants.

58.    Upon information and belief, this strategy is employed by all InventHelp representatives when they are presented an idea that they believe may not be patentable.

59.    Indeed, by letter dated June 18, 1999 to the U.S. Patent & Trademark Office from a patent attorney who was employed by an InventHelp-affiliated patent law firm, the attorney stated that he was taught "how to make a 'non-patentable' invention 'patentable'" by virtue of alterations to the nature and structure of consumers' proposed inventions without consumers' consent.

60.    Ms. Calhoun was overjoyed that a seemingly experienced, reputable and successful company, InventHelp, was impressed with her idea.  She signed the "Basic Information Package Agreement" and agreed to pay $780 for a "Basic Information Package Report."

61.    As part of that contract, Ms. Calhoun signed "Disclosures." required by InventHelp.  One of those disclosures states, "The total number of customers who have contracted with InventHelp in the past 5 years is 8,095. . . The total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 38."

62.    However, another "Affirmative Disclosure Statement" on behalf of Western InventHelp, signed and dated by Ms. Calhoun on that very same day, February 12, 2018, states,

"THE TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1985 IS 53,037. THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BYVIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE, AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS 0."

63.     At that meeting, InventHelp did not inform Plaintiff of, *inter alia*, the accurate number of customers it had in the last five years, the number of positive and negative evaluations, the accurate number of customers who received a net profit from inventions, the accurate number of customers who received license agreements, or the names and addresses of invention promotion companies with whom InventHelp or its officers were affiliated in the last ten (10) years.

64.     At that meeting, Renee told Ms. Calhoun that InventHelp would partner with her for $9,950.00 for their "Submission Services."

65.     That amount was shocking and costly to Ms. Calhoun and she declined. She agreed only to the $780 Basic Information Package Report.

66.     At that time, Ms. Calhoun could not afford the $780 payment.

67.     The InventHelp representative told her that InventHelp had a 'relationship' with a "private money lender" and conveniently had a "Retail Installment Contract" from Defendant Universal Payment Corporation on hand. That contract identifies the "Seller" as InventHelp, the "Buyer" as Ms. Porter, and the "Assignee" as Universal Payment Corporation.

68.     However, Ms. Calhoun's first payment pursuant to that contract was charged to "Techno InventHelp."

69.     After February 18, 2012, InventHelp repeatedly called Ms. Calhoun to urge her to move forward with submission services. Ms. Calhoun again met with Renee Hopes approximately one month later, on or about March 15, 2012, and was presented with a "Submission Agreement" for $9,950.00 at the meeting. However, the price was so overwhelmingly high to Ms. Calhoun that she left the meeting without committing to the contract.

70.     Thereafter, Ms. Calhoun was again repeatedly called by InventHelp.

71.     Upon information and belief, these calls came from InventHelp's Pittsburgh, Pennsylvania office.

72.     Ms. Calhoun did not want to speak with anonymous sales agents. Instead, she tried calling Renee Hope, with whom she had met. However, she was told that Renee was no longer with the company. Throughout the process, Ms. Calhoun was repeatedly told that certain representatives with whom she spoke or met had left, and was juggled from person to person. Upon information and belief, this is common practice of Defendants.

73.     Ms. Calhoun eventually connected with a sales representative named Heather. Heather spoke with Ms. Calhoun frequently and told her that "The Word of God Bedding" idea was brilliant, that she had never seen anything like it, that she would buy it, and that if Ms. Calhoun moved forward with InventHelp she would have a great chance of profiting from her invention. Ms. Calhoun was extremely apprehensive about spending close to $10,000, a tremendous amount of money, and repeatedly asked Heather's opinion. Heather at all times unequivocally told her to go forward. Upon information and belief, Heather's representations on behalf of InventHelp were false or made with reckless disregard for the truth.

74.     On or about April 2012, Ms. Calhoun received the "Basic Information Package" and "Preliminary Patentability Search and Opinion" for which she contracted from InventHelp.

75.     The Preliminary Patentability Search and Opinion is signed by Defendant Thomas Frost, a patent attorney, and is presented on his letterhead. Ms. Calhoun had no conversations or direct communications with Mr. Frost concerning her proposed invention, nor did she ever sign an independent engagement letter with Mr. Frost or his law office.

76.     Ms. Calhoun was led to believe that the Patentability Opinion was drafted by an objective and independent registered patent attorney.   Upon information and belief, Defendant Frost receives all or a substantial percentage of his business from Defendants, and is not independent nor objective.

77.     Upon information and belief, the Patentability Opinion provided to Ms. Calhoun is nothing but boilerplate drivel, meant to appear professional, and is purposefully confusing so that unsuspecting inventors will proceed with expensive "Submission Services" with InventHelp.

78.     Upon information and belief, many Patentability Opinions provided to InventHelp customers are not even researched or drafted by Mr. Frost or any other patent attorney. Instead, upon information and belief, InventHelp sends the searches to Defendant "Above Board Drafting, Inc., a Florida corporation. Upon information and belief Above Board Drafting performs the patent searches, drafts the 'Patentability Opinions' on attorney letterhead, and then sends hundreds of the Patentability Opinions to patent attorneys engaged by InventHelp for the purpose of fraudulently representing that those attorneys prepared the opinions and searches.

79.     Upon information and belief, Mr. Frost had first-hand knowledge of hundreds of customers referred by InventHelp that did not receive utility patents and complained that

17

InventHelp is a fraud. Mr. Frost, an attorney with a fiduciary duty to Ms. Calhoun, informed her of none of these facts.

80.     Independently, the "Basic Information Package" received by Ms. Calhoun is also constructed to appear professional and well thought out, when, in truth and in fact, it is nothing more than loosely-related cut and pasted information, placed into a hard-bound book with Ms. Calhoun's name on the first page.

81.     Although purporting to be an end in itself, in truth and in fact the Basic Information Package is part of Defendants' ploy to convince consumers that their inventions are marketable, and con them into signing contracts for the more expensive Submission Services.

82.     Upon information and belief, the 'Basic Information Package' is merely the first step in InventHelp's scheme to draw aspiring inventors into spending tens of thousands of dollars on additional services. InventHelp and Mr. Frost did not disclose this, nor did they disclose that the purpose of their next meeting would not be to review the book, but rather to "upsell" Ms. Calhoun on to another, more costly and involved, package.

83.     Following receipt of the "Basic Information Package," Ms. Calhoun was again contacted by InventHelp. The professed reason for those calls was to set up a meeting to go over the Basic Information Package. In truth and in fact, the real reason for those calls and subsequent meeting was to "upsell" Ms. Calhoun on the costly Submission Services Agreement.

84.     On or about August 2, 2013, Ms. Calhoun met with InventHelp representative Joy Hinson at 2002 Timberloch Place, Suite 200. The Woodlands, Texas 77380. Ms. Hinson told Ms. Calhoun that InventHelp was wrapping up a special offer, and that it was on or about the last day to receive a $1,000.00 discount for "Submission Services."

85.     At this meeting, Ms. Porter expressed concern about the high cost of these services.

86.     Ms. Hinson pressured Ms. Calhoun.  She also explained that Ms. Calhoun could use her contract with Universal Payment Corporation to finance the submission services.

87.     Ms. Porter signed a "Submission Agreement" with Western InventHelp for $8990.  Upon information and belief, all "Submission Agreements" with InventHelp and/or Western InventHelp are identical and are governed by the law of the Commonwealth of Pennsylvania .

88.     That Submission Agreement states, "WESTERN INVENTION SUBMISSION CORPORATION (WISC) is the name of the corporation contracting to perform the invention development services.  WISC is operating under its registered name, Western InventHelp.  There are no parent, subsidiary or affiliated companies that will engage in performing invention development services under this Contract except for INVENTION SUBMISSION CORPORATION, an affiliate, and TECHNOSYSTEMS SERVICE CORPORATION, an affiliate.  Company is also affiliated with INTROMARK INCORPORATED, which attempts to market inventions where substantial interest has been expressed in accordance with paragraph 1.N above."

89.     The Submission Agreement states, among other things, that "InventHelp will prepare a New Product Submission Brochure, which shall include a description of the invention, benefits and features, a 3D graphic or other illustration in color, Standard Industrial Classification (SIC) codes and suggested distribution channels."

90.     The Submission Agreement states, "InventHelp maintains a Data Bank of companies that have registered to receive our clients' submission materials on an ongoing basis. .

. . InventHelp will submit Client's invention, product or idea to Data Bank companies in an attempt to obtain a good faith review as set forth in more detail below."

91.     The Submission Agreement states, "Companies registered in our Data Bank have agreed to review submission materials submitted to them by InventHelp in confidence and have signed confidentiality and non-use agreements."

92.     The Submission Agreement states, "DataBank companies that we have attempted to match with your invention will be sent a copy of Client's New Product Submission Brochure. This is how Data Bank companies may encounter, receive or see your invention and are then in a position to decide whether to conduct a good faith review."

93.     The Submission Agreement states, "Client agrees that InventHelp shall have the exclusive right to submit the idea, invention or product which is the subject of this Agreement, for the sole purpose of attempting to obtain a good faith review and reviewing any interest expressed including the right to use designs, models, patents issued and pending . . . ."

94.     The August 8, 2013 Submission Agreement discloses:  "THE TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1985 IS 56,345.  THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BY VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE, AN AMOUNT OF MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS INVENTION DEVELOPER IS 0."

95.     That statement directly contradicts the disclosure signed by Ms. Calhoun approximately one year earlier, on February 18, 2012, which stated that over the past 5 years, "the total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 38."

96.     A Submission Agreement signed in 2016 obtained from a potential Class Member states, "From 2013-2015, we signed Submission Agreements with 6,076 clients. As a result of our services 153 clients have received license agreements for their products, and 27 clients have received more money than they paid us for these services."

97.     Submission Agreements signed in 2018 obtained from potential Class Members state, "from 2015-2017, we signed Submission Agreements with 6,564 clients." Those agreements state, "We charge $975 for a Basic Information Package. We charge from $11,900 to $16,900 for our marketing, licensing or promotional services."

98.     Submission Agreements signed in 2018 obtained from potential Class Members state, "The total number of customers who have contracted with InventHelp in the past 5 years is 10,272."

99.     Submission Agreements signed in 2018 obtained from potential Class Members state, "The total number of customers to have received a net financial profit as a direct result of invention promotion services provided by InventHelp is unknown. However, the total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 61."

100.    By letter dated April 23, 2014, Ms. Calhoun received a letter from InventHelp stating that "Your New Product Submission Brochure was mailed to the companies on the enclosed report listed as "Data Bank." Attached to that letter is a list of 20 "Data Bank" companies.

101.    Upon information and belief, this list of Data Bank companies, and Data Bank company lists sent to all InventHelp customers, are shams. Some of the companies do not exist and are purposefully misspelled to resemble actual existing companies that have no relationship

with InventHelp (for example, listing the company as 'Inc.' instead of 'LLC').  Other "Data Bank" companies claim to have no relationship with InventHelp, and have not signed any confidentiality agreements, or any agreements whatsoever, with InventHelp.  Upon information and belief, some of the companies are sham companies and/or are affiliated with InventHelp.

102.    Perhaps most disturbingly, some of the entities listed as Data Bank companies by Invent Help have in fact agreed to review invention ideas.  However, upon information and belief, in the rare instances that these companies express interest in an invention and attempt to contact InventHelp to proceed further, InventHelp does not return the calls.  These companies are provided no contact with InventHelp other than the 1-800 customer numbers advertised to the public on InventHelp's television commercials, and calls to these numbers on behalf of companies that actually want to proceed are often not returned.

103.    Upon information and belief, InventHelp has no infrastructure to deal with companies that actually want to proceed with ideas.   Rather, InventHelp's business model is to take consumers' money with absolutely no intention to follow up with any outside company that may be interested in a prospective inventor's idea.

104.    On August 2, 2013 Ms. Calhoun also signed an "Intromark Proposal" with Intromark Incorporated.  The Intromark Proposal provides that the contract "shall remain in effect for a period of twenty-four (24) months.  This will automatically renew for an additional three years unless terminated in writing by Client upon thirty (30) days' written notice prior to the expiration of the original term of this Agreement."  All agreements described herein were signed in Pittsburgh by "Angela Beauchamp" on behalf of the various entities.

105.    Upon information and belief, all individuals who sign Submission Agreements with InventHelp also sign "Intromark Proposals" with Intromark at the very same time, signed

by the same InventHelp representatives. During the meetings at which these documents are signed, the InventHelp representative makes no distinction between the companies, and purposefully gives the impression that all contracts form a single, integrated whole. All such contracts are ultimately signed by Angela Beauchamp on behalf of all entities, with no distinctions made between the entities.

106.     The Intromark contract states, "Intromark has agreed to attempt to market inventions, ideas or products only where substantial interest has been expressed, or where in Intromark' s sole discretion it wishes to undertake said marketing effort."

107.     The Intromark contract states, "Client further agrees that Intromark during the term of this Proposal shall have the <u>exclusive right to negotiate, and to execute contracts on Client's behalf for the sale and licensing of the idea, invention or product</u>."

108.     Thus, the Intromark contract creates a fiduciary relationship between the client, here, Ms. Calhoun, and Intromark.

109.     By letter dated August 26, 2014, InventHelp sent Ms. Calhoun a "copy of your completed Virtual Invention Presentation (VIP) which is a DVD containing 3-D renderings" of Ms. Calhoun's Invention. InventHelp represented that "We will send your VIP to any InventHelp Data Bank that may specifically request it."

110.     Ms. Calhoun was extremely distressed when she viewed the DVD. It was shoddily-done, and, to her dismay, did not present her "Word of God Bedding" in an attractive light.

111.     Ms. Calhoun immediately called InventHelp to express her disappointment and concern. An InventHelp representative assured Ms. Calhoun that the "Word of God Bedding" was purposefully presented in this way because, otherwise, "someone could steal your idea."

Upon information and belief, this was a lie.  However, Ms. Calhoun took InventHelp at its word – after all, she thought, they were the experts and she was merely a layperson.

112.    By letter dated December 10, 2015, InventHelp stated, "In accordance with your Intromark Proposal we will continue to follow up with any company who may express an interest in your invention as a result of our efforts for 3 additional years."

113.    By letter dated March 8, 2016, InventHelp informed Ms. Calhoun "Your New Product Submission Brochure was mailed to the companies on the enclosed report listed as 'Data Bank.'"  The letter provides, "We will inform you of any inquiries we may receive as a result of our submission efforts."  Attached to that letter is a list of 50 "Data Bank" companies.  Upon information and belief, InventHelp does not have relationships with these companies, these companies did not sign nondisclosure agreements with InventHelp, and, to the extent some of these companies actually exist, none of these companies have ever licensed a product from InventHelp and/or Intromark.

114.    As of March 8, 2016, Ms. Calhoun believed, and was led to believe, in furtherance of Defendants' scheme, that InventHelp was still fulfilling its contractual and statutory obligations to her.  In truth and in fact, they were not.

115.    Throughout this entire process, up to and including the present, Ms. Calhoun has been dutifully making monthly payments to Universal Payment Corporation.  While there were certain times where she felt financially constrained and was unable to make payments, even then, she would send $10 or $15 to Universal Payment Corporation monthly because she wanted to be "honest" and "keep [her] end of the bargain."

116.    At various points between 2013 to date, Universal Payment Corporation contacted Ms. Calhoun by telephone and mail, telling her to pay amounts owing on the contracts and

threatening that if she fails to do so, she will be reported to Credit Agencies and her credit will be otherwise damaged and/or destroyed.

117.    In sum, all "efforts" made on Ms. Calhoun's behalf by Defendants in order to help her "commercialize her invention" are lies and scams.  Defendants, contrary to their written and verbal representations, have no meaningful interest or investment in fulfilling their contractual promises; rather, their business model is based upon receipt of Submission Service fees, and nothing more.  Moreover, the AIPA statutorily-mandated disclosures presented to Ms. Calhoun are, upon information and belief, inaccurate, purposefully misleading, incorrect, and fraudulent.

118.    Upon information and belief, Defendants' acts have the same or similar purposes and results *(i.e.* carry out a scheme to defraud Plaintiff and Class Members of money), participants *(i.e.* Defendants), victims *(i.e.* the Plaintiff and Class Members), methods of commission *(i.e.* using television, telephone, in-person meetings, mail and internet networks to falsely represent to Plaintiff and Class Members that the inventions were patentable, profitable and that Defendants' were fulfilling their contractual and statutory obligations), and are not isolated events.

119.    Upon information and belief, the acts described herein amount to continued fraudulent activity and were committed by Defendants in furtherance of their continuing scheme to defraud Plaintiff and Class Members.

120.    Moreover, the scheme described herein is a continuing operation and poses the threat of continued fraudulent activity, preying upon unsuspecting victims. Defendants' websites and television commercials continue to tout their invention promotion services to lure potential inventors to enter into contracts with Defendants for fraudulent invention promotion services.

121.    Upon information and belief, Defendants defrauded other victims before, during

and after they defrauded Plaintiffs. The foregoing demonstrates that there is no obvious

terminating goal or date for the fraudulent activity; the foregoing acts are part of the Defendants'

ongoing, regular way of doing business; and Defendants operate a long-term association that

exists for criminal purposes *(e.g.,* fraudulently inducing potential inventors to enter into contracts

that obligate the inventors to pay money to Defendants).

122.    Defendants' conduct employs the use of the public telephone, television, U.S.

mail, and internet networks.

123.    The injuries to Plaintiffs and the members of the Class were caused by

Defendants' scheme of fraudulently inducing Plaintiffs and Class Members, through false

disclosures, false promises, misrepresentations, and omissions, to enter into contractual

agreements.

124.    Furthermore, most of the misrepresentations and omissions alleged herein are

contained on Defendant's websites.

## CLASS ACTION ALLEGATIONS

125.    Plaintiff brings this suit individually and as a class pursuant to Federal Rule of

Civil Procedure 23, the requirements of such are met with respect to the class as defined below.

126.    The Class consists of: All persons and entities in the United States who purchased

goods and/or services from Defendants from 2010 to present.

127.    Subject to additional information obtained through further investigation and

discovery, the foregoing definition may be expanded or narrowed by amendment.

128.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of

Defendants; any entity in which any Defendant has or had a controlling interest or which

Defendants otherwise control or controlled; any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

129.    This action is properly maintainable as a class action.

130.    The Class is so numerous that joinder of all individual members in one action would be impracticable.  Submission Agreements signed in 2018 obtained from potential Class Members state, "the total number of customers who have contracted with InventHelp in the past 10 years is 10,272."  Submission Agreements signed in 2018 from potential Class Members state, "from 2015-2017, we signed submission agreements with 6,564 clients." The exact number of class members can be determined by appropriate discovery.

131.    Plaintiffs' claims are typical of the claims of the Class Members in that they all signed identical contracts with Defendants, paid for the same services from Defendants, and were injured by the same wrongful conduct.  The violations of the statutory and common laws and the relief sought herein are common to Plaintiff and the members of the class.

132.    By decision dated February 21, 2018, the Supreme Court of Pennsylvania in *Danganan v. Guardian Protection Services* unequivocally held that a non-Pennsylvania resident may bring suit under the Pennsylvania Unfair Trade Practices and Consumer Protection Law against a Pennsylvania Commonwealth-headquartered business based on transactions that occurred outside of Pennsylvania.  Thus, a nationwide class is appropriate here.

133.    There are questions of fact and law common to all Class Members that predominate over questions which may affect individual members. These include the following:

a.  Whether the disclosures set forth in Defendants' contracts, which are identical and uniform, are truthful and in compliance with the American Inventors Protection Act of 1999, 53 U.S.C.A. § 297.

27

b.  Whether Defendants' advertisements and business practices are targeted to consumers and violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. Section 201-1, et seq.;

c.  Whether Defendants' acts as described herein constitute the unauthorized practice of law;

d.  Whether Defendants' acts described herein, and developed upon further discovery, constitute a mode and practice that pervades the entire company and/or enterprise, including promulgating policies and/or instruction to use common fraudulent practices;

e.  Whether Defendants' business model, which is uniformly applied and directed to all of their customers, is in fact geared toward and/or effective in helping consumers market and/or profit from their inventions, as Defendants claim in their advertisements;

f.  Whether Defendants made false and/or misleading statements to the Class and the public at large concerning the legitimacy of their goods and services;

g.  Whether Defendants are responsible for the conduct alleged herein, which was and is uniformly directed at all consumers who purchased Defendants' products and services;

h.  Whether Defendants' misconduct set forth herein demonstrates that Defendants engaged in unfair, fraudulent, and/or unlawful business practices with respect to the advertising, marketing and sale of their products and services;

i.  Whether Defendants' false and misleading statements were likely to deceive the public;

j.  Whether Defendants had a pattern or practice of making fraudulent and false representations to consumers in order to induce them to sign contracts;

k.  Whether Defendants had a pattern or practice of making fraudulent and false representations to consumers regardless of whether consumers' ideas were likely to receive a utility patent;

l.  Whether Defendants engaged in a conspiracy to work in concert to defraud Plaintiff and Class members;

m.  Whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

n.  Whether Defendants should be enjoined from the actions described herein.

134.  Plaintiff is an adequate Class representative because her interests do not conflict with the interest of the Class Members she seeks to represent; her claims are common to all members of the Class and are based upon the same facts (practice or course of conduct) undertaken by Defendants' with respect to all Class Members and are based upon the same legal theories; plaintiff has a strong interest in vindicating her rights.  The Class Members' interests will be fairly and adequately protected by Plaintiffs and counsel.  Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members.

135.  Plaintiff has retained counsel experienced and competent in the prosecution of complex class action litigation and intends to vigorously prosecute this action.  Plaintiff and her attorneys are familiar with the subject matter of this action and have already expended substantial hours ascertaining and investigating the allegations herein.

136.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class members. Common issues of law and fact predominate, as the primary focus is Defendants' uniform deceptive and misleading practices.

137.    The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class; (ii) to keep the courts from being inundated by thousands of repetitive cases; and (iii) to reduce transaction costs so that the injured class members can obtain the most compensation possible.  Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation.

138.    Importantly, individual Class Members here lack resources to undertake the burden and expense of individual prosecution of these claims.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. It also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

139.    Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action which will result in further damages to Plaintiff and Class Members.

## CLAIMS FOR RELIEF

### COUNT I
**Against Invention Submission Corp., Technosystems Consolidated Corp., Technosystems Service Corp., Western Invention Submission Corp., Robert J. Susa, Intromark, Inc. and Universal Payment Corporation**

**(Violation of the American Inventors Protection Act of 1999, 35 U.S.C. § 297)**

140.     Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

141.     Defendants are "invention promoters" as defined by the American Inventors Protection Act of 1999, 35 U.S.C. § 297 ("AIPA"). Defendants work in concert to perpetrate this scheme.

142.     The "Basic Information Package Agreements" and "Submission Agreements" are contracts for invention promotion services as defined by the AIPA.

143.     Plaintiff and Class Members are customers as defined by the AIPA.

144.     Defendants contracted with Plaintiff and Class Members to provide them with invention promotion services as defined by the AIPA.

145.     Defendants violated the AIPA by not providing the proper disclosures to Plaintiff and Class Members prior to entering into contracts for invention promotion services. As detailed *supra*, Defendants' purported disclosures are inaccurate, internally inconsistent, blatantly false, and fraudulent.

146.     Defendants violated the AIPA by making materially false and fraudulent statements to Plaintiff and Class Members, and are therefore liable for all damages prescribed by the AIPA.

147. By reason of the foregoing, Defendants are liable to Plaintiff and the Class for actual damages and statutory trebling of those damages, together with punitive damages, attorneys' fees, costs, and interest

**COUNT II**
**Against All Defendants**
**(Violations of Pennsylvania Unfair Trade Practices And Consumer Protection Act,**
**73 P.S. Section 201-1, et seq.)**

148. Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

149. Section 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Act ("UTPCPA") defines "trade" and "commerce" to mean the "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, person or mixed, and any other article, commodity, or thing of value wherever situate, and includes trade or commerce directly or indirectly affecting the people of this Commonwealth."

150. Defendants have engaged in trade and commerce in the Commonwealth of Pennsylvania and nationally by marketing (including the production and airing of television and internet advertisements starring George Foreman), offering for sale, and selling invention promotion services and intellectual property services directly to consumers of the Commonwealth and nationwide.

151. Plaintiffs are consumers who purchased Defendants' goods and services and have suffered ascertainable loss.

152. In the course of advertising, marketing, promotion, offering for sale and selling invention promotion services Defendants have represented that they have helped consumers monetize their inventions, that they are affiliated with certain institutions (such as Carnegie Mellon University) and have confidentiality agreements with DataBank companies, that their list

32

of DataBank companies is a legitimate and useful mechanism for Plaintiffs seeking to market their inventions, and that consumers' proposed inventions' will be displayed at Defendants INPEX trade shows, when, in truth and in fact, many DataBank companies do not exist, do not have relationships with Defendants, and/or are not appropriate companies to manufacture, license and/or market Plaintiff consumers' proposed inventions, Defendants are not affiliated with Carnegie Mellon University (and other such reputable institutions), and consumers' inventions are not, in fact, presented and/or displayed at INPEX.

153.    Defendants' acts and practices are likely to confuse or mislead consumers acting reasonably under the circumstances into believing that the Defendants are a legitimate enterprise, and that Defendants' services are tailored to help inventors monetize their inventions.  In truth and in fact, Defendants' services are tailored to extract as much money from Plaintiffs as possible, have little to no utility for Plaintiffs, and are in fact a fraud.

154.    InventHelp fraudulently targets minorities and women through the use of misleading websites, including www.black-inventor.com and www.women-inventor.com.  These websites, although purporting to be educational pages, are in fact InventHelp advertisements.

155.    Defendants often offer to give Class Plaintiffs "discounts" that are "about to expire."  If Class Plaintiffs request time to think about signing the contracts and/or making the substantial monetary commitment, Defendants inform them that the discount will be revoked if they do so.  Upon information and belief, these discounts and specials are shams.

156.    If and when Class Plaintiffs express questions or concerns about forfeiting any legal rights that they may have, Defendants' deceptively point out provisions in the purported contracts that appear to retain Class Plaintiffs' rights, while hiding those provisions that seek to

vanquish those same rights; Defendants also falsely state that the contracts are "no risk" when in fact they are not.

157.    Defendants have therefore engaged in unfair and deceptive acts and practices in violation of 73 Pa. Cons. Stat. Section 201-2(4).

158.    The acts and practices described *supra* and below constitute violations of UTPCPL:

> (a)  Passing off goods or services as those of another;
>
> (b)  Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (c)  Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
>
> (d)  Using deceptive representations or designations of geographic origin in connection with goods and services;
>
> (e)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has sponsorship, approval, status, affiliation or connection that he does not have;
>
> (f)  Representing that goods and services are original when they are in fact not;
>
> (g)  Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, when they are of another;
>
> (h)  Advertising goods or services with intent not to sell them as advertised;

(i) Advertising goods or services with intent not to supply reasonably expectable public demand;

(j) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(k) Failing to comply with the terms of written guarantees, warranties, and contracts;

(l) Knowingly misrepresenting that services are needed when they are not needed;

(m) Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing;

(n) Making solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating the seller, purpose of the call, and nature of the goods and services;

(o) Using a contract, form or other document related to consumer transactions that seeks to waive consumer's right to assert a legal defense to an action; and

(p) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

159.    Defendants have repeatedly and persistently engaged in material deceptive or misleading consumer-related business practices, i.e., advertising, publishing and selling invention promotion, patent, manufacturing, licensing and consultation services that they do not (nor intend to) provide, misrepresenting the viability and potential profitability of Plaintiffs' proposed inventions, and lying and/or coercing Plaintiffs into signing fraudulent contracts.

160.     The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services has been, and continues to be, materially misleading and deceptive to members of the Class and to Plaintiff in material respects.

161.     The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services are directed toward consumers and have a broad negative impact on the general public, including Plaintiff and members of the Class.

162.     Plaintiff and Class Members have been injured by reason of being deceived by Defendants into paying Defendants for purported services that Defendants did not (and did not intend to) provide.

163.     Defendants' deceptive practices were and are consumer-oriented. Defendants advertise via television commercials and internet web pages, among other things, thereby deceiving and attracting large numbers of consumers.

164.     Defendants' material misrepresentations were and are substantially uniform in content, presentation and impact upon consumers at large.

165.     Plaintiff and other members of the Class entered into agreements with Defendants herein and suffered ascertainable loss as a direct and proximate result of Defendants' actions.

166.     Defendants' misconduct described herein was intentional, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, Plaintiffs and the other members of the Class. Defendants are therefore additionally liable for treble and punitive damages, in an amount to be determined at trial, as well as attorneys' fees and costs.

## COUNT III
**Against Invention Submission Corp., Technosystems Consolidated Corp., Technosystems Service Corp., Western Invention Submission Corp., Intromark, Inc., Robert J. Susa and Universal Payment Corporation**
**(Violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227)**

167.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

168.    The Telephone Consumer Protection Act ("TCPA") provides that it is a violation for any person:  (A) to make any call . . . using an automatic telephone dialing system or an artificial or prerecorded voice" . . . (iii) to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. §227(b)(a)(A)(iii).

169.    Upon information and belief, Defendants use automatic telephone dialing systems and/or other prohibited means to call Class Plaintiffs' cell phones after being told to cease and desist.

170.    As set forth herein and as will be uncovered and disclosed in discovery, Defendants use abusive and harassing tactics in order to collect debts from Class Plaintiffs.

171.    As set forth herein and as will be uncovered and disclosed in discovery, Defendants often threaten to take legal action and/or make other threats in order to coerce Plaintiffs to pay their bills.

172.    As set forth herein and as will be uncovered and disclosed in discovery, Defendants often call Plaintiffs multiple times per day, both on land lines and cell phone lines.

173.    Defendants willfully and knowingly engaged in the conduct described above.

174.    As a result of Defendants' conduct, Plaintiffs suffered and continue to suffer personal humiliation, mental anguish and emotional distress, and Plaintiffs are entitled to

damages, statutory damages, including treble and punitive damages, injunctive relief, costs and attorneys' fees.

## COUNT IV
### Against All Defendants
### (Fraud)

175.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

176.    Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.

177.    The agreements and contracts signed by Class Plaintiffs are part and parcel of a grand fraudulent scheme perpetrated by Defendants.

178.    Defendants made and continue to make false and fraudulent statements (including false and misleading disclosures in their contracts and published materials), false promises, misleading representations, and omitting material facts to Plaintiff and Class members pertaining to the uniqueness, patentability, and profitability, among other things, of their inventions, as set forth above.  These representations are part of Defendants' overall business practices and are substantially similar and uniform.

179.    Throughout the course of dealings between Plaintiffs and Defendants, Defendants make many blatant misrepresentations and omissions of present fact, including that certain external companies are interested in Plaintiffs' inventions, when those companies do not exist or have not in fact expressed interest; that Defendants have relationships with "Data Bank" companies; that Defendants have never seen items similar to Plaintiffs' inventions; that Defendants believe that consumers' proposed inventions are likely to make a profit; and that Defendants' submission services have led to licensing agreements for consumers, among other things.

180.    Defendants fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants.

181.    Defendants also falsely represent verbally that their services will likely result in financial gain for consumers in order to induce Plaintiffs to sign the various contracts at issue, when, in truth and in fact, Defendants do not believe this to be the case, and, upon information and belief, Defendants have often seen these very same inventions before.

182.    Defendants falsely represent that they will undertake certain services on consumers' behalf, including but not limited to marketing and promotion of Plaintiffs' proposed inventions. In truth and in fact, Defendants do none of these things.

183.    Defendants falsely represent themselves to be independent companies, but they are part and parcel of a single, grand scheme.

184.    Defendants made many other material misrepresentations to and concealed or suppressed material facts from Class Plaintiffs.

185.    Defendants knew or believed these material misrepresentations and omissions to be false, or made them with reckless regard for the truth.

186.    Defendants misrepresented, concealed or suppressed these facts with the intent to defraud Class Plaintiffs inducing them to purchase Defendants' services and goods.

187.    Class Plaintiffs were reasonable in relying on Defendants' misrepresentations and omissions of material facts because Defendants advertised and held themselves out to be credible, legitimate and experienced sellers of invention promotion, manufacturing, distribution, and other such services, and as having extensive knowledge and expertise in bringing new inventions to fruition.

188.    At the time Class Plaintiffs acted, they were unaware of the false, concealed and/or suppressed facts and would not have purchased Defendants' goods and services had they known the true facts.

189.    All Defendants are liable for the tortious conduct of the other Defendants, as they (a) performed the tortious acts in concert with the others and pursuant to a common design with them, (b) knew that the other Defendants' conduct constituted tortious conduct and gave substantial assistance or encouragement to the other Defendants, and (c) gave substantial assistance to the other Defendants in accomplishing the tortious result and their own conduct, separately considered, constituted tortious conduct towards Plaintiff and Class members.

190.    As a direct and proximate result of Defendants' misrepresentations and concealment of material facts, Class Plaintiffs have suffered damages, the precise amount to be determined at trial.

**COUNT V**
**Against All Defendants**
**(Negligent Misrepresentation)**

191.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

192.    Defendants made misrepresentations and other statements in connection with their deceptive invention promotion, patent, manufacturing, licensing and consultation services.

193.    Defendants made these representations while in privity of contract with Plaintiffs.

194.    The misrepresentations were and are false, deceptive and misleading at the time they were made.

195.    Upon information and belief, at the time they were made, Defendants knew that the statements were false, deceptive and misleading.

196.     Upon information and belief, Defendants stated, disseminated, published and advertised the misrepresentations with the intent to deceive and defraud the general public, including Class Plaintiffs.

197.     Class Plaintiffs were unaware of the falsity of the misrepresentations and relied upon the misrepresentations and as a result have been defrauded out of large sums of money.

**COUNT VI**
**Against All Defendants**
**(Breach of Contract)**

198.     Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

199.     Defendants and Plaintiff and members of the Class entered into various contracts, as described above.

200.     Defendants failed to fulfill the obligations set forth in the above-referenced contracts, thereby breaching their respective contracts with Class Plaintiffs, and Class Plaintiffs have been damaged thereby.

201.     Upon information and belief, Defendants executed substantially identical contracts with all Class Plaintiffs and failed to fulfill their obligations set forth in those contracts, damaging Class Plaintiffs.

202.     By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees and costs.

## COUNT VII
### Against All Defendants
### (Breach of Duty of Good Faith & Fair Dealing)

203.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

204.    Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

205.    Under the contracts described herein, Plaintiff and Class Members reasonably expected Defendants' to carry out the covenants set forth in those contracts.

206.    Defendants arbitrarily and unreasonably did not fulfill the various covenants set forth in the contracts, even though they in fact represented to Plaintiff and Class Members that they would make best efforts to do so.

207.    Defendants acted in bad faith.

208.    As a result, Defendants' are liable to Plaintiff and Class Members for damages in an amount to be determined at trial and attorneys' fees and costs.

## COUNT VIII
### Against All Defendants
### (Unjust Enrichment)

209.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

210.    Defendants' conduct as described herein allowed Defendants to knowingly realize substantial revenues from selling their goods and services at the expense of, and to the detriment or impoverishment of, Class Plaintiffs, and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity and good conscience.

211.   Class Plaintiffs conferred significant financial benefits and paid substantial compensation to Defendants.

212.   It is inequitable for Defendants to retain the benefits conferred by Class Plaintiffs.

213.   By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they suffered as a result of Defendants' actions, the amount of which shall be determined at trial, plus attorneys' fees.

### COUNT IX
### Against All Defendants
### (Breach of Fiduciary Duty)

214.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

215.   Defendants owe Class Plaintiffs fiduciary duties, including advising and acting in Class Plaintiffs' best interests.

216.   Defendant Intromark Inc.'s contracts state, "Client further agrees that Intromark during the term of this Proposal shall have the exclusive right to negotiate, and to execute contracts on Client's behalf for the sale and licensing of the idea, invention or product."

217.   Defendants Submission Agreements state "Client agrees that InventHelp shall have the exclusive right to submit the idea, invention or product which is the subject of this Agreement."

218.   Upon information and belief, along with the Attorney Defendants named herein, there are several attorneys and/or law firms located throughout the United States with whom Defendants contract to provide services to Class Plaintiffs, under the guise that these defendants are independent and impartial. (Collectively, the "Attorney Defendants").

219.   The Attorney Defendants breached their fiduciary duties of care by, among other things, conducting incomplete patent searches, advising Class Plaintiffs to apply for utility patents even though Attorney Defendants were aware that Class Plaintiffs' idea were not suitable for utility patents for various reasons.  Attorney Defendants also had first-hand knowledge of hundreds (or thousands) of customers, referred to them by InventHelp, who did not receive utility patents and/or complained that InventHelp is a fraud.  Yet, Attorney Defendants informed Class Plaintiffs of none of these facts and instead advised them to apply for utility patents and to move forward with InventHelp's services.

220.   Pursuant to contracts between the parties, Defendants agreed to act in Class Plaintiffs' best interests and were given the exclusive rights to submit, to negotiate, and to execute contracts on Class Members' behalf. Upon information and belief, Defendants defrauded Class Plaintiffs by, among other things, falsely representing that companies were interested in Class Plaintiffs' proposed inventions, when, in truth and in fact, no such companies expressed any interest and/or even existed.

221.   Attorney Frost rarely spoke or met with consumers to discuss their proposed inventions, instead signing out boilerplate 'Patentability Opinions' without a formal engagement letter or any discussion whatsoever about the searches he was allegedly conducting.

222.   Class Plaintiffs have been damaged by Defendants' breaches of their fiduciary duties.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs, on behalf themselves and the Class, pray that the Court:

(a) Issue an Order certifying the Class as defined above, appointing the Plaintiff as Class Representative, and designating her Attorneys as Class Counsel;

(b) Find that Defendants have committed the violations of statutory and common law alleged herein;

(c) Enter an Order granting monetary relief, including treble and punitive damages on behalf of the Class in an amount at least $36,000,000.00, the precise amount of which is to be determined at trial;

(d) Enter an Order granting monetary relief, including compensatory damages on behalf of the Class in an amount of at least $72,000,000.00, the precise amount of which is to be determined at trial;

(e) Enter an Order rescinding the various contracts described herein;

(f) Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate Order awarding restitution and monetary damages;

(g) Enter an Order granting all appropriate relief on behalf of the Class under the applicable state statutory and common laws;

(h) Enter judgment including interest, costs, reasonable attorneys' fees, and expenses;

(i) Entering preliminary and permanent injunctive relief against Defendants, directing Defendants to correct their practices and to comply with Pennsylvania consumer protection laws and the AIPA; and

(j) Granting such other and further relief as the Court may deem just and proper.

Dated: White Plains, New York
September 18, 2018

OXMAN LAW GROUP, PLLC
*Attorneys for Plaintiffs*

By:_____
      JULIE PECHERSKY PLITT, ESQ.
      Bar #: JP8607
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 422-3900
(914) 422-3636 (Fax)
jplitt@oxmanlaw.com

Stanley W. Greenfield, Esq.
Greenfield and Kraut
1040 Fifth Avenue
Pittsburgh, PA 15219
(412) 261-4466
greenfieldandkraut@verizon.net

## CERTIFICATE OF SERVICE

I, Julie Pechersky Plitt, hereby certify that on September 18, 2018, I caused a true and correct copy of the foregoing *Amended Complaint Class Action* to be filed and served electronically via the Court's CM/ECF system.

/s/ Julie Pechersky Plitt
Julie Pechersky Plitt (Bar # JP8607)