## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------------X

Etta Calhoun, Sherry Porter, and Cynthia Gray,
On Behalf of Themselves and All Other Persons
Similarly Situated,

                    Plaintiffs,

     -against-

Invention Submission Corporation d/b/a InventHelp,
Technosystems Consolidated Corp., Technosystems
Service Corp., Western Invention Submission Corp.,
Universal Payment Corporation, Intromark Incorporated,
Robert J. Susa, Thomas Frost, P.A., Thomas Frost,
John Doe Companies 1-10, John Doe Individuals 1-10,

                    Defendants.

-------------------------------------------------------------------X

**Docket No. 2:18-cv-01022**

**<u>Second Amended Complaint</u>**

**Class Action**

**Jury Trial Demanded**

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs, on behalf of themselves and all others similarly situated, make the following allegations on personal knowledge as to their own actions and upon information and belief:

### <u>NATURE OF THE ACTION</u>

1.     This class action arises out of a deceptive and fraudulent invention promotion scam that has bilked thousands of aspiring inventors into paying millions of dollars to Defendants.

2.     The gravamen of this case is Defendants' outright, deliberate and fraudulent violation of the American Inventors Protection Act of 1999 ("AIPA"), 35 U.S.C. § 297.

3.     Defendants' AIPA-mandated disclosures are inaccurate, false and misleading.

4.      For example, Defendants' AIPA disclosures regarding clients' receipt of license agreements are inaccurate and fraudulent.  As detailed at length *infra*, InventHelp concocts bogus "60-day license agreements" on behalf of sham companies in order to manipulate and falsify its AIPA disclosure numbers.  *See* 35 U.S.C. § 297(a)(4).

5.      InventHelp includes these falsified numbers in its AIPA disclosures to clients (none of whom know or have reason to know that the numbers are falsified), thereby defrauding all InventHelp customers as a whole.

6.      Defendants and their agents intentionally misrepresent and omit material facts and willfully fail to disclose material facts to customers as a matter of regular business practice, also in violation of the AIPA.  *See* 35 U.S.C. § 297(b).

7.      For example, as part of its standard business practice, InventHelp sends customers lists of companies allegedly in its 'DataBank' that have purportedly agreed to "review new ideas in confidence."  In truth and in fact, many of the companies on these lists do not even exist and/or are sham companies.  Others have not agreed to "review new ideas in confidence," have not signed non-disclosure agreements, and have no relationship whatsoever with InventHelp.

8.      Defendants' entire business model and enterprise is fraudulent, from start to finish.  After being lured in by Defendants' slick advertising and sales tactics, Class Plaintiffs are induced to sign expensive Submission Services contracts based upon Defendants' purposefully incomplete patent searches and reports.

9.      InventHelp and its agents make many misrepresents of present fact in order to induce customers to sign the "Submission Agreements" thereby handing over to Defendants enormous sums of money.

10.     InventHelp advertises and verbally represents to prospective and existing clients that it has relationships with certain well-known entities, brands and big-box stores, including K-Mart, Walmart, Bed Bath & Beyond, Lysol, Air Wick, Cabela's, Elmer's, Heinz, Carnegie Mellon University, and other such large and reputable entities, and that these entities are registered in InventHelp's "DataBank."  (See **Exhibits I and J** hereto).  These verbal representations and visual advertisements are false, misleading and contain outright lies.

11.     Customers who sign up for the first, less expensive step of InventHelp's services receive a hard-bound InventHelp "Report" and a "Preliminary Patentability Opinion" purportedly authored by Patent Attorney Defendant Thomas Frost.

12.     InventHelp relays these reports to its clients.  Both documents are purposefully obtuse, contain omissions and misrepresentations, and serve as InventHelp's hook to set up additional meetings under the guise of "explaining the reports," "going over the patent results" or "revising the reports."  In truth, these reports and patentability opinions are InventHelp's crucial first step in its scheme to trick inventors into second meetings in which they are upsold into signing exorbitantly expensive Submission Services Agreements, which cost approximately $13,500 - $30,000 a pop.

13.     Defendants' "Preliminary Patentability Opinions," opine that customers' proposed inventions are eligible to receive design or utility patents, when, in fact, there often already exist "dead ringer" patents that preclude patents for these inventions.

14.     These are but a few examples of the rampant and blatant fraud perpetrated by Defendants as a matter of company policy, as detailed at length *infra.*

15.     Defendants' ubiquitous late-night television and internet commercials, featuring a cartoon image of a caveman sitting on a rock, banging a wheel with a chisel, promise consumers

3

that InventHelp has contracts with thousands of companies that are looking for new ideas. The commercials state, "We keep your idea confidential"; "We explain every step of the invention process"; "We create professional materials representing your idea and submit it to companies who are looking for new ideas"; "We have more than 9,000 companies who have agreed to review ideas, in confidence," among other representations.

16.     In truth and in fact, InventHelp does not keep its customers' ideas confidential, does not have relationships with "more than 9,000 companies who have agreed to review ideas, in confidence" and does not provide customers with "professional looking materials."

17.     To the extent InventHelp does send out mass mailings of flyers describing consumers' inventions, many recipients of the flyers have not signed nondisclosure agreements and/or do not even exist.

18.     Defendants' regular practice thus puts Plaintiffs' ideas in the public realm thereby impacting potential patentability.

19.     Defendants' regular practice also risks theft of Plaintiffs' unpatented ideas.

20.     Defendants' regular practice also decreases and/or eliminates the salability of Plaintiffs' inventions because these ideas become public.

21.     InventHelp is also engaged in the unauthorized practice of law and the unauthorized advertisement of legal services. For example, InventHelp's television and internet advertisements state: "How do you get a patent? Call InventHelp – they've been helping people just like you for 35 years." Others state: "We have been helped over 10,000 clients get patents." Yet others state: "Do you want to try to get a patent? Call InventHelp now."

4

22.     During customers' follow up meetings with InventHelp, non-lawyer InventHelp representatives explain and advise customers with respect to the Thomas Frost Patentability Opinions as a matter of company practice.

23.     Some InventHelp commercials feature InventHelp client testimonials.  These commercials falsely intimate that the clients featured therein have achieved success through InventHelp.  In fact, not a single one of those InventHelp clients made a dime.

24.     Other InventHelp commercials use the logos of well-known brands and big-box stores, thereby giving customers and prospective customers the incorrect impression that InventHelp is affiliated with these entities.

25.     Whilst InventHelp, Universal Payment Corporation, Intromark Inc., and the other named Defendants hold themselves out to be independent companies, they are one and the same, and are parts of an integrated fraudulent enterprise.  The schemes, trickery, and fraud set forth herein are universal and indistinguishable, notwithstanding the titles of the entities with which Class Plaintiffs believe they are dealing.

26.     Defendants craft their polished marketing materials (including television advertisements, internet ads, web pages and telemarketing calls) to create the impression that Defendants have successfully helped other consumers monetize their inventions, and thus that Defendants are reliable and reputable.  Defendants' offices are decorated with supposed successful inventions, often labeled, "As Seen On TV," in order to further create the impression that they are a legitimate enterprise.  In truth and in fact, Defendants are a fraud.

27.     Defendants' multi-tiered conspiracy preys upon consumers' high hopes and dreams.  It is cleverly constructed to avoid liability and monetary judgment by employing an intricate web of entities – invention promotion companies, licensing agents, private money

lenders, patent attorneys and agents, licensing and distribution companies – that act in concert to defraud Class Plaintiffs.

28.     Defendants employ sophisticated and crafty mechanisms to escape liability, including the insertion of fraudulent clauses into their various contracts designed to extinguish would-be private litigants' rights.

29.     Because Class Plaintiffs often do not have at hand the tens of thousands of dollars 'necessary' to make their dreams come true, they are offered generous loans by "independent private money lender" Universal Payment Corporation.

30.     This "independent private money lender" is not independent at all – it operates under the identical ownership and control as InventHelp, has no actual business address other than a P.O. Box, and is an indispensable arm of the fraudulent scheme described herein.

31.     Class Plaintiffs agree to pay the steep initial fees out of pocket (often selling personal property, remortgaging their homes, or borrowing from family members) or to loan the money from Defendant Universal Payment Corporation.  In the meantime, Defendants make off with Class Plaintiffs' money and do little to nothing to fulfill their end of the bargain, stringing Class Plaintiffs along with false promises and boilerplate "analyses" in order to extract more money, and then disappearing and dodging calls as soon as Defendants have the money in hand.

32.     Once consumers sign the expensive agreements, they receive a flurry of paperwork for years on end, giving them the continuing impression that Defendants are working on their behalf.  In truth and in fact, Defendants are generating this paperwork in order to create this impression, with no expectation that the proposed inventions will be licensed.  Indeed, on the rare occasion that a legitimate company expresses interest in an InventHelp client's idea, that

company has no means of contacting InventHelp other than the 1-800 number advised on InventHelp's late-night television commercials.  These calls go unreturned.

33.     After months or years of silence, Defendants reappear to clients, representing that outside companies have discovered their inventions, and that those companies now want to license the products pursuant to "60-day license agreements."

34.     Defendants falsely represent to these clients that "60-day license agreements" are standard industry practice.  InventHelp customers sign the paperwork and excitedly wait for their dreams to come true.  Inevitably, the sham licensing companies decide against "renewing" the fake 60-day licenses.

35.     In the meantime, InventHelp files fraudulent tax documents with the U.S. Federal government, representing that clients received licensing agreements, when, in truth and in fact, these purported "60-day licenses" are concocted solely for the purpose of bolstering InventHelp's AIPA disclosures – InventHelp includes the sham "60-day licenses" in their AIPA numbers, thereby falsely representing to existing and potential clients the number of InventHelp customers who received licensing agreements.

36.     Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.  Defendants' enterprise as a whole is fraudulent, and Defendants fraudulently induce Class Plaintiffs to sign various contracts.

37.     Defendants also fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants (*fraud-in-the-factum*).

38.      Before consumers have the opportunity to meaningfully review the lengthy,

complicated contracts at issue, Defendants use high-pressure tactics, routinely telling consumers

that "today is the very last day" of a "special" or "promotion" that will save consumers hundreds

or thousands of dollars, but that in order to get these savings, consumers must sign immediately,

before leaving the office.  These statements are false and fraudulent – there are no such

"specials" or "promotions" that are about to expire.

39.      As detailed herein, when customers express concern about their ability to make

future payments pursuant to the contracts with Defendants, Defendants' representatives point out

Paragraph 3 of the Submission Agreement, falsely representing to customers that this clause

enables them to stop making payments with no penalties, when, in truth and in fact, it does not.

40.      Defendants' actions are particularly egregious because many of their customers

are of modest means.  Defendants' representatives employ high pressure tactics to push Class

Plaintiffs to hand over tens of thousands of dollars and sign fraudulent contracts, falsely

representing to Class Plaintiffs the actual content of those contracts, that if Class Plaintiffs sign

immediately (without time to properly review the contracts) they will receive substantial

discounts pursuant to "specials" that are about to expire, that Class Plaintiffs' proposed

inventions are one-of-a-kind and/or carry terrific potential for profit, and that Class Plaintiffs

likely stand to make 'millions' or 'billions' if they engage Defendants' services.

41.      Defendants also use nefarious means to censor, block and/or mask negative

reviews of InventHelp, thereby preventing consumers from seeing what really happens to those

who sign up for their services.

42.      In order to obstruct consumers' view of the hundreds of negative reviews of

InventHelp on the consumer-targeted internet websites www.pissedconsumer.com, and

www.ripoffreport.com, Defendants employ sophisticated mechanisms (including purchasing domain names) to redirect those consumers to InventHelp's own website, or otherwise redirect consumers without consumers' knowledge and/or consent, to false and fraudulent glowing reviews.

43.     Defendants also employ deceptive and fraudulent tactics by using threats, intimidation and harassment to collect debts.  In order to induce Class Plaintiffs to sign contracts, Defendants represent that if Class Plaintiffs can no longer make payments, then, pursuant to Paragraph 3 of the Submission Agreement, there is "no risk" – the contracts will simply expire with no further performance on either end.  However, if and when Class Plaintiffs stop paying, Defendants dog Class Plaintiffs, threaten to "destroy" Plaintiffs' credit and threaten to put liens on their homes and other personal property.

44.     Defendants call Class Plaintiffs multiple times per day, often on Plaintiffs' cell phones, and verbally threaten and harass, oftentimes using foul language.

45.     As detailed *infra*, Defendants' actions violate the AIPA and give rise to liability pursuant to a variety of common law claims, including fraud and breach of contract, among others.

## THE PARTIES

46.     Plaintiff Etta Calhoun is an individual who is a citizen of the State of Texas, residing at 23510 Whispering Willow, Spring, Texas 77373.

47.     Plaintiff Sherry Porter is an individual who is a citizen of the State of New York, residing at 99 Mill Road, Rochester, New York, 14626.

48.     Plaintiff Cynthia Gray is an individual who is a citizen of the State of Texas, residing at 8612 Sunwood Ct., Fort Worth, Texas, 76123.

49.     The entities and individuals listed in paragraphs 50-59 have engaged in and have conspired to engage in a pattern of fraudulent activity, have each committed numerous acts as part of their scheme to defraud Class Plaintiffs, have each participated in the operation or management of a fraudulent enterprise, and have each acted with actual authority and/or apparent authority on behalf of each and every Defendant herein.

50.     Defendant Invention Submission Corporation does business under the names 'InventHelp,' and 'Innovation Communications,' among others, and is located in the same office, and shares identical management and employees, with InventHelp, Technosystems Consolidated Corporation, Western Invention Submission Corporation, Technosystems Service Corporation, and Intromark Incorporated (collectively, "InventHelp" or "InventHelp Defendants").

51.     Consumers who sign contracts with InventHelp and/or Western InventHelp (including Named Plaintiffs herein) sign an explicit acknowledgement that InventHelp, Invention Submission Corp., Western InventHelp, and Technosystems Service Corporation will all be performing services under the contracts, regardless of the particular contract's corporate signatory.  All contracts signed by any InventHelp Defendant are ultimately signed by Angela Beauchamp, in Pittsburgh PA, on behalf of each and every entity.  Although Plaintiffs often sign contracts with multiple entities at the same time – for example, Western InventHelp and Intromark Incorporated – all letters they receive thereafter are on InventHelp letterhead and are signed by "InventHelp representatives."

52.     Defendant Invention Submission Corporation d/b/a/ InventHelp and d/b/a/ Innovative Communications, is a Pennsylvania corporation with its principal place of business located at 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  It is registered to do business under the name InventHelp.

53.     Defendant Technosystems Consolidated Corporation identifies its "web URL" as "www.inventhelp.com."   It is a Delaware corporation with its primary place of business located at 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  Bloomberg identifies the "web URL" of Technosystems Consolidated Corporation as "www.inventhelp.com."  Named Plaintiffs and proposed Class Plaintiffs who sign contracts with InventHelp, Universal Credit Corp., and/or Western InventHelp, are actually charged on credit card statements by Technosystems Consolidated Corporation.

54.     Defendant Technosystems Service Corporation is a Delaware Corporation with a primary place of business located at 217 9th Street, Pittsburgh, PA 15222.   Individuals who contract with InventHelp and/or Western InventHelp sign an explicit acknowledgement that Technosystems Service Corporation will:  "engage in performing invention development services under this Contract."

55.     Defendant Western Invention Submission Corporation ("WISC") is a North Carolina Corporation with a principal place of business located at 217 9th Street, Pittsburgh, PA 15222.  WISC operates under the registered name Western InventHelp.  Individuals who contract with WISC sign the following acknowledgement:  "[WISC] is the name of the corporation contracting to perform the Invention development services.  WISC is operating under its registered name, Western InventHelp.  Western Inventhelp's principal business address is: 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  There are no parent, subsidiary or affiliated companies that will engage in performing invention development services under this Contract other than INVENTION SUBMISSION CORPORATION, 217 Ninth Street, Pittsburgh, Pennsylvania, 15222, an affiliate, and TECHNOSYSTEMS SERVICE CORP., 217 Ninth Street, Pittsburgh, Pennsylvania, an affiliate."

56.     Defendant Intromark Incorporated is a Pennsylvania Corporation with a primary place of business located at 217 9th Street, Pittsburgh, PA 15222.

57.     Defendant Universal Payment Corporation is a Pennsylvania Corporation with a principal place of business listed at 903 Liberty Avenue, 3rd Floor, Pittsburgh, PA 15222. Individuals who finance their contracts with Defendants do so through this entity, which operates under the same management and control as InventHelp.

58.     Defendant Robert J. Susa is President of all of the InventHelp Defendants - Defendants Invention Submission Corporation d/b/a InventHelp, Technosystems Consolidated Corporation, Technosystems Service Corporation, Western Invention Submission Corporation d/b/a Western InventHelp, Universal Payment Corporation, Innovation Communications, and Intromark, Incorporated.  Mr. Susa is an individual who is a citizen of Pennsylvania, residing at 4190 and 4240 Muirfield Circle, Presto, Pennsylvania 15142-1069.

59.     Defendant Thomas Frost is a patent attorney licensed to practice in the State of Florida, and is the principal of Defendant Thomas Frost, P.A. (collectively, the "Frost Attorney Defendants"), with a primary place of business at 6600 Fourth Street North, Suite 102, Saint Petersburg, Florida 33702.

60.     Defendants 'John Doe' Individuals and 'John Doe' Companies are unidentified persons and entities that participate in the fraud described herein.

## JURISDICTION

61.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. Sections 1331, 1332(d)(2)(A). This Court has original jurisdiction over this civil action as it arises under the Constitution, laws, or treaties of the United States.  This Court also has original jurisdiction because the amount in controversy exceeds the sum or value of $5,000,000,

exclusive of interest and costs, and is a class action in which a member of the class of plaintiffs is a citizen of a state different from the defendants.

62.    Venue is proper pursuant to 28 U.S.C. Section 1391.

63.    Exercise of jurisdiction over Defendants is proper.  Defendants are subject to general jurisdiction in the Commonwealth of Pennsylvania Defendants' principal places of business are located in Pittsburgh, Pennsylvania, they regularly transact extensive business activities in Pennsylvania, and are licensed and/or authorized to do business in Pennsylvania. Moreover, Defendants are subject to specific jurisdiction in Pennsylvania because they have transacted and continue to transact business in Pennsylvania, have engaged in tortious conduct in Pennsylvania, receive all business and referrals by virtue of Pennsylvania entities, and there is a substantial nexus between Defendants' purposeful availment of the Pennsylvania forum and Plaintiffs' claims.

64.    Defendants have significant contact with Pennsylvania such that they are subject to the personal jurisdiction of this Court.  This Court's assertion of jurisdiction over Defendants is consistent with the notions of fair play and substantial justice.  Defendants purposefully avail themselves of the benefits of Pennsylvania such that they could reasonably anticipate being hauled into Court here, or otherwise directed their conduct toward this Pennsylvania such that the effects of their damages were occasioned upon Plaintiffs within Pennsylvania.

## FACTUAL BASIS FOR CLAIMS

65.    The instant complaint tells the stories of three InventHelp customers.  While the names, dates, and locations of each may differ, the course of action that they illustrate are one and the same. Each Named Plaintiff (and potential class member) was presented with false and

misleading AIPA disclosures; each Named Plaintiff (and potential class member) signed expensive contracts by virtue of false and misleading statements, advertisements and reports; and each Named Plaintiff (and potential class member) was strung along for years on end with false and misleading letters and communications from InventHelp, including the false representation that InventHelp was sending information describing their inventions to "DataBank" companies that had signed nondisclosure agreements, when, in fact, InventHelp was not.

* * *

66.     In or about January 2013, Plaintiff Sherry Porter, a 52-year old accounts payable clerk at a sheet metal manufacturing company, believed that she had created a new invention:  a pet collar with LED lights to keep animals safe at night, which she named "Light Lock Pet Collar."

67.     Ms. Porter had seen various television commercials for InventHelp and was persuaded to call the company.

68.     On or about January 11, 2013, Ms. Porter contacted InventHelp via email.

69.     That same day Ms. Porter was notified that Amanda Herman, an InventHelp representative, would be present at InventHelp's Rochester, New York, Linden Oaks office, and Ms. Porter set an appointment for January 19, 2013.

70.     On January 19, 2013, Ms. Porter met with InventHelp representative Amanda Herman.  At that meeting, Ms. Porter was impressed with InventHelp's offices and the professionalism and seeming profitability of the Rochester, New York office.  Upon information and belief, contrary to its purposeful impression, the Rochester, New York office, and most InventHelp offices throughout the country, are merely temporary rented space and not permanent InventHelp locations.

71.     At that meeting, Ms. Porter was also impressed with Amanda Herman, who presented herself and InventHelp as experienced experts in helping laypersons develop and capitalize upon their inventions.

72.     Amanda Herman expressed extreme excitement about Ms. Porter's idea, and said, "I really hope that you decide to move forward with this idea." Ms. Herman said, "animals get hit by cars daily across the country and world for that matter. Not to mention that this could go far in branching out to have this with children. Your idea isn't just a product that you use in the kitchen, it saves innocent lives and that to me is priceless."

73.     Ms. Herman emphasized that she had never seen a product like this on the market. Upon information and belief, this statement was false or was made with reckless disregard for its truth or falsity.

74.     Ms. Herman said that Ms. Porter's idea was extremely marketable and carried immense potential for profit because it could be used not just for pets, but for farm animals and children. Upon information and belief, this statement was false or was made with reckless disregard for its truth or falsity because Ms. Herman had reason to believe that similar items were likely already sold on the open market.

75.     Ms. Herman presented Ms. Porter with disclosures at the January 19, 2013 meeting. Those disclosures state: "From 2009-2011, we signed Submission Agreements with 4,607 clients. As a result of our services, 116 clients have received license agreements for their products, and 26 clients have received more money than they paid us for these services." Although Ms. Porter did not know it at the time, the numbers in these disclosures are false and misleading by virtue of their inclusion of sham licensing agreements, among other reasons. She had no way of knowing this.

15

76.     Ms. Porter was presented with a second set of disclosures at that meeting setting forth InventHelp's numbers for the past 5 years that provided statistics regarding number of InventHelp clients, number of InventHelp customers who profited from their contracts with InventHelp and, "The total number of customers known by InventHelp to have received license agreements for their inventions as a direct result of InventHelp services is 167," among other things.  Although Ms. Porter did not know it at the time, the numbers in these disclosures are false and misleading by virtue of their inclusion of sham licensing agreements, among other reasons.  She had no way of knowing this.

77.     Ms. Porter was overjoyed that InventHelp, a seemingly sophisticated and successful invention promotion company, was impressed with her idea.  However, due to financial constraints, she was reluctant to sign a contract right then and there.  Ms. Herman told Ms. Porter that InventHelp was wrapping up a special offer, and that it was the last day to receive a $100 discount on the "Basic Information Package."

78.     Ms. Herman also told Ms. Porter that Ms. Porter could finance the cost through an independent loan company, Universal Payment Corporation.

79.     Ms. Porter signed a "retail installment contract" with Universal Payment Corporation, agreeing to a $300 cash down payment and installments thereafter of $128 per month.

80.     Thereafter, Ms. Porter received emails from "universalpaymentcorp.com" with payment receipts.

81.     However, Ms. Porter's payment pursuant to that contract was charged to "Techno InventHelp."

82.     Ms. Porter began to get nervous about the money she had spent.  She performed some internet searches and saw many complaints about InventHelp on various online complaint boards, chat groups, and other online spaces.

83.     By email dated January 21, 2013, Ms. Porter reached out to the "United Inventors Association of America," a purported 501c3 nonprofit organization "dedicated to providing educational resources and opportunities to the independent inventing community."  Ms. Porter stated:  "Hi my name is Sherry and I recently interviewed with InventHelp, and since I have seen nothing but bad reviews.  I am wondering if you have any insights to offer to me.  I would greatly appreciate anything you can offer."

84.     InventHelp was made aware of Ms. Porter's email to the United Inventors Association of America.

85.     It is unclear how InventHelp obtained access to Ms. Porter's inquiry to the "United Inventors Association of America," and what the relationship is between InventHelp and that purported 501c3 entity.

86.     By email dated January 22, 2013, Amanda Herman, on behalf of InventHelp, replied to Ms. Porter stating, "I realized that there are several links that have both Inventhelp and Scam , however, they are our own websites that we have created to help inventors from being scammed by shady invention companies, so I am not sure if you have actually clicked on those links to see that they are our sights (sic.) created to stop invention scams in the business.  The only negative info I saw available was 41 complaints.  In 29 years of business and 1000's of inventors 41 complaints is a very low percentage for a company to have.  I am not discounting the fact that there are a couple unhappy customers, but again all subjective information and you never get the other side of the story when reading their complaints.  We work hard to resolve any

issues when it comes to customer care, and everything we do here is regulated by a strict compliance department and the FTC.  With that said, <u>I urge you to not only research us with the BBB but also click on the links that say inventhelp and scam…..they are not saying we are a scam, we are exposing other companies out there that are.</u>" (*emphasis in original*).

87.     Upon information and belief, these statements were made with knowing falsity and/or reckless disregard for their truth.  The 'InventHelp / scam' postings found on the internet were NOT posted by InventHelp or by its own websites, as represented by Ms. Herman.  The InventHelp complaints online are NOT "our sights (sic) created to stop invention scams in the business," as represented by Ms. Herman.  As of January 2013, contrary to Ms. Herman's representation, there were hundreds, if not thousands, of online complaints against InventHelp, not, as Ms. Herman stated, only 41.

88.     Ms. Porter had no way of knowing this because InventHelp uses nefarious means to censor, block and/or mask negative reviews of InventHelp.

89.     In order to obstruct consumers' view of the hundreds of negative reviews of InventHelp on the consumer-targeted internet websites www.pissedconsumer.com, and www.ripoffreport.com, Defendants employ sophisticated mechanisms (including purchasing domain names) to redirect those consumers to InventHelp's own website, or otherwise redirect consumers, without consumers' knowledge and/or consent, to false and fraudulent glowing reviews.

90.     InventHelp pays sophisticated "reputation management professionals" to erase bad reviews online, falsely representing to website administrators that certain bad reviews have been ruled defamatory by court orders, when, in fact, they have not.  For example, InventHelp

engaged Florida "reputation management lawyer" Zachary Sloan to erase negative online

InventHelp reviews; the purported court orders relating to those reviews are nonexistent.

91.     Throughout the next few weeks, Ms. Porter repeatedly contacted InventHelp and

Ms. Herman.  She was repeatedly urged to go forward and told that InventHelp was successful

and that with its help, she too would be successful with her invention, which carried immense

potential for profit due to the large market size.

92.     On or about February 25, 2013 Ms. Porter received the "Basic Information

Package" that she had purchased for approximately $700.  She contacted Amanda Herman at

InventHelp to go over the results and point out errors in the package.

93.     By email dated February 25, 2013 at 10:46 am, Ms. Herman stated, "Don't be

disappointed.  First there is a lot of information throughout the basic information package, and I

haven't read through it all.   That is the first draft so if you find something is missing after you

have gotten through every thing, tell me and we can add what we need to ensure it is all correct

and we are all on the same page.  Second, you should schedule to come in and see me when I am

in Rochester I will be there Friday 15th-Sunday 17th so we can sit down and go over the second

stage options so you fully understand everything.  The one program is designed to have inventors

who want to be involved do so but most hire us to do everything for them.  So instead of getting

down and out, please let me know what day and time would be great so we can go through

everything and get things corrected, added and understood.  One of the major reasons we send

out a copy of the work so far, is so that the inventor can proofread and add and make comments

to ensure that we are all on the same page."

94.     Upon information and belief, these statements were knowingly false and/or made

in reckless disregard of the truth.  The 'Basic Information Package' is the first step in

InventHelp's scheme to draw aspiring inventors into spending tens of thousands of dollars on additional services. Ms. Herman did not disclose this, nor did she disclose that the purpose of their next meeting was not to revise the book, or to "go through everything and get things corrected," but rather to "upsell" Ms. Porter on to another, more costly and involved, package.

95.     In March 2013, Ms. Porter, her daughter in tow, again met in Rochester with Amanda Herman. At this meeting, Ms. Herman told her about a recent news story about a cow that was hit by a car. Ms. Herman represented that the Basic Information Package results showed that Ms. Porter's invention carried immense potential for profit, and that Ms. Porter "must pursue this" as soon as possible in order to capitalize on this huge opportunity, which could amount to "hundreds of millions of dollars." Upon information and belief, Ms. Herman was lying, had not seen any news story about a cow, did not believe that Ms. Porter's idea was unique or marketable, and did not believe that Ms. Porter's idea would be profitable for her.

96.     At this meeting, Ms. Porter expressed concern about the next level of services offered, "Submission Services" for over $10,000.

97.     Ms. Herman pressured Ms. Porter, telling her that it was the last day of a "rare special" where she would get $1,900 off the $11,000 price. Ms. Herman explained that Ms. Porter could use her contract with Universal Payment Corporation to finance the submission services, and that if she signed up that very day, she would get that special price. In truth and in fact, it was not the "last day" of a "special."

98.     Sherry Porter told the InventHelp representative that she was worried that she would be unable to keep up with payments in the future.

99.     Ms. Herman told Ms. Porter at that meeting that if Ms. Porter ever failed to come up with the money, it was no risk to her – she could just stop making payments and InventHelp

would stop performing services.  Ms. Herman pointed out Paragraph 3 of the Submission

Services contract, which states, "In the event Client breaches this Agreement by failing to pay

for  the services described herein, InventHelp shall have the right to suspend services or

terminate the Agreement, in which case InventHelp shall be under no obligation whatsoever to

provide any further services to Client."

100.    Ms. Herman represented that pursuant to Paragraph 3, the only legal recourse

InventHelp would have if Ms. Porter were to stop paying would be to cease services, and thus

that Ms. Porter had nothing to worry about.  In truth and in fact, InventHelp aggressively pursues

clients who fail to make payments, reporting them to credit agencies and threatening legal action.

Ms. Herman knew this but did not disclose it.

101.    Following that meeting, Ms. Porter emailed Ms. Herman, stating "I am just trying

to come up with some ideas of different ways to finance the $9000.00 that we talked about.  One

of my thoughts was can I do 4 years verses 3 to bring the payment down?"

102.    AHerman@inventhelp.com replied that Ms. Porter could finance for 4 years, but

then Ms. Porter would lose the $1900 discount.

103.    Ms. Porter eventually signed a "Submission Agreement" with InventHelp for

$9,000 on or about May 17, 2013.  Upon information and belief, all "Submission Agreements"

with InventHelp and/or Western InventHelp are identical.

104.    Ms. Porter financed the Submission Agreement through Universal Payment

Corporation.

105.    When she signed the contracts, Ms. Porter was not provided with accurate

disclosures of, *inter alia*, the accurate number of customers it had in the last five years, the

number of positive and negative evaluations, the accurate number of customers who received a

net profit from inventions, the accurate number of customers who received license agreements, or the names and addresses of invention promotion companies with whom InventHelp or its officers were affiliated in the last ten (10) years

106.    The Submission Agreement states, among other things, that "InventHelp will prepare a New Product Submission Brochure, which shall include a description of the invention, benefits and features, a 3D graphic or other illustration in color, Standard Industrial Classification (SIC) codes and suggested distribution channels."

107.    The Submission Agreement states, "InventHelp maintains a Data Bank of companies that have registered to receive our clients' submission materials on an ongoing basis. . . .  InventHelp will submit Client's invention, product or idea to Data Bank companies in an attempt to obtain a good faith review as set forth in more detail below."

108.    The Submission Agreement states, "Companies registered in our Data Bank have agreed to review submission materials submitted to them by InventHelp in confidence and have signed confidentiality and non-use agreements."

109.    The Submission Agreement states, "DataBank companies that we have attempted to match with your invention will be sent a copy of Client's New Product Submission Brochure. This is how Data Bank companies may encounter, receive or see your invention and are then in a position to decide whether to conduct a good faith review."

110.    The Submission Agreement states, "Client agrees that InventHelp shall have the exclusive right to submit the idea, invention or product which is the subject of this Agreement, for the sole purpose of attempting to obtain a good faith review and reviewing any interest expressed including the right to use designs, models, patents issued and pending . . . ."

111.    By email dated July 31, 2013 Ms. Porter reached out to Amanda Herman asking about the status of her invention submission materials.

112.    On that same day, Ms. Herman replied that it takes months before the materials are ready.  Ms. Herman attached a document entitled, "InventHelp Timetable of Submission Services."  That document states that between 6 to 20 weeks after the Submission Agreement is signed, InventHelp will send its clients drafts of materials describing the invention, after which time the "Submission Services" would begin.

113.    In early 2014, Ms. Porter began receiving mail from InventHelp representing that it was submitting her information to companies in accordance with their contracts.

114.    Ms. Porter was given the impression that InventHelp was working diligently on her behalf.

115.    For example, by letter dated March 14, 2014, InventHelp informed Ms. Porter that it had submitted information about her invention to companies.

116.    By letter dated March 2, 2015 InventHelp informed Ms. Porter that it had submitted information about her invention to more companies.

117.    By letter dated March 9, 2015 InventHelp informed Ms. Porter that it had posted her invention press release on PR WEB news distribution website.

118.    By letter dated May 13, 2015, Ms. Porter received a letter from InventHelp stating that "Your New Product Submission Brochure was mailed to the companies on the enclosed report listed as "Data Bank."  Attached to that letter is a list of 48 "Data Bank" companies.

119.    Upon information and belief, this list of Data Bank companies, and company lists sent to all InventHelp customers, are shams.  Some of the companies do not exist and are purposefully misspelled to resemble actual existing companies that have no relationship with

InventHelp (for example, listing the company as 'Inc.' instead of 'LLC').  Other "Data Bank"
companies claim to have no relationship with InventHelp, and have not signed any
confidentiality agreements, or any agreements whatsoever, with InventHelp.

120.    For example, the company "Fulcrum Designs" based in Portland Oregon is listed
as a DataBank company to which InventHelp sent Sherry's New Product Submission Brochure.
However, per the principal of Fulcrum, that company has no relationship with InventHelp,
receives no mail from InventHelp, received no information about Sherry's invention from
InventHelp, and has never signed any nondisclosure agreement with InventHelp.  Another
company on InventHelp's May 13, 2015 list to Sherry Porter, "Gen 7 Pets," does not accept
invention ideas whatsoever as a matter of company policy.

121.    These are but two examples; a limited survey of InventHelp clients' DataBank
lists reveals that approximately one half of the companies that InventHelp represents to clients
are in its DataBank in fact claim to have no relationship with InventHelp, claim to have never
signed nondisclosure agreements, and/or appear to be nonexistent companies.

122.    Ms. Porter did not know this; she trusted InventHelp's representations that it was
in fact sending her idea to DataBank companies, that those companies were legitimate, and that
those companies had agreed to review InventHelp customers' ideas "in confidence."

123.    By letter dated July 21, 2015, InventHelp sent Ms. Porter a letter summarizing
InventHelp's work on her behalf, including "we have prepared and submitted different materials
to companies and publications to help you try to get exposure for your idea and generate
interest/feedback.  We targeted companies in the InventHelp DataBank that have registered their
preliminary product interest areas and have agreed to review our clients' inventions in
confidence," among other things.

124.    The July 21, 2015 letter stated: "Beginning now, in accordance with your Intromark Proposal Agreement, we will continue to follow up with any company who expresses an interest in your invention as a result of our efforts for a period of 3 additional years."

125.    Time passed, and Ms. Porter assumed that InventHelp had in good faith submitted her invention to companies, and that none were interested.

126.    Then, in March 2018, InventHelp contacted Ms. Porter by telephone and email claiming that a company was interested in her invention.

127.    In April 2018, InventHelp left a voicemail message for Ms. Porter, telling her that a company wanted to pay her $500.00 to review the paperwork for her invention.  Ms. Porter's interest was piqued by the offer of $500.00, and she returned the call.

128.    On April 18, 2018, Ms. Porter was contacted via email from "Director of Product Development InventHelp/Intromark" from the address JDiresta@intromark.com.  That email stated:  "My name is Joe DiResta, I am happy to make your acquaintance it was nice to speak to you. As we discussed we have a company who we work with that is willing to give us $500.

To hold the product for 60 days from the time we sign the deal.  This is not a transfer of rights it is a license for them to review the item.
I will be sending a contract over the next day or so if you have any questions please give me a call to discuss.
**Please send me an email back to let me know you received this email.**

Thanks,

Joseph DiResta
Director of Product Development
InventHelp/Intromark

C. 917 991 0204
O. 412 288 1300 x1416"  (*emphasis in original*).

25

129.    Joe DiResta identified himself as "Director of Product Development

InventHelp/Intromark," making no distinction between these companies.

130.    The official LinkedIn Profile of Joe DiResta on that date, and as of the date of the

instant filing, lists his title as "Director of Product Development at InventHelp" from "July 2008

to present."

131.    Ms. Porter called Mr. DiResta at 1-412-288-1300, InventHelp's Pittsburgh

headquarters, and was overjoyed to learn that a company was interested in licensing her product.

She told Mr. Diresta that she wanted to proceed.

132.    That same day, April 18, 2018, Joe DiResta sent Ms. Porter another email

attaching a "Licensing Agreement" between "Abrams Gentile Entertainment LLC, 244 West 54th

Street, 9th Floor, New York, New York," Intromark, and Ms. Porter together with a W-9 tax

form.  Mr. DiResta's email stated:  "Hi Sherry,

Thank you for the help with this.
So you have my information, my name is Joe DiResta the Director of Product
Development InventHelp/Intromark, it has been nice to speak to you. As we discussed we have a
company who we work with that is willing to give us $500.
To hold the product for 60 days from the time we sign the deal.  This is not a transfer of rights it
is a license for them to review the item.

Attached is the contract and the W9 for tax purposes.

***Please sign and fax or scan back the last/signature page only thank you.

Once we receive your page signed we will reach out to the company for signature. Once the doc
is fully executed and we should receive the funds;

 when the check clears you will receive the funds.

This is a 30 day process but you can check in at any time thank you.

_Also attached is a W-9 please fill out and return for our accounting dept._

*I need both docs filled out and or signed and scanned back or faxed to me  before we can
redistribute the funds.*

Thank you very much, please call my cell if you have any questions!

FAX NUMBER 412 338 0497

*Thanks,*

> *Joseph DiResta*
> *Director of Product Development*
> *InventHelp/Intromark*

>> *C. 917 991 0204*
>> *O. 412 288 1300 x1416*
>> *F.  412 338 0497"*

133.    Attached hereto as **Exhibit A** is a copy of that email together with the purported

"60-day License Agreement" and the W-9 Form transmitted to Ms. Porter from InventHelp

therewith.

134.    Everything in InventHelp's April 18 communications are outright lies.  The

"License Agreement" is a sham.  Abrams Gentile Entertainment, LLC, is also a sham.  The

website for Abrams Gentile Entertainment, www.agebrands.com,  describes it as "a New York

based concept development group incorporated in 1986 specializing in creating and producing

youth consumer products and family brand entertainment with sustainable value. . . .  [It has]

created such ground breaking brands as SKY DANCERS,  the Nintendo POWER GLOVE,

SHINING STARS."

135.    As of June 2018, the telephone number listed on the website for Abrams Gentile

Entertainment was 1-212-757-0700.  Calls to that number were routed to an operator that

answered, "Airport Service," and references a website, www.airportservice.com; calls to the

number provided on the "Airport Service" website are routed to the same operator service as the one for Abrams Gentile Entertainment.

136.    As of the date of the instant filing, the telephone number has been removed from the Abrams Gentile website.

137.    The purported License Agreement, attached hereto as **Exhibit A**, lists its "effective date" as "April 18, 2018" and lists "244 West 54th St., 9 fl., New York City, New York, USA" as Abrams Gentile's "principal place of business."  However, per the building doorman and building tenant listing, as of April 18, 2018 no tenant resided at that address, and Abrams Gentile was not located in that building.

138.    The "License Agreement" states that Abrams Gentile "is a product and custom accessory & boutique company.  They are looking to bring style & fashion to all levels of society.  They also look to manufacturer (sic.) custom fashion product for both men and woman and the like, designer and developer of various products for sale in the mass and boutique markets, and is desirous of obtaining an exclusive license to sell INVENTION direct (sic) to their other international customers hereinafter referred to as 'TERRIRORY,'(sic)."

139.    Upon information and belief, this contract is a fake and a sham and is being used to further perpetrate a fraud upon Ms. Porter and upon all InventHelp customers as a whole by virtue of its inclusion in AIPA disclosure numbers.  Ms. Porter did not know this – she assumed that InventHelp was acting in good faith.

140.    Ms. Porter spoke to Mr. DiResta several times via his InventHelp office number in Pittsburgh, and corresponded with him on his InventHelp / Intromark email address, JDiresta@intromark.com.  She continued to express confusion about the concept of a "60-day license" and why she needed to send InventHelp her tax information.

141.    InventHelp continued to aggressively pursue Ms. Porter, urging her to sign the sham license agreement and the tax document, including repeatedly imploring her to provide her social security number and repeatedly representing that a preliminary 60-day licensing agreement was standard industry practice.

142.    By email dated April 23, Joe DiResta stated, "I left a vm for you when you get a chance please execute the below docs if you need please reach out to call me."

143.    By email dated April 24, 2018, (11:22 am), Ms. Porter informed Joe DiResta at InventHelp / Intromark that she needed time to think about it.

144.    By email dated April 24, 2018 (11:44 am), JDiresta@intromark.com replied, "Thank you so much for reaching out.  If you have any questions please give me a call.  I just wanna get everything wrapped up before the company changes there (sic.) mind.  I look forward to hearing from you have a great week!!  Joey, Joseph DiResta, The Director of Product Development InventHelp/Intromark."

145.    On Wednesday April 25, 2018, Ms. Porter called Mr. DiResta at his InventHelp Pittsburgh number at approximately 3pm.  She told him that she had some questions and that she did not understand the Abrams Gentile offer.  Mr. DiResta told her that he was on the other line with Hong Kong negotiating a license agreement and abruptly hung up.

146.    Ms. Porter and Mr. DiResta had several more conversations in which Ms. Porter expressed confusion about the deal and questioned Mr. DiResta about the need for her to send InventHelp a W-9 tax form.

147.    On the morning of April 30, 2018, Ms. Porter received multiple telephone calls from 1-412-288-1300, InventHelp's Pittsburgh number.  She picked up a call approximately

11am, and spoke to Mr. DiResta, telling him that she did not feel comfortable with her understanding of the deal.

148.     On the morning of May 2, 2018, Mr. DiResta called Ms. Porter again.  He told her that Abrams Gentile wanted to pay her $500 immediately and that if she failed to jump on this, she would probably lose the deal.  Ms. Porter asked some more questions about the $500 check she would receive if she signed the agreement.  Mr. DiResta said that Ms. Porter would get the $500 check within a week.  When Ms. Porter again expressed reservations and lack of understanding, Mr. DiResta emphatically told her that the work that she paid InventHelp to do "was finally paying off" because a company was extremely interested in her invention.

149.     After the repeated and assurances from InventHelp, Ms. Porter finally decided to move forward.  She reasoned that InventHelp was an expert in these things and that per Mr. DiResta' s repeated representations, a 60-day license agreement was standard industry practice.

150.     Ms. Porter informed Mr. DiResta on May 2, 2018 that she would sign the License Agreement with Abrams Gentile Entertainment, and she faxed a signed copy to InventHelp's Pittsburgh Headquarters at 1-412-338-0497.

151.     Mr. DiResta responded via email at 12:10 pm, "Hi Sherry are you going to be sending me the W9 under a separate cover? Joseph DiResta, The Director of Product Development InventHelp/Intromark."

152.     Ms. Porter responded, "Joe we talked about the W9 and I am not comfortable sending that at this time."

153.     Mr. DiResta then responded via email, "Thank you again!! Joseph DiResta, The Director of Product Development InventHelp/Intromark."

154.     On May 4, 2018, Mr. DiResta emailed Ms. Porter and stated, "Hi Sherri!

30

W9 all ok. Your check is going out in the next 7 days we have to wait for their check to clear.

Thanks Have great weekend!!"

155.    Ms. Porter asked Mr. DiResta when she would receive a copy of the fully executed License Agreement.

156.    On May 4, Mr. DiResta responded that he was out of the office and would not return until the week of May 14, at which time he would forward her the fully executed agreement.

157.    On or about May 4, a check in the amount of $500 was issued from "Intromark, Inc., 217 Ninth Street, Pittsburgh, PA 15222" to Sherry Porter.  The authorized signature bears the name of Defendant Robert J. Susa.  The memo notation states, "Royalty Advance."  A copy of that check is attached hereto as **Exhibit B.**

158.    Upon information and belief, as of the date of the sham licensing agreement, there already existed on the market scores of dog collars embedded with LED lights, and an entity called Abrams Gentile Entertainment did not exist and/or did not agree to license Ms. Porter's product for 60 days.

159.    By email dated May 16, 2018, Mr. Diresta emailed Ms. Porter a purported copy of the fully executed license agreement.

160.    Ms. Porter asked Mr. Diresta if the company was interested in her idea, and if so, when she would begin to receive royalties.

161.    By email dated May 16, 2018, Mr, Diresta responded that he spoke via telephone with someone from Abrams Gentile Entertainment, and that "they are reviewing and are not

doing anything till we see where they are at the end of this review period." Upon information and belief, this was a lie.

162.    On January 28, 2019, Ms. Porter received a Form 1099 in the mail representing that she was paid $500 for "Royalties" from Intromark. That form is attached hereto as **Exhibit C.**

163.    Ms. Porter never heard from InventHelp again.

164.    From 2013 through May 2018, InventHelp strung Ms. Porter along, providing her with false AIPA disclosures, falsely representing that it was working on her behalf, even going so far as to present her with a sham licensing agreement and an InventHelp company check signed by Defendant Susa for $500, fraudulently representing that it was in exchange for a "60-day license" of Ms. Porter's unpatented idea.

165.    Upon information and belief, InventHelp includes "60-day license agreements" like the one sent to Ms. Porter in its AIPA disclosures, fraudulently and falsely representing to each and every InventHelp customer and potential customer the number of license agreements received by clients by virtue of InventHelp's services.

166.    Those agreements inevitably 'fall through.' After receipt of the $500 checks, InventHelp customers never hear from InventHelp again, or, are told by InventHelp that the sham companies decided not renew the 60-day licenses. In the meantime, InventHelp uses these false numbers in its disclosures to each and every client and potential client and in its tax filings with the U.S. and Pennsylvania government.

167.    Indeed, in addition to the stories of Sherry Porter and Cynthia Gray detailed herein, counsel is in possession of other, nearly identical, "60-day license agreements" on behalf

of bogus companies, sent by InventHelp to InventHelp customers.  Attached hereto as **Exhibit D**

is one such sham agreement and a copy of a $500 check purportedly related thereto.

168.     Online message boards also contain comments and confusion from InventHelp

clients about the $500 agreements and checks.

169.     Sadly, Ms. Porter's experience is not unique.

170.     In 2014, Plaintiff Cynthia Gray, a retired woman in her late 60's, believed she had

created a new invention, "Hair Edges by Cynthia,"  a hair band geared toward African American

women that seamlessly blends into a woman's hair and fills thinning spots around the hairline.

171.     Lured in by InventHelp's television commercials, on August 6, 2014 Ms. Gray

met with InventHelp representative Richard Feldbush at InventHelp's Dallas, Texas office.  Mr.

Feldbush expressed extreme excitement over her idea and told her that it carried enormous

potential for profit due to the large size of the potential market.  Despite intense pressure from

Mr. Feldbush, Ms. Gray did not sign any agreement that day.

172.     On September 15, 2014 Cynthia met with Richard Feldbush again and signed the

Basic Information Package Agreement with Western InventHelp and a retail installment contract

with Universal Payment Corporation, for $845.00.

173.     She was provided with purported AIPA disclosures at that meeting on behalf of

InventHelp.  Those disclosures stated:  "The total number of customers who have contracted

with InventHelp in the past 5 years is 8,268.  The total number of customers to have received a

net financial profit as a direct result of invention promotion services provided by InventHelp is

unknown.  However, the total number of clients known to have received more money than they

paid InventHelp for submission services as a direct result of these services is 37.  The total

number of customers known by InventHelp to have received license agreements for their inventions as a direct result of InventHelp services is 209."

174.    These disclosure numbers are incorrect, false and fraudulent.  Among other things, the disclosure number as to license agreements is false because InventHelp includes sham "60-day license agreements" in those numbers.  Ms. Gray had no way of knowing this.

175.    Ms. Gray was not presented with disclosures on behalf of Western InventHelp at this meeting.  However, Mr. Feldbush gave her the impression that InventHelp and Western InventHelp were one and the same.  Thus, she had no reason to believe that she should have been provided with disclosures from Western InventHelp separate and apart from the InventHelp disclosures.

176.    As part of the Basic Information Package, Ms. Gray opted to receive a Preliminary Patentability Opinion from Attorney Defendant Thomas Frost.

177.    Ms. Gray signed a "Preliminary Patentability Search and Opinion Referral Request."  InventHelp sent materials on her behalf to Attorney Defendant Frost.

178.    Ms. Gray did not have a single meeting with Attorney Defendant Frost in which she described or discussed the particulars of her invention.

179.    Ms. Gray did not have a single telephone conversation with Attorney Defendant Frost in which she described or discussed the particulars of her invention.

180.    In or about October 2014 Ms. Gray received her Basic Information Package and Preliminary Patentability Opinion from InventHelp's Pittsburgh address, not Attorney Defendant Frost.

181.    The Preliminary Patentability Opinion is signed by Defendant Thomas Frost, a patent attorney, and is presented on his letterhead.

182.    Ms. Gray was led to believe by InventHelp and the Frost Defendants that the Patentability Opinion was drafted by an objective and independent registered patent attorney. Upon information and belief, Defendant Frost receives all or a substantial percentage of his business from Defendants and is neither independent nor objective.

183.    The Preliminary Patentability Opinion includes a 7-page letter from the Frost Attorney Defendants dated October 22, 2014.  That letter only contains a single sentence very generally describing Ms. Gray's invention.  The remainder describes considerations of utility patents, design patents, the Leahy-Smith America Invents Act, foreign patent protection, and other such legal issues generally applicable to any proposed invention.  The letter concludes with the statement: "it is my professional opinion that design patent protection should be available for your invention."

184.    The October 22, 2014 letter from Thomas Frost asserts that he completed an "international patentability search meeting the standards of the Leahy-Smith America Invents Act."

185.    This letter, and the Thomas Frost P.A. Preliminary Patentability Opinion letters sent to all InventHelp customers, are false and misleading.  Mr. Frost did not have the ability to conduct a proper patent search, and did not do so.  Ms. Gray, a non-lawyer, did not know this.

186.    Upon information and belief, the materials provided to Ms. Gray in connection with the Basic Information Package are nothing but boilerplate drivel, meant to appear professional, and are purposefully confusing so that unsuspecting inventors will proceed with expensive "Submission Services" with InventHelp.

187.    Upon information and belief, many Patentability Opinions provided to InventHelp customers are not even researched or drafted by Mr. Frost or any other patent attorney.  Instead,

upon information and belief, InventHelp sends the searches to "Above Board Drafting, Inc., a Florida corporation, or another such company.  These outside companies perform the patent searches, draft the 'Patentability Opinions' on attorney letterhead, and then send hundreds of the Patentability Opinions to the Frost Defendants for the purpose of fraudulently representing that the Frost Defendants prepared the opinions and searches.

188.    Upon information and belief, Defendant Frost had first-hand knowledge of hundreds of customers referred by InventHelp that were informed by Defendant Frost's Preliminary Patentability Opinions that their inventions were eligible to receive patents, but in fact did not receive patents and complained that InventHelp is a fraud.  Mr. Frost, an attorney with a fiduciary duty to Ms. Gray, informed her of none of these facts.

189.    Following her receipt of the Basic Information Package materials in late 2014, Ms. Gray again met with InventHelp on or about January 27, 2015 at the urging of Mr. Feldbush, who told her that they should meet to go over the wonderful results of the package.

190.    At the January 27, 2015 meeting, Mr. Feldbush reviewed the Preliminary Patentability Opinion with Ms. Gray, and explained that the Preliminary Patentability Opinion showed that a design patent would be available for her invention, and that the overall results of her package were very promising, especially in light of the "large market size" of the female African American demographic.

191.    Mr. Feldbush pressured Ms. Gray to sign a Submission Services contract.  When she expressed reservations about the extremely high cost of these services, Mr. Feldbush told her that Paragraph 3 of the Submission Services contract protected her – that if she needed to stop making payments she could do so and InventHelp would have no recourse.

192.    Excited by Mr. Feldbush's representations, Ms. Gray signed a "Submission Agreement" with Western InventHelp for $12,400, and an Intromark Proposal at the same exact time.  Richard Feldbush signed on behalf of InventHelp, Western InventHelp, and Intromark. Those agreements are identical to those signed by all Named Plaintiffs herein and all proposed class members.

193.    Ms. Gray financed the Submission Agreement through her retail installment contract with Universal Payment Corporation, which is identical to that signed by all Named Plaintiffs and proposed class members.

194.    Ms. Gray was provided disclosures from Western InventHelp at the January 27, 2015 meeting.  The Western InventHelp disclosures state:  "The total number of customers who have contracted with the Invention Developer since 1985 is 59,495.  The total number of customers known by this invention developer to have received, by virtue of this invention developer's performance, an amount of money in excess of the amount paid by the customer to this invention developer is 0."

195.    The Western InventHelp disclosures provided no information whatsoever as to number of license agreements, and thus is *ipso facto* in violation of the AIPA.

196.    To the extent the Western InventHelp disclosure is a stand-alone disclosure, it is in violation of the AIPA because it omits the number of licensing agreements.  To the extent the Western InventHelp disclosure is a supplement to InventHelp disclosures signed at the same time, the disclosures are in violation of the AIPA because their numbers contradict one another.

197.    InventHelp AIPA disclosures signed in January 2015 state that "the total number of customers known by InventHelp to have received license agreements for their inventions as a direct result of InventHelp services is 209."

198.    On August 26, 2015, InventHelp sent Ms. Gray a letter informing her that "the final printing of your submission materials has been completed.  We have enclosed copies for your records and we have begun to submit these materials to [DataBank] companies."

199.    Thereafter, Ms. Gray began regularly receiving letters on InventHelp letterhead representing that InventHelp had sent her idea to DataBank companies, which had signed confidentiality agreements.

200.    Ms. Gray believed, and was led to believe, that InventHelp was working on her behalf.

201.    However, many of these DataBank companies do not exist, did not sign nondisclosure agreements, and/or do not have any relationship with InventHelp.  For example, by letter dated February 15, 2016, InventHelp sent Ms. Gray a purported DataBank list naming the company "Sta-Rite Ginnie Lou" as one DataBank company to which InventHelp sent Ms. Gray's idea.  Per Sta-Rite Ginnie Lou principals, that company has no relationship with InventHelp, never had any such relationship with InventHelp, never signed any nondisclosure agreement with InventHelp and never received any information about Ms. Gray's invention from InventHelp.  Another company on that same list, "Raani" does not appear to exist.  A third company, Crown Crafts, received unsolicited materials from InventHelp, but has no relationship with InventHelp and has never signed any nondisclosure agreement with InventHelp.

202.    Ms. Gray trusted the representations made in InventHelp's letters, and did not know these facts.

203.    Ms. Gray believed, and was led to believe, that InventHelp was diligently working on her behalf and that such efforts had the potential to lead to licensing or manufacturing agreements for her.  In truth, this is not the case.

204.     On July 17, 2018, Ms. Gray received a call from InventHelp's Pittsburgh number, 412-288-1300.  She was told that a company called "DRTD Products" was interested in a "60-day license" of her product and would pay her $500.00.

205.     She was excited that a company was interested in her invention, but she was confused about the concept of a "60-day license."

206.     On July 19, 2018 Ms. Gray sent InventHelp and email asking for clarification.

207.     On July 19, 2018 Ms. Gray received an email from Director of Product Development InventHelp/Intromark Joe DiResta stating, "the company will review the item for 60 days (sixty days).  For the time the company will pay you a fee of $500.00 (five hundred dollars).  All of the $500 Goes to you.  If they decide not to move forward with your product the deal automatically cancels."

208.     On July 19, 2018 Ms. Gray emailed Joe DiResta at InventHelp and again expressed confusion about the terms of the deal.

209.     In response, Joe DiResta, Director of Product Development InventHelp/Intromark, told Ms. Gray to call him at InventHelp's Pittsburgh number, 412-288-1300.  Ms. Gray called him immediately.  He explained that it was a win-win situation for her – a company would review her invention for 60 days, pay her to do so, and possibly would license the product for more than 60 days, thereby potentially paying her even more money.  He told her that this was standard industry practice, and that it was precisely for this very reason that Ms. Gray got involved with InventHelp in the first place.  Ms. Gray then told InventHelp that she wanted to proceed.

210.    On July 19, 2018 Joe DiResta sent Cynthia Gray an email attaching a "60-day license agreement" between Intromark Incorporated, Clear Innovation Inc., and Cynthia Gray" and a W-9 tax form.

211.    The purported 'licensee,' is listed as Clear Innovation Inc. in some parts of the contract, and as "DRTV company" in others.

212.    The purported license agreement bears the InventHelp file number for Cynthia Gray's invention.

213.    The July 19, 2018 email transmitting the licensing agreement states:  "Hi Cynthia, I hope this email finds you well, it was nice to speak to you.  As we discussed the attached are the contract and for accounting a W9 form because we are paying you $500.  We need that for year end tax reporting. . . .  Once we receive your page signed we will reach out to the company for signature.  Once the doc is fully executed and we should receive the funds; when the company check clears our account you will receive the funds.  This is a about 30 day process but you can check in at any time thank you.  Also attached is a financial doc W9 please fill out and return for our accounting dept. or they will not cut the check.  I need both docs filled out and or signed and scanned back too or faxed to me before we can redistribute the funds.  Thank you very much.  Fax number: 412-338-0497."

214.    That email, the purported license agreement, and W-9 accompanying tax form are attached hereto as **Exhibit E**.

215.    On or about July 26, 2018 Ms. Gray signed the license agreement and W-9, and faxed them to InventHelp's Pittsburgh fax number.  By email dated July 26, 2018 Mr. DiResta confirmed that InventHelp received the documents.

216.     By email dated July 26, 2018 Ms. Gray asked Mr. DiResta for a fully executed copy of the license agreement.  He did not respond.

217.     She called Mr. DiResta several times to inquire about the deal.

218.     On August 2, 2018 Ms. Gray received a call from Mr. DiResta from InventHelp's Pittsburgh telephone number.  He told her that the company named on the "60-day license agreement," backed out of the deal.

219.     During that August 2, 2018 call, Mr. DiResta told Ms. Gray that luckily, a new company was interested in her invention.  He said he could just use the license agreement with Clear Innovations / DRTV and tax form that she had already signed and faxed to InventHelp for this new deal.

220.     Ms. Gray was confused, and on August 2, 2018 she called InventHelp back and asked Mr. DiResta if he had a new contract for her to review and sign.  Mr. Diresta reiterated that InventHelp could just use the existing, signed contract and tax form for the new company.

221.     Ms. Gray did not understand how an entirely new company could use her "60-day license agreement" with DRTV for this new deal.  She repeatedly contacted InventHelp and Mr. DiResta, but her calls and emails were not returned.

222.     On August 20, 2018 Ms. Gray received a $500 check in the mail.  The check is dated August 16, 2018, is from Intromark, Inc., 217 Ninth Street, Pittsburgh Pa.  It bears the memo notation:  DLL-2959 – ADVANCE ROYALTY, and is signed by Robert J. Susa.  A copy of that check is attached as **Exhibit F** hereto.

223.     Ms. Gray was happy to receive the check and telephoned Mr. Diresta but could not reach him. She then sent an email on August 20, 2018 stating, "Hello Mr. DiResta, I'm so excited!  I received the check in the mail today, but there was no letter indicating which company

will be reviewing my invention.  Can you send me the name of the company?  Thank you,
Cynthia Gray."

224.    Neither Mr. DiResta nor InventHelp responded.

225.    On August 30, 2018 Ms. Gray sent Mr DiResta another email stating, "Haven't
heard from you in a while.  I hope no news is good news.  Has a company had a chance to review
my invention?  And what is the name of the company?  Just excited and anxious to see how
things are going."

226.    By email dated August 31, 2018, Mr. Diresta stated, "I am on vacation I am out of
the office sorry."

227.    Months passed and Ms. Gray never heard from anyone InventHelp despite
repeated calls.

228.    In or about late 2018, Ms. Gray received a Form 1099 from Intromark, indicating
a payment to her of $500.00, characterized as "Royalties," attached hereto as **Exhibit G.**

229.    On December 31, 2018 Ms. Gray emailed JDiresta@intromark.com stating:  "Mr.
Diresta, It's been a while since I last heard from you.  You indicated my invention was going to
be reviewed by a royalty company.  Can you provide an update?"

230.    Mr. Diresta responded that he was on vacation.

231.    Following more silence and unanswered emails, Mr. Diresta finally called Ms.
Gray on January 30, 2019.  He told her that the company decided not to move forward with her
invention, but that she should look for other companies to do so, and that InventHelp would also
keep looking for her.

232.    Ms. Gray emailed Mr. Diresta and asked him for the name of the company that paid $500 for the 60-day license so that she could call the company herself and pitch her idea, explaining that as the inventor of the product, she could best convey her vision.

233.    Mr. Diresta called Ms. Gray from InventHelp's Pittsburgh telephone number and told her that he could not send the name and phone number of the company to her because "when companies say 'No,' they mean 'No.'"

234.    Ms. Gray never heard from Joe DiResta again.

235.    Upon information and belief, InventHelp routinely uses sham "60-day license agreements" and $500.00 checks like those sent to Ms. Gray and Ms. Porter to falsify its AIPA disclosures regarding the number of InventHelp clients who received license agreements by virtue of InventHelp's services.

236.    Defendant Robert J. Susa signs all of the fraudulent $500 checks, with full knowledge that they are not in exchange for purported "60-day license agreements," but rather that they are used to falsify InventHelp's AIPA disclosures.

237.    These are not real license agreements, and the companies on whose behalf they are sent are not real – Mr. Susa, the President of all InventHelp Defendants named herein, has full knowledge of this fact.

238.    Indeed, Defendant Robert J. Susa is intimately involved in InventHelp's fraud at all levels.  For example, InventHelp refers its clients to several patent attorney firms located throughout the United States, including the now-defunct firm Crossley & Stevenson.  These patent attorneys apply for utility or design patents on InventHelp customers' behalf.

239.    In or about late 2016, one such attorney, Tarley G. Stevenson, learned that her law partner, Patricia K. Crossley, was engaging in fraud with the help of InventHelp.

240.   As a result, attorney Tarley G. Stevenson sought to file a lawsuit and dissolve her partnership with Patricia Crossley and InventHelp.

241.   Upon learning this, Defendant Robert J. Susa personally called Ms. Stevenson and repeatedly threatened and harassed her, pressuring her to cover up the fraud.  Mr. Susa also repeatedly threatened Ms. Stevenson that if she used InventHelp's name in any lawsuit or filing he would sue her for defamation.

242.   Attached hereto as **Exhibit H** is an email dated August 28, 2018 from Tarley Stevenson characterizing InventHelp as a "deceitful, despicable company" and stating that "Bob Susa and his attorney at Fox Rothschild not only meddled in the lawsuit, but asked me to cover up the close to $1M in fraud that my partner was responsible for . . . as a result of black-lining federal documents and correspondence to clients. . . . "

243.   In the Spring of 2018, Ms. Stevenson wrote a letter to Mr. Susa memorializing her understanding of InventHelp's fraud vis-à-vis the patent attorneys with whom InventHelp works. Among other things, she complained about the patent attorneys' lack of independence.  She also opined that the Thomas Frost Preliminary Patentability Opinions and searches "are an absolute sham."  Mr. Susa personally responded with threats to Ms. Stevenson and her law practice.

244.   From September 2014 through January 2019, InventHelp strung Ms. Gray along, providing her with false AIPA disclosures, falsely representing that it was working on her behalf, even going so far as to present her with a sham licensing agreement and an InventHelp company check signed by Defendant Susa for $500, fraudulently representing that it was in exchange for a "60-day license" of her unpatented idea.

245.   Sadly, the stories of Ms. Gray and Ms. Porter are not unique.

246.     During 2012, Plaintiff Etta Calhoun, a retired grandmother in her 70's, believed that she had created a new invention, bed linens printed with words of Christian scripture.  She named her invention, "The Word of God Bedding."

247.     Etta saw various television spots advertising the services of the company InventHelp and was struck by the advertisement's cartoon image of a caveman sitting on a rock, banging a wheel with a chisel.

248.     On or about January 2012, Ms. Calhoun contacted InventHelp by telephone to inquire about their services.

249.     An InventHelp representative answered the telephone, took Ms. Calhoun's name, telephone number, and address, and promised that someone from the InventHelp team would return her call shortly.

250.     On or about February 18, 2012, Plaintiff met with InventHelp at their offices located at 11200 Broadway, Suite 2743, Pearland, Texas 77584 to inquire about whether her idea was appropriate for their services.  Upon entering InventHelp's office, Plaintiff was given the impression that InventHelp had successfully helped other inventors, and thus that they are a reliable and reputable company.  Defendants' offices were decorated with supposed successful inventions in order to further create the impression that the entity is a legitimate enterprise. Upon information and belief, contrary to its purposeful impression, the Pearland, Texas office, and most InventHelp offices throughout the country, are merely temporary rented space and not permanent InventHelp locations.

251.     At that meeting, Ms. Calhoun was assured by an InventHelp representative, Renee Hopes, that her idea was not only viable, but that it was original and presented an excellent

opportunity for profit.  Upon information and belief, these statements were knowingly false when made and/or were made with reckless disregard for their truth or falsity.

252.    Upon information and belief, Plaintiff's idea was not novel, non-obvious, or otherwise unavailable to the public, and several companies already manufactured and sold products similar to Plaintiff's idea.

253.    Upon information and belief, all Class Plaintiffs are given the impression by Defendants that their proposed inventions are novel, marketable, and/or present excellent opportunities for profit during their initial meetings with Defendants.

254.    At that meeting, the InventHelp representative told Ms. Calhoun that she had a great "add on" idea for Ms. Calhoun's invention.  In addition to linens with words of Christian scripture, the pillowcases could have a "listening device" that would play audio recordings of words of scripture.  Ms. Calhoun agreed that this "add on" was a great idea.

255.    Upon information and belief, InventHelp did not suggest the listening device because it would add to the marketability and/or profitability of Ms. Calhoun's invention.  Rather, unbeknownst to Ms. Calhoun, InventHelp suggested the listening device because the addition of that device to Ms. Calhoun's idea would render it potentially patentable, and would thereby increase the amount of money that Ms. Calhoun would pay to Defendants.

256.    Upon information and belief, this strategy is employed by InventHelp representatives when they are presented an idea that they believe may not be patentable.

257.    Indeed, by letter dated June 18, 1999 to the U.S. Patent & Trademark Office from a patent attorney who was employed by an InventHelp-affiliated patent law firm, the attorney stated that he was taught "how to make a 'non-patentable' invention 'patentable'" by virtue of

alterations to the nature and structure of consumers' proposed inventions without consumers'

consent.

258.    Ms. Calhoun was overjoyed that a seemingly experienced, reputable and

successful company, InventHelp, was impressed with her idea.  She signed the "Basic

Information Package Agreement" and agreed to pay $780 for a "Basic Information Package

Report."

259.    As part of that contract, Ms. Calhoun signed InventHelp AIPA "Disclosures."

One of those disclosures states, "The total number of customers who have contracted with

InventHelp in the past 5 years is 8,095. . . The total number of clients known to have received

more money than they paid InventHelp for submission services as a direct result of these services

is 38."

260.    However, another "Affirmative Disclosure Statement" on behalf of Western

InventHelp, signed and dated by Ms. Calhoun on that very same day, February 12, 2012, states,

"THE TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE

INVENTION DEVELOPER SINCE 1985 IS 53,037.  THE TOTAL NUMBER OF

CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED,

BYVIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE, AN AMOUNT OF

MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS

INVENTION DEVELOPER IS 0."

261.    To the extent the Western InventHelp disclosure is a stand-alone disclosure, it is

in violation of the AIPA because it omits the number of licensing agreements.  To the extent the

Western InventHelp disclosure is a supplement to the InventHelp disclosure signed at the same

time, it is in violation of the AIPA because its numbers contradict those in the InventHelp

disclosure. The InventHelp disclosure is inaccurate false and misleading because it includes the sham 60-day license agreements as part of its numbers. Ms. Calhoun had no way of knowing this.

262.    At that meeting, InventHelp did not inform Plaintiff of, *inter alia*, the accurate number of customers it had in the last five years, the number of positive and negative evaluations, the accurate number of customers who received a net profit from inventions, the accurate number of customers who received license agreements, or the names and addresses of invention promotion companies with whom InventHelp or its officers were affiliated in the last ten (10) years.

263.    At that meeting, Renee told Ms. Calhoun that InventHelp would partner with her for $9,950.00 for their "Submission Services."

264.    That amount was shocking and costly to Ms. Calhoun and she declined. She agreed only to the $780 Basic Information Package Report.

265.    At that time, Ms. Calhoun could not afford the $780 payment.

266.    The InventHelp representative told her that InventHelp had a 'relationship' with a "private money lender" and conveniently had a "Retail Installment Contract" from Defendant Universal Payment Corporation on hand. That contract identifies the "Seller" as InventHelp, the "Buyer" as Ms. Porter, and the "Assignee" as Universal Payment Corporation.

267.    However, Ms. Calhoun's first payment pursuant to that contract was charged to "Techno InventHelp."

268.    After February 18, 2012, InventHelp repeatedly called Ms. Calhoun to urge her to move forward with submission services. Ms. Calhoun again met with Renee Hopes approximately one month later, on or about March 15, 2012, and was presented with a

"Submission Agreement" for $9,950.00 at the meeting.  However, the price was so overwhelmingly high to Ms. Calhoun that she left the meeting without committing to the contract.

269.    Thereafter, Ms. Calhoun was again repeatedly called by InventHelp.

270.    Upon information and belief, these calls came from InventHelp's Pittsburgh, Pennsylvania office.

271.    Ms. Calhoun did not want to speak with anonymous sales agents.  Instead, she tried calling Renee Hope, with whom she had met.  However, she was told that Renee was no longer with the company.  Throughout the process, Ms. Calhoun was repeatedly told that certain representatives with whom she spoke or met had left, and was juggled from person to person. Upon information and belief, this is common practice of Defendants.

272.    Ms. Calhoun eventually connected with a sales representative named Heather. Heather spoke with Ms. Calhoun frequently and told her that "The Word of God Bedding" idea was brilliant, that she had never seen anything like it, that she would buy it, and that if Ms. Calhoun moved forward with InventHelp she would have a great chance of profiting from her invention.  Ms. Calhoun was extremely apprehensive about spending close to $10,000, a tremendous amount of money, and repeatedly asked Heather's opinion.  Heather at all times unequivocally told her to go forward.  Upon information and belief, Heather's representations on behalf of InventHelp were false or made with reckless disregard for the truth.

273.    On or about April 2012, Ms. Calhoun received the "Basic Information Package" and "Preliminary Patentability Search and Opinion" from InventHelp's Pittsburgh address.

274.    The Preliminary Patentability Search and Opinion is signed by Defendant Thomas Frost, a patent attorney, and is presented on his letterhead.  Ms. Calhoun had no conversations or

direct communications with Mr. Frost concerning her proposed invention, nor did she ever sign an independent engagement letter with Mr. Frost or his law office.

275.   Ms. Calhoun was led to believe that the Patentability Opinion was drafted by an objective and independent registered patent attorney.   Upon information and belief, Defendant Frost receives all or a substantial percentage of his business from Defendants, and is not independent nor objective.

276.   The 8-page Preliminary Patentability Opinion is dated April 5, 2012, and contains a single sentence generally describing Ms. Calhoun's invention.  It then contains pages of generalized legal information applicable to any and all United States patents.  The letter concludes:  "Therefore, it is my professional opinion that design patent protection should be available for your invention."

277.   Upon information and belief, the Patentability Opinion provided to Ms. Calhoun is nothing but boilerplate drivel, meant to appear professional, and is purposefully confusing so that unsuspecting inventors, including Ms. Calhoun, will proceed with expensive "Submission Services" with InventHelp.

278.   Upon information and belief, many Patentability Opinions provided to InventHelp customers are not even researched or drafted by Mr. Frost or any other patent attorney.  Instead, upon information and belief, InventHelp sends the searches to Defendant "Above Board Drafting, Inc., a Florida corporation.  Upon information and belief Above Board Drafting performs the patent searches, drafts the 'Patentability Opinions' on attorney letterhead, and then sends hundreds of the Patentability Opinions to patent attorneys engaged by InventHelp for the purpose of fraudulently representing that those attorneys prepared the opinions and searches.

279.     Upon information and belief, Mr. Frost had first-hand knowledge of hundreds of customers referred by InventHelp that did not receive utility patents and complained that InventHelp is a fraud.  Mr. Frost, an attorney with a fiduciary duty to Ms. Calhoun, informed her of none of these facts.

280.     Independently, the "Basic Information Package" received by Ms. Calhoun is also constructed to appear professional and well thought out, when, in truth and in fact, it is nothing more than loosely-related cut and pasted information, placed into a hard-bound book with Ms. Calhoun's name on the first page.

281.     Although purporting to be an end in itself, in truth and in fact the Basic Information Package and Preliminary Patentability Opinion is part of Defendants' ploy to convince consumers that their inventions are marketable, and con them into signing contracts for the more expensive Submission Services.

282.     Upon information and belief, the 'Basic Information Package' is merely the first step in InventHelp's scheme to draw aspiring inventors into spending tens of thousands of dollars on additional services.  InventHelp and Mr. Frost did not disclose this, nor did they disclose that the purpose of their next meeting would not be to review the book, but rather to "upsell" Ms. Calhoun on to another, more costly and involved, package.

283.     Following receipt of the "Basic Information Package," Ms. Calhoun was again contacted by InventHelp.  The professed reason for those calls was to set up a meeting to go over the Basic Information Package.  In truth and in fact, the real reason for those calls and subsequent meeting was to "upsell" Ms. Calhoun on the costly Submission Services Agreement.

284.     On or about August 2, 2013, Ms. Calhoun met with InventHelp representative Joy Hinson at 2002 Timberloch Place, Suite 200. The Woodlands, Texas 77380.  Ms. Hinson told

Ms. Calhoun that InventHelp was wrapping up a special offer, and that it was on or about the last day to receive a $1,000.00 discount for "Submission Services."

285.   At this meeting, Ms. Calhoun expressed concern about the high cost of these services and her ongoing ability to make payments.

286.   Ms. Hinson pressured Ms. Calhoun.  She also explained that Ms. Calhoun could use her contract with Universal Payment Corporation to finance the submission services.  Ms. Hinson also told Ms. Calhoun that pursuant to Paragraph 3 in the Submission Services agreement, if Ms. Calhoun were ever to be in a position where she could not make the monthly payments, InventHelp would have the right to cease services on her behalf, but nothing more.

287.   Ms. Calhoun signed a "Submission Agreement" with Western InventHelp for $8990.  Upon information and belief, all "Submission Agreements" with InventHelp and/or Western InventHelp are identical and are governed by the law of the Commonwealth of Pennsylvania.

288.   That Submission Agreement states, "WESTERN INVENTION SUBMISSION CORPORATION (WISC) is the name of the corporation contracting to perform the invention development services.  WISC is operating under its registered name, Western InventHelp.  There are no parent, subsidiary or affiliated companies that will engage in performing invention development services under this Contract except for INVENTION SUBMISSION CORPORATION, an affiliate, and TECHNOSYSTEMS SERVICE CORPORATION, an affiliate.  Company is also affiliated with INTROMARK INCORPORATED, which attempts to market inventions where substantial interest has been expressed in accordance with paragraph 1.N above."

289.    The Submission Agreement states, among other things, that "InventHelp will prepare a New Product Submission Brochure, which shall include a description of the invention, benefits and features, a 3D graphic or other illustration in color, Standard Industrial Classification (SIC) codes and suggested distribution channels."

290.    The Submission Agreement states, "InventHelp maintains a Data Bank of companies that have registered to receive our clients' submission materials on an ongoing basis. . . . InventHelp will submit Client's invention, product or idea to Data Bank companies in an attempt to obtain a good faith review as set forth in more detail below."

291.    The Submission Agreement states, "Companies registered in our Data Bank have agreed to review submission materials submitted to them by InventHelp in confidence and have signed confidentiality and non-use agreements."

292.    The Submission Agreement states, "DataBank companies that we have attempted to match with your invention will be sent a copy of Client's New Product Submission Brochure. This is how Data Bank companies may encounter, receive or see your invention and are then in a position to decide whether to conduct a good faith review."

293.    The Submission Agreement states, "Client agrees that InventHelp shall have the exclusive right to submit the idea, invention or product which is the subject of this Agreement, for the sole purpose of attempting to obtain a good faith review and reviewing any interest expressed including the right to use designs, models, patents issued and pending . . . ."

294.    AIPA disclosures provided to Ms. Calhoun with her August 8, 2013 Submission Agreement state: "THE TOTAL NUMBER OF CUSTOMERS WHO HAVE CONTRACTED WITH THE INVENTION DEVELOPER SINCE 1985 IS 56,345.  THE TOTAL NUMBER OF CUSTOMERS KNOWN BY THIS INVENTION DEVELOPER TO HAVE RECEIVED, BY

VIRTUE OF THIS INVENTION DEVELOPER'S PERFORMANCE, AN AMOUNT OF

MONEY IN EXCESS OF THE AMOUNT PAID BY THE CUSTOMER TO THIS

INVENTION DEVELOPER IS 0."

295.    AIPA disclosures signed in connection with a 2016 Western InventHelp

Submission Agreement obtained from a potential Class Member state, "From 2013-2015, we

signed Submission Agreements with 6,076 clients.  As a result of our services 153 clients have

received license agreements for their products, and 27 clients have received more money than

they paid us for these services."

296.    Submission Agreements signed in 2018 obtained from potential Class Members

state, "from 2015-2017, we signed Submission Agreements with 6,564 clients."  Those

agreements state, "We charge $975 for a Basic Information Package.  We charge from $11,900

to $16,900 for our marketing, licensing or promotional services."

297.    Submission Agreements signed in 2018 obtained from potential Class Members

state, "The total number of customers who have contracted with InventHelp in the past 5 years is

10,272."

298.    Submission Agreements signed in 2018 obtained from potential Class Members

state, "The total number of customers to have received a net financial profit as a direct result of

invention promotion services provided by InventHelp is unknown.  However, the total number of

clients known to have received more money than they paid InventHelp for submission services

as a direct result of these services is 61."

299.    On or about April 23, 2014, Ms. Calhoun received a letter from InventHelp on

InventHelp's letterhead stating that "Your New Product Submission Brochure was mailed to the

companies on the enclosed report listed as "Data Bank."   Attached to that letter is a list of 20 "Data Bank" companies.

300.    Upon information and belief, this list of Data Bank companies, and Data Bank company lists sent to all InventHelp customers, are shams.   Some of the companies do not exist and are purposefully misspelled to resemble actual existing companies that have no relationship with InventHelp (for example, listing the company as 'Inc.' instead of 'LLC').   Other "Data Bank" companies claim to have no relationship with InventHelp, and have not signed any confidentiality agreements, or any agreements whatsoever, with InventHelp.   Upon information and belief, some of the companies are sham companies and/or are affiliated with InventHelp.

301.    For example, one company named on InventHelp's DataBank list sent to Ms. Calhoun on April 23, 2014 is "Kerruso" located in Arkansas.   Upon information and belief, there is no company with that name.   However, there is a company in Arkansas called Kerusso, which is a Christian clothing store.   Per Mr. Steve Gates, Controller of Kerusso, the company has no relationship with InventHelp and has never signed any nondisclosure agreement with InventHelp.

302.    Perhaps most disturbingly, some of the entities listed as Data Bank companies by InventHelp have in fact agreed to review invention ideas.   However, in the rare instances that these companies express interest in an invention and attempt to contact InventHelp to proceed further, InventHelp does not return the calls.   These companies are provided no contact with InventHelp other than the 1-800 customer numbers advertised to the public on InventHelp's television commercials, and calls to these numbers on behalf of companies that actually want to proceed are often not returned.

303.    For example, by letter dated April 23, 2014, InventHelp represented to Ms. Calhoun that it sent her invention description to "Robert Gaspard Co., Inc.," an online Christian store selling vestments and other such items.  Jason Gaspard, principal of that company, represented that he does in fact receive brochures from InventHelp, but that there have been times when he has called InventHelp to follow up about particular products, but that InventHelp never responded to any of his inquiries.

304.    Upon information and belief, InventHelp has no infrastructure to deal with companies that actually want to proceed with ideas.   Rather, InventHelp's business model is to take consumers' money with absolutely no intention to follow up with any outside company that may be interested in a prospective inventor's idea.

305.    Ms. Calhoun believed that InventHelp was working with her in good faith, and that the DataBank companies received confidential descriptions of her Word of God Bedding.

306.    At the August 2, 2013 meeting, Ms. Calhoun also signed an "Intromark Proposal" with Intromark Incorporated.  The Intromark Proposal provides that the contract "shall remain in effect for a period of twenty-four (24) months.  This will automatically renew for an additional three years unless terminated in writing by Client upon thirty (30) days' written notice prior to the expiration of the original term of this Agreement."

307.    All individuals who sign Submission Agreements with InventHelp also sign "Intromark Proposals" with Intromark at the very same time, both signed by the same InventHelp representatives.  Although these contracts are signed at the exact same time, and by the exact same signatories, they each contain integration clauses.  Thus, it is unclear which, if any, integration clause controls.

308.   Moreover, although the various agreements purport to be on behalf of different entities, Named Plaintiffs, and all class members, receive mail only from InventHelp, bearing InventHelp's header on the stationary.  All contracts are signed at the same time by the same InventHelp representatives.

309.   The Intromark contract states, "Intromark has agreed to attempt to market inventions, ideas or products only where substantial interest has been expressed, or where in Intromark' s sole discretion it wishes to undertake said marketing effort."

310.   The Intromark contract states, "Client further agrees that Intromark during the term of this Proposal shall have the exclusive right to negotiate, and to execute contracts on Client's behalf for the sale and licensing of the idea, invention or product."

311.   By letter dated August 26, 2014, InventHelp sent Ms. Calhoun a "copy of your completed Virtual Invention Presentation (VIP) which is a DVD containing 3-D renderings" of Ms. Calhoun's Invention.  InventHelp represented that "We will send your VIP to any InventHelp Data Bank that may specifically request it."

312.   Ms. Calhoun was extremely distressed when she viewed the DVD. It was shoddily-done, and, to her dismay, did not present her "Word of God Bedding" in an attractive light.

313.   Ms. Calhoun immediately called InventHelp to express her disappointment and concern.  An InventHelp representative assured Ms. Calhoun that the "Word of God Bedding" was purposefully presented in this way because, otherwise, "someone could steal your idea." Upon information and belief, this was a lie.  However, Ms. Calhoun took InventHelp at its word – after all, she thought, they were the experts and she was merely a layperson.

314.   By letter dated December 10, 2015, InventHelp stated, "In accordance with your Intromark Proposal we will continue to follow up with any company who may express an interest in your invention as a result of our efforts for 3 additional years."

315.   By letter dated March 8, 2016, InventHelp informed Ms. Calhoun "Your New Product Submission Brochure was mailed to the companies on the enclosed report listed as 'Data Bank.'"  The letter provides, "We will inform you of any inquiries we may receive as a result of our submission efforts."  Attached to that letter is a list of 50 "Data Bank" companies.

316.   Upon information and belief, InventHelp does not have relationships with these companies, many of these companies did not sign nondisclosure agreements with InventHelp, and, to the extent some of these companies actually exist, none of these companies have ever licensed a product from InventHelp and/or Intromark.

317.   As of March 8, 2016, Ms. Calhoun believed, and was led to believe, in furtherance of Defendants' scheme, that InventHelp was still fulfilling its contractual and statutory obligations to her.  In truth and in fact, they were not.

318.   Throughout this entire process, up to and including the present, Ms. Calhoun has been dutifully making monthly payments to Universal Payment Corporation.  While there were certain times where she felt financially constrained and was unable to make payments, even then, she would send $10 or $15 to Universal Payment Corporation monthly because she wanted to be "honest" and "keep [her] end of the bargain."

319.   At various points between 2013 to date, Universal Payment Corporation contacted Ms. Calhoun by telephone and mail, telling her to pay amounts owing on the contracts and threatening that if she fails to do so, she will be reported to Credit Agencies and her credit will be otherwise damaged and/or destroyed.

320.     In sum, all "efforts" made on Ms. Calhoun's behalf by Defendants in order to help her "commercialize her invention" are lies and scams.  Defendants, contrary to their written and verbal representations, have no meaningful interest or investment in fulfilling their contractual promises; rather, their business model is based upon receipt of Submission Service fees, and nothing more.  Moreover, the AIPA statutorily-mandated disclosures presented to Ms. Calhoun and the other Named Plaintiffs herein are inaccurate, misleading, and fraudulent.

321.     Attached hereto as **Exhibit I** is a screenshot of an online video advertisement sent by InventHelp to Plaintiffs and available for viewing by the public at large.  That advertisement states:  "More than 8,000 Companies in the InventHelp DataBank."  The advertisement then flashes the names and logos of dozens of reputable and well-known companies, such as Cabela's, Toro, Heinz, waterpik, Elmer's Glue, Kraft, Clorox, Bosch, among others.  The message conveyed by this advertisement is false, ambiguous and deceptive because, among other things, InventHelp has no relationship with these entities (including the fact that they are not registered in InventHelp's Database) and is unaware of any InventHelp client who worked with any of these entities by virtue of InventHelp's so-called services.

322.     Attached hereto as **Exhibit J** is a screenshot of an online advertisement sent by InventHelp to Plaintiffs and available for viewing by the public at large.  The advertisement states:  "InventHelp's Inpex Product Searches" and then flashes the names and logos of various well-known companies, including "Tupperware," Rubbermaid," "green works," Glad," "Tilex," Kraft," Elmers," Walmart," "K-Mart," Autozone," "Mucinex," Woolite," and "Clearasil," among others.   The message conveyed by this advertisement is false, ambiguous and deceptive because, among other things, InventHelp has no relationship with these entities (including the fact that

they are not registered in InventHelp's Database) and is unaware of any InventHelp client who worked with any of these entities by virtue of InventHelp's so-called services.

323.   Upon information and belief, Defendants' acts have the same or similar purposes and results *(i.e.* carry out a scheme to defraud Plaintiff and Class Members of money), participants *(i.e.* Defendants), victims *(i.e.* the Plaintiff and Class Members), methods of commission *(i.e.* using television, telephone, in-person meetings, mail and internet networks to falsely represent to Plaintiffs and Class Members that the inventions were patentable, profitable and that Defendants' were fulfilling their contractual and statutory obligations), and are not isolated events.

324.   Upon information and belief, the acts described herein amount to continued fraudulent activity and were committed by Defendants in furtherance of their continuing scheme to defraud Plaintiffs and Class Members.

325.   Moreover, the scheme described herein is a continuing operation and poses the threat of continued fraudulent activity, preying upon unsuspecting victims. Defendants' websites and television commercials continue to tout their invention promotion services to lure potential inventors to enter into contracts with Defendants for fraudulent invention promotion services.

326.   Defendants defrauded other victims before, during and after they defrauded Plaintiffs. The foregoing demonstrates that there is no obvious terminating goal or date for the fraudulent activity; the foregoing acts are part of the Defendants' ongoing, regular way of doing business; and Defendants operate a long-term association that exists for criminal purposes *(e.g.,* fraudulently inducing potential inventors to enter into contracts that obligate the inventors to pay money to Defendants).

327. Defendants' conduct employs the use of the public telephone, television, U.S. mail, and internet networks.

328. The injuries to Plaintiffs and the members of the class were caused by Defendants' scheme of fraudulently inducing Plaintiffs and Class Members, through false disclosures, false promises, misrepresentations, and omissions, to enter into contractual agreements.

329. The injuries to Plaintiffs and potential class members are ongoing – InventHelp has publicly disseminated Plaintiffs' invention ideas, thereby putting them in the public realm and impacting potential patentability and profitability for Plaintiffs.

330. Furthermore, most of the misrepresentations and omissions alleged herein are contained on Defendant's websites.

## **CLASS ACTION ALLEGATIONS**

331. Plaintiffs bring this suit individually and as a class pursuant to Federal Rule of Civil Procedure 23, the requirements of such are met with respect to the class as defined below.

332. The Class consists of: All persons and entities in the United States and abroad who purchased goods and/or services from Defendants from 2010 to present.

333. Subject to additional information obtained through further investigation and discovery, Plaintiffs reserve the right to expand, narrow, or otherwise refine the foregoing definition.

334. Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which any Defendant has or had a controlling interest or which

Defendants otherwise control or controlled; any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

335.    This action is properly maintainable as a class action.

336.    The Class is so numerous that joinder of all individual members in one action would be impracticable.  Submission Agreements signed in 2018 obtained from potential Class Members state, "the total number of customers who have contracted with InventHelp in the past 10 years is 10,272."  Submission Agreements signed in 2018 from potential Class Members state, "from 2015-2017, we signed submission agreements with 6,564 clients." The exact number of class members can be determined by appropriate discovery.

337.    Plaintiffs' claims are typical of the claims of the Class Members in that they all signed identical contracts with Defendants and paid for the same services from Defendants. Class members were all injured by the same wrongful conduct, namely, receipt of false and misleading AIPA disclosures, as well as Defendants' fraudulent course of conduct and policy. The violations of the statutory and common laws and the relief sought herein are common to Plaintiff and the members of the class.

338.    By decision dated February 21, 2018, the Supreme Court of Pennsylvania in *Danganan v. Guardian Protection Services* unequivocally held that a non-Pennsylvania resident may bring suit under the Pennsylvania Unfair Trade Practices and Consumer Protection Law against a Pennsylvania Commonwealth-headquartered business based on transactions that occurred outside of Pennsylvania.  Thus, a nationwide class is appropriate here.

339.    There are questions of fact and law common to all Class Members that predominate over questions which may affect individual members. These include the following:

a. Whether the disclosures set forth in Defendants' contracts and other paperwork and advertisements, which are identical and uniform, are truthful and in compliance with the American Inventors Protection Act of 1999, 53 U.S.C.A. § 297.

b. Whether Defendants' advertisements and business practices are targeted to consumers and violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. Section 201-1, et seq.;

c. Whether Defendants' advertisements improperly and deceptively represent that InventHelp has relationships with certain big-box stores and well-known brands, such as K-Mart, Carnegie Mellon University, durex, Resolve, Lysol, Bed Bath & Beyond, Clorox, among others;

d. Whether Defendants' acts as described herein constitute the unauthorized practice of law;

e. Whether Defendants' acts described herein constitute a mode and practice that pervades the entire company and/or enterprise, including promulgating policies and/or instruction to use common fraudulent practices;

f. Whether Defendants' business model, which is uniformly applied and directed to all of their customers, is in fact geared toward and/or effective in helping consumers market and/or profit from their inventions, as Defendants claim in their advertisements;

g. Whether Defendants made false and/or misleading statements to the Class and the public at large concerning the legitimacy of their goods and services;

h.  Whether Defendants are responsible for the conduct alleged herein, which was and is uniformly directed at all consumers who purchased Defendants' products and services;

i.  Whether Defendants' misconduct set forth herein demonstrates that Defendants engaged in unfair, fraudulent, and/or unlawful business practices with respect to the advertising, marketing and sale of their products and services;

j.  Whether Defendants' false and misleading statements were likely to deceive class members;

k.  Whether Defendants had a pattern or practice of making fraudulent and false representations to consumers in order to induce them to sign contracts;

l.  Whether Defendants had a pattern or practice of making fraudulent and false representations to consumers regarding whether consumers' ideas were likely to be profitable;

m.  Whether Defendants engaged in a conspiracy to work in concert to defraud Plaintiff and Class members;

n.  Whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

o.  Whether Defendants should be enjoined from the actions described herein.

340.   Plaintiffs are adequate Class Representatives because their interests do not conflict with the interest of the Class Members; their claims are common to all members of the Class and are based upon the same facts (practice or course of conduct) undertaken by Defendants' with respect to all Class Members and are based upon the same legal theories; Plaintiffs have strong interests in vindicating their rights.  The Class Members' interests will be

fairly and adequately protected by Plaintiffs and counsel.  Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members.

341.   Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation and have been engaged and intend to continue to vigorously prosecute this action.  Plaintiffs and their attorneys are familiar with the subject matter of this action and have already expended substantial hours ascertaining and investigating the allegations herein.

342.   A class action is superior to other available means for the fair and efficient adjudication of the claims of the class members. Common issues of law and fact predominate, as the primary focus is Defendants' AIPA disclosures and uniform deceptive and misleading practices.

343.   The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the class; (ii) to keep the courts from being inundated by thousands of repetitive cases; and (iii) to reduce transaction costs so that the injured class members can obtain the most compensation possible.  Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation.

344.   Importantly, individual Class Members here lack resources to undertake the burden and expense of individual prosecution of these claims.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. It also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management

difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

345.    Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action which will result in further damages to Plaintiff and class members.

346.    The scheme described herein is a continuing operation and poses the threat of continued fraudulent activity, preying upon unsuspecting victims. Defendants' websites and television commercials continue to tout their invention promotion services and falsely represent affiliation with companies in order to lure potential inventors to enter into contracts with Defendants for fraudulent invention promotion services.

## CLAIMS FOR RELIEF

### COUNT I
### Against InventHelp Defendants
### (Violation of the American Inventors Protection Act of 1999, 35 U.S.C. § 297)

347.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

348.    Defendants are "invention promoters" and their agents, as defined by the American Inventors Protection Act of 1999, 35 U.S.C. § 297 ("AIPA").  Defendants work in concert to perpetrate this scheme.

349.    The "Basic Information Package Agreements," "Submission Agreements," and other contracts described herein are contracts for invention promotion services as defined by the AIPA.

350.    Plaintiffs and Class Members are customers as defined by the AIPA.

351.    Defendants contracted with Plaintiffs and Class Members to provide them with invention promotion services as defined by the AIPA.

352.    Defendants violated the AIPA by not providing the proper disclosures to Plaintiff and Class Members prior to entering into contracts for invention promotion services.  As detailed *supra*, Defendants' purported disclosures are inaccurate, internally inconsistent, blatantly false, and fraudulent.  In addition to the sham licensing agreements explained herein, discovery will unearth additional fraudulent practices that render all of Defendants' AIPA disclosures false and misleading.

353.    InventHelp files fraudulent tax documents with the U.S. Federal government, representing that clients received licensing agreements, when, in truth and in fact, these purported "60-day licenses" are concocted solely for the purpose of bolstering InventHelp's AIPA disclosures – InventHelp includes the sham "60-day licenses" in their AIPA numbers,

thereby falsely representing to existing and potential clients the number of InventHelp customers who received licensing agreements.  Discovery will unearth additional facts showing that Defendants' AIPA disclosures are false and fraudulent.

354.    Defendants violated the AIPA by making materially false and fraudulent statements to Plaintiff and Class Members, and are therefore liable for all damages prescribed by the AIPA.

355.    By reason of the foregoing, Defendants are liable to Plaintiff and the Class for actual damages and statutory trebling of those damages, together with punitive damages, attorneys' fees, costs, and interest

### COUNT II
**Against InventHelp Defendants**
**(Violations of Pennsylvania Unfair Trade Practices And Consumer Protection Act, 73 P.S. Section 201-1, et seq.)**

356.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

357.    Section 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Act ("UTPCPA") defines "trade" and "commerce" to mean the "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, person or mixed, and any other article, commodity, or thing of value wherever situate, and includes trade or commerce directly or indirectly affecting the people of this Commonwealth."

358.    Defendants have engaged in trade and commerce in the Commonwealth of Pennsylvania and nationally by marketing (including the production and airing of television and internet advertisements starring George Foreman), offering for sale, and selling invention

promotion services and intellectual property services directly to consumers of the
Commonwealth and nationwide.

359.     Plaintiffs are consumers who purchased Defendants' goods and services and have
suffered ascertainable loss.

360.     Paragraph 5 of Defendants' Submission Services contracts state: "InventHelp
agrees only to attempt to submit Client's idea, invention or product to companies through
InventHelp's standardized submission process as set forth in paragraph 1 above and to review
any interest which may be expressed.  Client wishes to retain InventHelp's services to see
Client's idea presented in a favorable light and to have the satisfaction of having made an effort."

361.     In the course of advertising, marketing, promotion, offering for sale and selling
invention promotion services Defendants have represented that they have helped consumers
monetize their inventions, that they are affiliated with certain institutions (such as Carnegie
Mellon University) and have confidentiality agreements with DataBank companies, that their list
of DataBank companies is a legitimate and useful mechanism for Plaintiffs seeking to market
their inventions, and that consumers' proposed inventions' will be displayed at Defendants
INPEX trade shows, when, in truth and in fact, many DataBank companies do not exist, do not
have relationships with Defendants, and/or are not appropriate companies to manufacture,
license and/or market Plaintiff consumers' proposed inventions, Defendants are not affiliated
with Carnegie Mellon University (and other such reputable institutions), and consumers'
inventions are not, in fact, presented and/or displayed at INPEX.

362.     Attached hereto as **Exhibit I** is a screenshot of an online video advertisement sent
by InventHelp to Plaintiffs and available for viewing by the public at large.  That advertisement
states: "More than 8,000 Companies in the InventHelp DataBank."  The advertisement then

flashes the names and logos of dozens of reputable and well-known companies, such as Cabela's, Toro, Heinz, waterpik, Elmer's Glue, Kraft, Clorox, Bosch, among others.  The message conveyed by this advertisement is false, ambiguous and deceptive.

363.    Attached hereto as **Exhibit J** is a screenshot of an online advertisement sent by InventHelp to Plaintiffs and available for viewing by the public at large.  The advertisement states: "InventHelp's Inpex Product Searches" and then flashes the names and logos of various well-known companies, including "Tupperware," Rubbermaid," "green works," Glad," "Tilex," Kraft," Elmers," Walmart," "K-Mart," Autozone," "Mucinex," Woolite," and "Clearasil," among others.   The message conveyed by this advertisement is false, ambiguous and deceptive.

364.    Defendants' acts and practices are likely to confuse or mislead consumers acting reasonably under the circumstances into believing that the Defendants are a legitimate enterprise, that Defendants have relationships with the companies and products listed on **Exhibits I and J,** and that Defendants' services are tailored to help inventors monetize their inventions.  In truth and in fact, Defendants' services are tailored to extract as much money from Plaintiffs as possible, have little to no utility for Plaintiffs, and are in fact a fraud.

365.    InventHelp fraudulently targets minorities and women through the use of misleading websites, including www.black-inventor.com and www.women-inventor.com.  These websites, although purporting to be educational pages, are in fact InventHelp advertisements.

366.    Defendants often offer to give Class Plaintiffs "discounts" that are "about to expire."  If Class Plaintiffs request time to think about signing the contracts and/or making the substantial monetary commitment, Defendants inform them that the discount will be revoked if they do so.  Upon information and belief, these discounts and specials are shams.

367.    If and when Class Plaintiffs express questions or concerns about forfeiting any legal rights that they may have, Defendants' deceptively point out provisions in the purported contracts that appear to retain Class Plaintiffs' rights (such as Paragraph 3 of the Submission Services contract).  Defendants also falsely state that the contracts are "no risk" when in fact they are not.

368.    Defendants have therefore engaged in unfair and deceptive acts and practices in violation of 73 Pa. Cons. Stat. Section 201-2(4).

369.    The acts and practices described *supra* and below constitute violations of UTPCPL:

    (a)   Passing off goods or services as those of another;

    (b)  Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

    (c)  Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

    (d)  Using deceptive representations or designations of geographic origin in connection with goods and services;

    (e)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has sponsorship, approval, status, affiliation or connection that he does not have;

    (f)  Representing that goods and services are original when they are in fact not;

(g) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, when they are of another;

(h) Advertising goods or services with intent not to sell them as advertised;

(i) Advertising goods or services with intent not to supply reasonably expectable public demand;

(j) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(k) Failing to comply with the terms of written guarantees, warranties, and contracts;

(l) Knowingly misrepresenting that services are needed when they are not needed;

(m)Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing;

(n) Making solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating the seller, purpose of the call, and nature of the goods and services;

(o) Using a contract, form or other document related to consumer transactions that seeks to waive consumer's right to assert a legal defense to an action; and

(p) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

370.    Defendants have repeatedly and persistently engaged in material deceptive or misleading consumer-related business practices, i.e., advertising, publishing and selling invention promotion, patent, manufacturing, licensing and consultation services that they do not (nor intend to) provide, misrepresenting the viability and potential profitability of Plaintiffs' proposed inventions, and lying and/or coercing Plaintiffs into signing fraudulent contracts.

371.    The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services has been, and continues to be, materially misleading and deceptive to members of the Class and to Plaintiff in material respects.

372.    The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services are directed toward consumers and have a broad negative impact on the general public, including Plaintiff and members of the Class.

373.    Plaintiff and Class Members have been injured by reason of being deceived by Defendants into paying Defendants for purported services that Defendants did not (and did not intend to) provide.

374.    Defendants' deceptive practices were and are consumer-oriented.  Defendants advertise via television commercials and internet web pages, among other things, thereby deceiving and attracting large numbers of consumers.

375.    Defendants' material misrepresentations were and are substantially uniform in content, presentation and impact upon consumers at large.

376.    Plaintiff and other members of the Class entered into agreements with Defendants herein and suffered ascertainable loss as a direct and proximate result of Defendants' actions.

377.    Defendants' misconduct described herein was intentional, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, Plaintiffs and the other members of the Class.  Defendants are therefore additionally liable for treble and punitive damages, in an amount to be determined at trial, as well as attorneys' fees and costs.

## COUNT III
### Against InventHelp Defendants
### (False Advertising In Violation of The Lanham Act, 15 U.S.C. § 1125(a))

378.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

379.    *Alternatively*, if the Court finds that Plaintiffs are not "consumers" as defined by the UTPCPA, then Plaintiffs assert that they fall within the statutory zone of interest of the Lanham Act such that they may assert claims pursuant thereto.

380.    Defendants' ubiquitous late-night television and internet commercials, featuring a cartoon image of a caveman sitting on a rock, banging a wheel with a chisel, promise consumers that InventHelp has contracts with thousands of companies that are looking for new ideas.  The commercials state, "We keep your idea confidential"; "We explain every step of the invention process"; "We create professional materials representing your idea and submit it to companies who are looking for new ideas"; "We have more than 9,000 companies who have agreed to review ideas, in confidence," among other representations.

381.    In truth and in fact, InventHelp does not keep its customers' ideas confidential, does not have relationships with "more than 9,000 companies who have agreed to review ideas, in confidence" and does not provide customers with "professional looking materials."

382.    Attached hereto as **Exhibit I** is a screenshot of an online advertisement sent by InventHelp to Plaintiffs and available for viewing by the public at large.  That advertisement states: "More than 8,000 Companies in the InventHelp DataBank."  The advertisement then flashes the names and logos of dozens of reputable and well-known companies, such as Cabela's, Toro, Heinz, waterpik, Elmer's Glue, Kraft, Clorox, Bosch, among others.  The message conveyed by this advertisement is false, ambiguous and deceptive.

383.    Attached hereto as **Exhibit J** is a screenshot of an online advertisement sent by InventHelp to Plaintiffs and available for viewing by the public at large.  The advertisement states: "InventHelp's Inpex Product Searches" and then flashes the names and logos of various well-known companies, including "Tupperware," Rubbermaid," "green works," Glad," "Tilex," Kraft," Elmers," Walmart," "K-Mart," Autozone," "Mucinex," Woolite," and "Clearasil," among others.   The message conveyed by this advertisement is false, ambiguous and deceptive.

384.    InventHelp's television and internet advertisements also state:  "How do you get a patent?  Call InventHelp – they've been helping people just like you for 35 years."  Others state: "We have been helped over 10,000 clients get patents."  Yet others state:  "Do you want to try to get a patent?  Call InventHelp now."

385.    In truth and in fact, InventHelp does not help Plaintiffs get patents.

386.    InventHelp's commercials deceive or are intended to deceive a substantial portion of the intended audience.

387.    That deception causes Plaintiffs to purchase InventHelp's products and services.

388.    InventHelp's advertisements, goods and services travel in interstate commerce.

389.    Class Plaintiffs have been injured thereby by direct out-of-pocket payment to InventHelp.

390.    Class Plaintiffs have been injured by loss of patentability and/or marketability of their inventions by virtue of InventHelp's publicizing of Class Plaintiffs' ideas and proposed inventions to companies that have not signed nondisclosure agreements, among other things. This damages Class Plaintiffs' products' position in the marketplace.

391.    To the extent InventHelp does send out mass mailings of flyers describing consumers' inventions, many recipients of the flyers have not signed nondisclosure agreements and/or do not even exist.

392.    Defendants' regular practice thus puts Plaintiffs' ideas in the public realm thereby impacting potential patentability.

393.    Defendants' regular practice also risks theft of Plaintiffs' unpatented ideas.

394.    Defendants' regular practice also decreases and/or eliminates the salability of Plaintiffs' inventions.

395.    Class Plaintiffs have been injured by virtue of their failure to further pursue development and/or monetization of their inventions because they were under the false impression that InventHelp was and is doing so for them by, among other things, sending descriptions of their inventions to DataBank companies that purportedly signed nondisclosure agreements.  This damages Class Plaintiffs' products' position in the marketplace.

396.    Class Plaintiffs have been injured by virtue of Defendants' false and misleading representation that they have relationships with, are affiliated with, or otherwise have had business relationships with reputable companies and entities, included those listed on **Exhibits I and J** hereto.  Plaintiffs and class members did not and do not pursue development and/or monetization of their inventions aside from their association with InventHelp because they were and are under the false impression that InventHelp was and is doing so for them.  This damages

Class Plaintiffs and by virtue of their failure to pursue other means and methods to develop and profit from their inventions.

## COUNT IV
### Against All Defendants
### (Fraud)

397.   Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

398.   Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.

399.   The agreements and contracts signed by Class Plaintiffs are part and parcel of a grand fraudulent scheme perpetrated by Defendants.

400.   Defendants made and continue to make false and fraudulent statements (including false and misleading disclosures in their contracts and published materials), false promises, misleading representations, and omitting material facts to Plaintiff and Class members pertaining to the uniqueness, patentability, and profitability, among other things, of their inventions, as set forth above.  These representations are part of Defendants' overall business practices and are substantially similar and uniform.

401.   Throughout the course of dealings between Plaintiffs and Defendants, Defendants make many blatant misrepresentations and omissions of present fact, including that certain external companies are interested in Plaintiffs' inventions, when those companies do not exist or have not in fact expressed interest; that Defendants have relationships with "Data Bank" companies; that Defendants have never seen items similar to Plaintiffs' inventions; that Defendants have performed proper patent searches; that Defendants believe that Plaintiffs' inventions are patentable; that Defendants believe that consumers' proposed inventions are likely

to make a profit; and that Defendants' submission services have led to licensing agreements for consumers, among other things.

402.    Defendants fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants.

403.    Defendants also falsely represent verbally that their services will likely result in financial gain for consumers in order to induce Plaintiffs to sign the various contracts at issue, when, in truth and in fact, Defendants do not believe this to be the case, and, upon information and belief, Defendants have often seen these very same inventions before.

404.    Defendants falsely represent that they will undertake certain services on consumers' behalf, including but not limited to marketing and promotion of Plaintiffs' proposed inventions.  In truth and in fact, Defendants do none of these things.

405.    Defendants falsely represent themselves to be independent of one another, but they are part and parcel of a single, grand scheme.

406.    Defendants made many other material misrepresentations to and concealed or suppressed material facts from Class Plaintiffs, as described in detail *supra*, among other things.

407.    Defendants knew or believed these material misrepresentations and omissions to be false, or made them with reckless regard for the truth.

408.    Defendants misrepresented, concealed or suppressed these facts with the intent to defraud Class Plaintiffs inducing them to purchase Defendants' services and goods.

409.    Class Plaintiffs were reasonable in relying on Defendants' misrepresentations and omissions of material facts because Defendants advertised and held themselves out to be credible, legitimate and experienced sellers of invention promotion, manufacturing, distribution,

and other such services, and as having extensive knowledge and expertise in bringing new inventions to fruition, and as independent attorneys.

410.    At the time Class Plaintiffs acted, they were unaware of the false, concealed and/or suppressed facts and would not have purchased Defendants' goods and services had they known the true facts.

411.    All Defendants are liable for the tortious conduct of the other Defendants, as they (a) performed the tortious acts in concert with the others and pursuant to a common design with them, (b) knew that the other Defendants' conduct constituted tortious conduct and gave substantial assistance or encouragement to the other Defendants, and (c) gave substantial assistance to the other Defendants in accomplishing the tortious result and their own conduct, separately considered, constituted tortious conduct towards Plaintiff and Class members.

412.    As a direct and proximate result of Defendants' misrepresentations and concealment of material facts, Class Plaintiffs have suffered damages, the precise amount to be determined at trial.

## COUNT V
**Against All Defendants**
**(Negligent Misrepresentation)**

413.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

414.    Defendants made misrepresentations and other statements in connection with their deceptive invention promotion, patent, manufacturing, licensing and consultation services.

415.    Defendants made these representations while in privity of contract with Plaintiffs.

416.    The misrepresentations were and are false, deceptive and misleading at the time they were made.

417.    Upon information and belief, at the time they were made, Defendants knew that the statements were false, deceptive and misleading.

418.    Upon information and belief, Defendants stated, disseminated, published and advertised the misrepresentations with the intent to deceive and defraud the general public, including Class Plaintiffs.

419.    Class Plaintiffs were unaware of the falsity of the misrepresentations and relied upon the misrepresentations and as a result have been defrauded out of large sums of money.

## COUNT VI
### Against All Defendants
### (Breach of Contract)

420.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

421.    Defendants and Plaintiffs and members of the Class entered into various contracts, as described above.

422.    Defendants failed to fulfill the obligations set forth in the above-referenced contracts, thereby breaching their respective contracts with Class Plaintiffs, and Class Plaintiffs have been damaged thereby.

423.    Upon information and belief, Defendants executed substantially identical contracts with all Class Plaintiffs and failed to fulfill their obligations set forth in those contracts, damaging Class Plaintiffs.

424.    Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

425.    Under the contracts described herein, Plaintiffs and Class Members reasonably expected Defendants to carry out the covenants set forth in those contracts.

426.    Defendants arbitrarily and unreasonably did not fulfill the various covenants set forth in the contracts, even though they in fact represented to Plaintiffs and Class Members that they would make best efforts to do so.

427.    Defendants acted in bad faith.

428.    By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees and costs.

## COUNT VII
### Against Frost Attorney Defendants
### (Unjust Enrichment)

429.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

430.    Defendants' conduct as described herein allowed Defendants to knowingly realize substantial revenues from selling their goods and services at the expense of, and to the detriment or impoverishment of, Class Plaintiffs, and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity and good conscience.

431.    Class Plaintiffs conferred significant financial benefits and paid substantial compensation to Defendants.

432.    It is inequitable for Defendants to retain the benefits conferred by Class Plaintiffs.

433.     By reason of the foregoing, Defendants are liable to Plaintiffs and members of the

Class for the damages they suffered as a result of Defendants' actions, the amount of which shall

be determined at trial, plus attorneys' fees.


**COUNT VIII**
**Against Frost Attorney Defendants**
**(Breach of Fiduciary Duty)**


434.     Plaintiffs reallege and incorporate herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

435.     The Frost Attorney Defendants owe Class Plaintiffs fiduciary duties, including

advising and acting in Class Plaintiffs' best interests.

436.     Defendants' "Preliminary Patentability Opinions," opining that customers'

proposed inventions are eligible to receive patents, when, in fact, there often already exist "dead

ringer" patents that preclude patents for these inventions, are an integral part of the fraudulent

conspiracy.

437.     The Frost Attorney Defendants provide services to Class Plaintiffs under the guise

that these defendants are independent and impartial, when, in fact, they are not.

438.     The Attorney Defendants breached their fiduciary duties of care by, among other

things, conducting incomplete patent searches, advising Class Plaintiffs to apply for patents even

though Attorney Defendants were aware that Class Plaintiffs' idea were not suitable for patents

for various reasons.  The Frost Attorney Defendants also had first-hand knowledge of hundreds

(or thousands) of customers, referred to them by InventHelp, who did not receive utility patents

and/or complained that InventHelp is a fraud.  Yet, they informed Class Plaintiffs of none of

these facts and instead advised them to apply for patents and to move forward with InventHelp's services.

439.    Attorney Frost rarely spoke or met with consumers to discuss their proposed inventions, instead signing out boilerplate 'Patentability Opinions' without a formal engagement letter or any discussion whatsoever about the searches he was allegedly conducting.

440.    Class Plaintiffs have been damaged by The Frost Attorney Defendants' breaches of their fiduciary duties.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs, on behalf themselves and the Class, pray that the Court:

(a) Issue an Order certifying the Class as defined above, appointing the Plaintiffs as Class Representatives, and designating their Attorney as Class Counsel;

(b) Find that Defendants have committed the violations of statutory and common law alleged herein;

(c) Enter an Order granting monetary relief, including treble and punitive damages on behalf of the Class in an amount at least $36,000,000.00, the precise amount of which is to be determined at trial;

(d) Enter an Order granting monetary relief, including compensatory damages on behalf of the Class in an amount of at least $72,000,000.00, the precise amount of which is to be determined at trial;

(e) Enter an Order rescinding the various contracts described herein;

(f)  Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate Order awarding restitution and monetary damages;

(g)  Enter an Order granting all appropriate relief on behalf of the Class under the applicable state statutory and common laws;

(h)  Enter judgment including interest, costs, reasonable attorneys' fees, and expenses;

(i)  Entering preliminary and permanent injunctive relief against Defendants, directing Defendants to correct their practices and to comply with Pennsylvania consumer protection laws, the Lanham Act, and the AIPA; and

(j)  Granting such other and further relief as the Court may deem just and proper.

Dated:  White Plains, New York
April 29, 2019

OXMAN LAW GROUP, PLLC
*Attorneys for Plaintiffs*

By: _____
JULIE PECHERSKY PLITT, ESQ.
Bar #: JP8607
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 422-3900
(914) 422-3636 (Fax)
jplitt@oxmanlaw.com

Stanley W. Greenfield, Esq.
Greenfield and Kraut
1040 Fifth Avenue
Pittsburgh, PA 15219
(412) 261-4466
greenfieldandkraut@verizon.net