## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

ETTA CALHOUN, SHERRY PORTER, and
CYNTHIA GRAY, on behalf of themselves
and all other persons similarly situated,

                 Plaintiff,

   v.

INVENTION SUBMISSION
CORPORATION D/B/A INVENTHELP,
TECHNOSYSTEMS CONSOLIDATED
CORP., TECHNOSYSTEMS SERVICE
CORP., WESTERN INVENTION
SUBMISSION CORP., UNIVERSAL
PAYMENT CORPORATION,
INTROMARK INCORPORATED,
ROBERT J. SUSA, THOMAS FROST,
P.A., THOMAS FROST, JOHN DOE
COMPANIES 1-10, JOHN DOE
INDIVIDUALS 1-10,

                 Defendants.

C.A. No. 2:18-cv-01022

CLASS ACTION

**DECLARATION OF JULIE
PECHERSKY PLITT IN SUPPORT
OF CONSOLIDATION AND
APPOINTMENT OF OXMAN LAW
GROUP AS INTERIM LEAD
COUNSEL AND IN OPPOSITION
TO MOTIONS OF BERGER
MONTAGUE**

I, Julie Pechersky Plitt declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a Partner of the law firm of Oxman Law Group ("Oxman"), counsel of record for Plaintiffs Etta Calhoun, Sherry Porter, Cynthia Gray, Geta Miclaus and Vim and Kevin Byrne ("*Calhoun* Plaintiffs") in the above captioned actions.

2.      I submit this Declaration in support of *Calhoun* Plaintiffs' motion for consolidation for pretrial purposes, for Oxman to be appointed interim lead counsel and in opposition to the motions of Berger Montague PC ("BM") for consolidation for "all purposes" and for BM to be appointed interim lead counsel. I have personal knowledge of the facts in this Declaration.

3.      In September 2017, I was approached by a potential plaintiff concerned with InventHelp's fraudulent conduct. Oxman then began a lengthy and intensive investigation to determine whether InventHelp was engaging in fraud and otherwise actionable behavior, and to determine whether such malfeasance was occurring on a systemic, company-wide basis.

4.      On June 1, 2018 Oxman filed the *Calhoun* complaint.

5.      At some point shortly thereafter, a seemingly informational "Alert" was posted on the website, Classaction.org, entitled, "*InventHelp Hit with Class Lawsuits Over Invention Promotion Scam.*"

6.       The "Alert" actually attached the *Calhoun* Complaint and quoted language from the Complaint verbatim. A true and correct copy of a March 14, 2019 screenshot entitled, "*InventHelp Hit with Class Lawsuits Over Invention Promotion Scam*" is attached as Exhibit A to the Declaration of Julie Pechersky Plitt dated June 9, 2020 ("Plitt Dec.") and is located at *Calhoun* ECF Doc. No. 122-1.

7.      The "Alert" contains the directive, "To learn more about the lawsuits and how you can get involved, simply fill out the form on this page," and elsewhere states, "Fill out

the form on this page and tell us what happened to you.  One of the attorneys handling this investigation may then reach out to you directly."

8.     As it turns out, the "Alert" was a client solicitation for BM.  However, it nowhere identified that it is an advertisement on behalf of BM.  Instead, it posted the *Calhoun* Complaint and quoted extensively from it.  When I discovered the posting I had no idea that it was in any way connected to BM.

9.     The solicitation violates Pennsylvania Rule of Professional Conduct Section 7.2(i), which states:  "All advertisements and written communications shall disclose the geographic location, by city or town, of the office in which the lawyer or lawyers who will actually perform the services advertised principally practice law.  If the office location is outside the city or town, the county in which the office is located must be disclosed."

10.     The solicitation does not disclose the manner in which Classaction.org is compensated by BM for posting this advertisement.

11.     The solicitation thus also runs afoul of Pennsylvania Rule of Professional Conduct 7.2(k), which directs that "A lawyer shall not, directly or indirectly (whether through an advertising cooperative or otherwise), pay all or part of the costs of an advertisement by a lawyer not in the same firm or by any for-profit entity other than the lawyer's firm, unless the advertisement discloses the name and principal office address of each lawyer or law firm involved in paying for the advertisement and, if any lawyer or law firm will receive referrals from the advertisement, the circumstances under which referrals will be made and the basis and criteria on which the referral system operates."

2

12.     In early 2019 I filled out the form provided on the InventHelp solicitation on the Classaction.org website using my personal email address. At that point, I had no idea that it was a solicitation on behalf of BM.

13.     On April 9, 2019 I received an email from BM responding to the form and offering a "free consultation." At that point, the Classaction.org solicitation quoting from and attaching the *Calhoun* Complaint remained online.

14.     I called the number provided in the email and spoke with associate Devona Thomas, who stated that she was assigned to the case. I posed numerous questions about the *Calhoun* Action, including explicitly referencing Plaintiff Etta Calhoun's "Word of God Bedding," and at no point did Ms. Thomas disclose that BM was not representing the *Calhoun* Plaintiffs and that BM in fact had not filed any action against InventHelp whatsoever.

15.     According to the May 19, 2020 *Austin* Plaintiffs' Motion to Attend Rule 16 Conference, BM attended "an in-person settlement conference at Defendants' counsel's offices in Pittsburgh PA on August 9, 2019 . . . that was also attended by Mr. Robert Susa, President of InventHelp." (*Calhoun* ECF No. 116, ¶ 6).

16.     As of that date, August 9, 2019, BM had not filed any action and the solicitation on Classaction.org that attached the *Calhoun* Complaint was online collecting potential plaintiffs.

17.     On or about October 25, 2019, BM filed the *Austin* Complaint. The Complaint did not name Mr. Susa as a Defendant. This is curious to say the least, given that the American Inventors Protection Act provides for strict *personal liability* of "the officers, directors, or partners" of invention promotion companies found in violation of the Act. 35 U.S.C. § 297(b)(1).

18.    The *Austin* Complaint did not name Universal Payment Corporation, the "financing arm" of InventHelp, as a Defendant.  This is curious to say the least, given the integral part that entity plays in InventHelp's malfeasance.

19.    The *Austin* Complaint did not name Technosystems Consolidated Corporation, the InventHelp Defendants' parent company, as a Defendant.  This is curious to say the least, given that it is a potentially deep-pocket Defendant.

20.    The *Austin* Complaint did not name the patent attorney Thomas Frost Defendants.  This is curious to say the least, given that Mr. Frost was an indispensable part of the fraud, and his deposition will almost certainly give rise to key evidence.

21.    Immediately after filing *Austin* on October 25, 2019, BM and Classaction.org revised the advertisement, removing the *Calhoun* Complaint link and quotes, and replacing them with the *Austin* Complaint and new quotes from that action.  A true and correct copy of an April 1, 2020 screenshot is attached as Exhibit B to the Plitt Dec. and is located at *Calhoun* ECF Doc. No. 122-2.

22.    That new advertisement still does not comport with the requirements of the Pennsylvania Rules of Professional Conduct because it does not identify that it is soliciting clients on behalf of BM and it does not disclose the manner in which Classaction.org is compensated by BM, although it does attach the *Austin* Complaint and remove the *Calhoun* Complaint.

23.    On or about October 29, 2019 I spoke with Messrs. Carson and Kahana about their copy-cat action.  I took contemporaneous notes during that conversation, which I retained.  They told me that they met with InventHelp President Robert J. Susa during the summer.  I was taken aback.

4

24.     According to my notes taken during that call, Shanon Carson told me that BM began investigating a potential action against InventHelp in February 2019. Peter Kahana told me that he had been referred an InventHelp client around that time and was examining the issues when *Calhoun* "appeared on the docket." At the time, I did not find these statements credible in part because I knew BM had been soliciting clients via the Classaction.org advertisement quoting from the *Calhoun* Complaint. Contrary to his representations to me on the October 29, 2019 call, Mr. Carson now claims that BM began investigating *Austin* in the "late summer/early fall of 2018." (*Austin* Motion ¶ 21).

25.     On January 15, 2020, the InventHelp Defendants filed a motion for sanctions against Oxman Law, requesting a Court Order demanding removal of a website describing the lawsuit launched by Oxman. (*See Calhoun* ECF Nos. 75, 76). Curiously, the InventHelp Defendants did not make a corresponding motion against BM, even though the *Austin* case had been filed by that point and the language on BM's solicitation on Classaction.org was virtually identical to that on Oxman's website. This is particularly noteworthy because the BM Classaction.org solicitation is extremely-well optimized and is likely viewed by many more people than the Oxman InventHelp website, collecting, in Mr. Carson's own words, thousands of potential plaintiffs. InventHelp moved against Oxman, but not BM.

26.     Shortly after BM filed *Austin,* I began exploring partnerships with other law firms because I anticipated that BM would move to consolidate and be appointed lead counsel. After discussions, Ira Press and I signed a joint prosecution agreement on behalf of Kirby McInerney LLP ("Kirby") and the Oxman Law Group ("Oxman"). On April 1, 2020, Kirby attorneys Ira M. Press, Andrew M. McNeela and Karina Kosharskyy filed notices of appearance and motions to appear *pro hace vice.*

27.     On April 1, 2020, Oxman and Kirby filed a motion for consolidation and for appointment as interim lead counsel. The papers submitted in support of that motion attached the misleading Classaction.org advertisement and representations by BM and unmasked BM's deceptive solicitation in violation of the Pennsylvania Rules of Professional Conduct. (*See Calhoun* ECF Nos. 99-4, 99-5).

28.     After the April 1 filing, in a tacit acknowledgement that its solicitations ran afoul of the Pennsylvania Disciplinary Rules, Berger again revised the solicitation on Classaction.org, *for the very first time* inserting the language, **"The information submitted on this page will be forwarded to Berger Montague who has sponsored this investigation."**   A true and correct copy of a May 19, 2020 screenshot is attached as Exhibit C to the Plitt Dec. and is located at *Calhoun* ECF Doc. No. 122-3.

29.     However, the advertisement still does not disclose "the name and principal office address of each lawyer or law firm involved in paying for the advertisement and, if any lawyer or law firm will receive referrals from the advertisement, the circumstances under which referrals will be made and the basis and criteria on which the referral system operates." Pa.R.Prof.C. 7.2(k).

30.     Following several rounds of negotiations, on May 14, 2020, parties in the *Calhoun* Action filed a joint Rule 26(f) Planning Meeting Report. (*Calhoun* ECF No. 114).

31.     On May 14, 2020, the *Calhoun* parties filed a joint Stipulation Selecting ADR Process. (*Calhoun* ECF No. 115). That Stipulation states, "The parties have not agreed upon a neutral at this time . . . . However, the parties will continue to work diligently to identify an agreed-upon neutral and will advise the Court once the parties have come to an agreement."

32.     The Court scheduled a telephonic case management conference in *Calhoun* for May 21, 2020 in accordance with the Initial Local Rule 16.1 Scheduling Order entered on April 23, 2020. (*Calhoun* ECF No. 110).

33.     The first time BM informed Oxman and Kirby of their intention to file a "motion to attend" the May 21 Conference in the *Calhoun* Action was *8:50 a.m.* the morning of May 19, 2020.  A true and correct copy of Berger's May 19, 2020 email is attached as Exhibit E to the Plitt Dec., located at [].  In the email, BM vaguely asserted that they had "information to share with you and the Court about the litigation"— without providing further explanation – and asked the *Calhoun* Plaintiffs to respond by no later than *10:30 a.m.* whether they consented to the *Austin* Plaintiffs' request.  *Id.*  Berger filed the *Austin* Plaintiffs' "Motion to Attend Rule 16 Conference" that same day at *11:48 a.m.*  *See Calhoun* ECF No. 116.  It was only upon reading their motion papers that the *Calhoun* Plaintiffs first learned of BM's and InventHelp's settlement-related maneuverings.

34.     On the morning of May 19, 2020, just two days before the originally scheduled *Calhoun* Rule 16 Conference, BM filed a "Motion for Leave to Attend Rule 16 Conference," representing that they and InventHelp had agreed to participate in a June 4, 2020 mediation and that "Berger Montague invites *Calhoun-Miclaus* Plaintiffs' counsel to attend and participate in the mediation . . . should they desire to do so.  Berger Montague has met and conferred with Defendants on this point who state they have no objection." (*Austin* Motion ¶ 12).

35.     The *Austin* Plaintiffs represented that they and InventHelp had already engaged a Philadelphia mediator Diane M. Welsh, to conduct the mediation. (*Austin* Motion ¶ 7).  The *Austin* Plaintiffs' counsel are located in Philadelphia.  The InventHelp Defendants' lead counsel

7

practiced for many years in the Philadelphia office of Fox Rothschild. The *Calhoun* Plaintiffs'
counsel had absolutely no role in the selection or engagement of that mediator.

36.     Kirby and Oxman immediately began work on an aggressive opposition to BM's
"motion to attend," drafting papers until past midnight that contained details about BM's
solicitations on Classaction.org, among other things.



39.     Ira and David told me that at BM's behest, Kirby would "fall on its sword" and relinquish the lodestar it had accumulated in the *Calhoun* Actions (which was not insubstantial). Kirby would bow out of the *Calhoun* Actions in exchange for future partnerships between Kirby and BM in the antitrust field that would be profitable for Kirby.



42.     Although I was hesitant to partner with BM due to my previous interactions with Shanon Carson, I said that I would think about it, and agreed not to file the papers that Kirby and Oxman had drafted.

43.     Days passed and Ira and I discussed Kirby remaining in the case at least for the short term in order to attend the June 4 mediation – Ira was hopeful that the *Calhoun* Plaintiffs' presence at the mediation could pressure InventHelp and BM to agree to provide meaningful relief to the class.

44.     I participated in several pre-mediation calls with Shanon Carson and his team that left me feeling uneasy.

45.    On the morning of May 27 I had another conversation with David Kovel and Ira Press of Kirby. David told me that now that Oxman and Kirby had not filed the papers that BM was worried about, BM no longer felt the need to partner with Oxman.

46.    Ira and I agreed that Kirby and Oxman would attend the mediation on behalf of the *Calhoun* Plaintiffs. Nonetheless, Ira made clear both before and after the mediation that Kirby would no longer join in any papers opposing BM because doing so would jeopardize future partnerships.

47.    Section 3.6 of the Western District ADR Policies and Procedures states, "The mediator must schedule a brief joint telephone conference with counsel and any unrepresented parties before the mediation session to discuss matters such as the scheduling of the mediation, the procedures to be followed, the nature of the case, and which client representatives will attend.

51.     On behalf of the *Calhoun* Plaintiffs, Marc S. Oxman, Ira Press, Andrew McNeela, Karina Kosharskyy and I attended the June 4 mediation, which began at *9:30 a.m.*

52.     BM's memorandum in support of motion to appoint Shanon J. Carson and Peter R. Kahana of BM as interim lead counsel makes the following statement:  "Mr. Oxman attended that first day of the mediation only partially before leaving (demonstrably showing his disinterest in the case).  Ms. Plitt attended most of the mediation but she too left before the mediator declared the first day concluded."

53.     These statements are totally misleading.

54.     In total, the mediation ran from *9:30 a.m.* to approximately *8:30 p.m.*, 11 hours.

60.    I have been practicing law for 22 years and have never experienced anything like this mediation.

74.     On June 10, I served BM and InventHelp counsel a proposed motion for sanctions for engaging in mediation in bad faith.

75.     Oxman and counsel for the InventHelp Defendants conducted a meet and confer regarding the proposed motion for sanctions on June 17. During that call counsel for InventHelp pointedly asked about Kirby's continued participation in the case, seeming to indicate that they, along with BM, were eagerly awaiting the withdrawal.

76.     I repeatedly attempted to schedule a meet and confer with BM regarding the proposed sanctions motion. BM ignored emails and resisted those efforts. BM finally agreed to a call on June 25, so long as InventHelp could also participate.

77.     Not so coincidentally, on June 24, the day before the meet and confer, Ira called me and said that he was under pressure from his partners and BM to file a notice of withdrawal that day. On June 24, Kirby filed its notice.

78.     The very next day, Shanon Carson filed papers to be appointed lead counsel, relying heavily upon Kirby's withdrawal as support: "Most tellingly, Plitt/Oxman's own co-counsel [Kirby] filed a motion yesterday to completely withdraw from the case . . . apparently for irreconcilable conflicts with Plitt/Oxman . . . [who] took positions that [Kirby] would not support." (BM Mem. at 4).

79.     BM's papers make the knowingly false assertion that Kirby withdrew because Kirby attorneys were "witnesses to Plitt/Oxman's conduct and know the falsity and absurdness of Plitt/Oxman's allegations." (BM Mem. at []). BM characterizes me as "silly" and states:

15

"[Kirby's] withdrawal [] from its relationship with Plitt/Oxman and from the *Calhoun* case entirely speaks volumes."

80.     Elsewhere BM misleadingly states, "Most tellingly, Plitt/Oxman's own co-counsel [Kirby] filed a motion yesterday to completely withdraw from the case . . . apparently for irreconcilable conflicts with Plitt/Oxman . . . [who] took positions that [Kirby] would not support" (*id.* at 4) and argues that the withdrawal was due to "Plitt/Oxman's conduct" (*id.* at 16).

81.     In fact, the public filings drafted and signed by Kirby show that Kirby and Oxman were at that time on the same page *vis-à-vis* BM. (*See Calhoun* ECF Nos. 99, 107). Only after BM's back-door machinations with Kirby did Kirby change its tune.

82.     Oxman is not averse to partnering with another law firm in the prosecution of these actions, as evinced by the partnership with Kirby, as well the current partnership offers that Oxman is entertaining that are set forth below. It would have been the path of least resistance to partner with BM after they filed *Austin*. However, Mr. Carson has been uncooperative and disingenuous despite his representations to the contrary.

83.     The July 8 teleconference with the Court is a case in point, and is only the latest in a string of similar incidents. Mr. Carson reached out to me by email on July 7 and we spoke by telephone. We discussed whether and how we could move forward cooperatively. During two calls, Mr. Carson repeatedly suggested that we take a week to potentially work out a deal. After what I thought were productive and relatively pleasant conversations, I took him at his word. However, at *8 p.m.* Mr. Carson sent me an email with a proposed agreement between BM and Oxman, and informing me that I was required to sign the contract *that night* in order to proceed. Then, during the July 8 conference, Mr. Carson refused to consent to the one-week adjournment that he himself had suggested. Flabbergasted, I said nothing. These antics

16

employing artificial time-pressure, about-faces, and generally untrustworthy representations appear to be his modus operandi.

84.    I attended the University of Pittsburgh and then graduated from New York University School of Law in 1998. Following work with the Honorable Timothy K. Lewis (Ret.) of the U.S. Court of Appeals for the Third Circuit and the Honorable Sylvia H. Rambo of the United States District Court for the Middle District of Pennsylvania, I joined the law firm of Rosenman & Colin LP, which later merged with another firm to become Katten Muchin Rosenman LLP. I made Partner in 2007. During my many years at that firm, my practice was almost exclusively comprised of class action litigation; in fact, I was privileged to consistently work with Joel W. Sternman, the attorney who argued *Basic Inc. v. Levinson*, before the U.S. Supreme Court, the seminal case articulating the fraud-on-the-market theory used in every single securities class action to this day. I joined the Oxman Law Group in 2016 to work with attorney Marc S. Oxman, who is a brilliant trial attorney who has tried over 200 jury cases. The CV of Oxman Law is found on the *Calhoun* Docket at 99-9.

85.    I have been practicing law longer than Mr. Carson, but until this case, the majority (though not all) of my class action experience has been on the defense side of the table. Recognizing that the Court may prefer that Oxman partner with a plaintiffs'-side class action firm, Oxman partnered with Kirby. That partnership ended as set forth above.

86.    After losing Kirby, I began looking for a new partner firm. David Worby of Worby Veccio Edelman, LLP has agreed to co-counsel with Oxman on this case. Mr. Worby and his firm were co-lead counsel in the largest class action in New York City history, resulting in a settlement amount of over $1 billion related to the September 11 tragedy. He and his firm certainly have the experience and resources to manage this action alongside

Oxman. I am also in discussions with the Chair of the Class Action Group of Newman Ferrara, who has acted as lead counsel in numerous cases resulting in substantial settlements in the tens of millions, as well as Robert Peirce & Associates, P.C., a Pittsburgh class action and mass torts firm. However, from a business perspective it does not make sense to enter into a formal partnership until Oxman learns whether it will have a leadership role in this case, as without one, a partnership is unnecessary.

87.    I declare under penalty of perjury that the foregoing is true and correct.

Dated: White Plains, New York
       July 13, 2020


                                          /s/ Julie Pechersky Plitt
                                          Julie Pechersky Plitt

**CERTIFICATE OF SERVICE**

I, Julie Pechersky Plitt, hereby certify that on July 13, 2020, I caused a true and correct copy of

the foregoing declaration to be filed and served electronically via the Court's ECF system.


/s/ Julie Pechersky Plitt
Julie Pechersky Plitt, Esq.
 (Bar No. JP-8607)